# EXHIBIT A

EFiled:  Jul 10 2019 04:05PM EDT
Transacation ID 63531729
Case No. 2019-0532-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| BUS AIR, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ANTHONY R. WOODS and | ) |
| E3 RIVERS, LLC f/k/a BUS AIR | ) |
| MANUFACTURING, LLC, | ) |
| | ) |
| Defendants. | ) |

### VERIFIED COMPLAINT

Plaintiff, Bus Air, LLC ("Bus Air"), for its verified complaint against Defendants, Anthony R. Woods ("Mr. Woods") and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("Old Co." and connectively with Mr. Woods, the "Defendants"), alleges as follows:

### I.    INTRODUCTION

1.    This is an action against the Defendants for knowing, willful and ongoing breaches of restrictive covenants not to compete and not to solicit included in the September 25, 2017 Asset Purchase Agreement by and between the Bus Air and the Defendants (the "APA").

2.    Bus Air has recently discovered that the Defendants are breaching restrictive covenants entered into in connection with the asset purchase, in which

1

they were paid tens of millions of dollars, by competing in the subject aftermarket bus air conditioning space and soliciting both Bus Air's customers and employees.

## II.   PARTIES

3.     Plaintiff Bus Air is a Delaware limited liability company with principal place of businesses in Rhome, Texas and Tulsa, Oklahoma.  Bus Air is a well-established manufacturer, installer, service provider and parts provider of air conditioning systems to the motor vehicle market. Bus Air specializes in buses, emergency vehicles and large trucks.   Bus Air's parent company, Pro Air Holdings, LLC, is a Delaware limited liability company.

4.     Mr. Woods is an individual residing in Decatur, Texas and is the principal owner and controlling person of Old Co.   He is a sophisticated businessperson who was instrumental in scaling Old Co. to its size prior to the APA.  In this capacity, Mr. Woods had a number of personal relationships with key customers and spent personal time with most of them as he grew the Business. The largest customer was Longhorn Bus Sales ("Longhorn") with whom he still has a relationship. Mr. Woods also had excellent relationships with Summit Bus, Midwest Transit, Capital City, Creative Bus, Rosenbauer, along with a long list of Directors at independent school districts ("ISDs") in Texas and other states.  These customers account for over 90% of Bus Air's present business.

2

5.     In addition, Mr. Woods is, upon information and belief: (i) the sole and managing member of 6630 East Hwy 114, LLC, which is the landlord of Bus Air's facility located at 6630 East Highway 114, Rhome, Texas 76078; (ii) the sole and managing member of 1641 East Pine LLC, which is the landlord of Bus Air's facility located at 1641 E. Pine Street, Tulsa, Oklahoma; (iii) the sole and managing member of a certain entity named Building 380, LLC ("Building 380"), which is an affiliate of the Defendants; and (iii) a silent member, financial backer or beneficiary of WW Sales, LLC ("WW"), which is an affiliate of the Defendants.

6.     Old Co. is a Texas limited liability company.  At all times relevant hereto, and regardless of Old Co.'s name, Mr. Woods has been the sole and managing member of Old Co.  As such, the acts of Mr. Woods are one and the same as those of Old Co. and vice versa.

### III.   <u>JURISDICTION AND VENUE</u>

7.     Under the APA, the Defendants agreed that "[a]ll disputes, litigation, proceedings or other legal actions by any party to [the APA] shall be instituted exclusively in the courts of the State of Delaware or of the Unites States of America in the State of Delaware."  <u>See</u> Section 10 of the APA, a true and correct copy of which (without schedules, attachments and disclosures) is appended hereto as <u>Exhibit 1</u>.  Since the claims asserted by Bus Air in this case relate solely to the

3

transactions memorialized in the APA, this Court has personal jurisdiction over the Defendants.

8.      This Court has subject matter jurisdiction over this matter pursuant to 10 *Del. C.* § 341 because, among other things, Bus Air seeks injunctive relief.

## IV.    FACTUAL BACKGROUND

### A.    The Parties Execute The APA

9.      After months of negotiation concerning Bus Air's purchase of, among other things, the Defendants' Business (as defined by the APA), the parties executed the APA and the asset purchase closed on September 25, 2017 (the "Closing").   All parties to the APA were represented by separate counsel throughout the due diligence and negotiation processes and at the time of Closing. At Closing, Bus Air paid the Defendants $18,190,000 in cash consideration, which consideration paid for, amongst other things, the goodwill of Old Co.

10.     The APA defines "Business" as "the business of designing, engineering, providing, manufacturing, installing, servicing and providing parts to the motor vehicle air conditioning industry", which the Defendants  sold to Bus Air pursuant to the APA.  See Exhibit 1, p. 1, 2nd Whereas clause.

11.     The Business of Bus Air is the same Business Old Co. was engaged in prior to the Closing and has significant good will and other value to Bus Air.

12.     After Bus Air purchased the Business, Bus Air took over Old Co.'s pre-Closing facilities in Rhome, Texas and Tulsa, Oklahoma (which are ultimately owned by the Defendants) and continued operating the Business in the same fashion as it had been previously operated by Old Co., proving the same goods and services to the same customer base.

13.     Since Bus Air was acquiring the Business for substantial consideration, an important feature of the transaction was an agreement by Defendants that they would not engage in a similar "Business" for a period of five years after Closing.  Section 7.4 of the APA includes restrictive covenants to which the Defendants are personally bound that were critical to Bus Air's willingness to enter into the APA, which Section provides in pertinent part:

7.4.   <u>Noncompetition and Nonsolicitation</u>. The Company and each Stockholder, jointly and severally, hereby acknowledge and agree that *the covenants and agreements set forth in this Section 7.4 are a material inducement to Buyer* to enter into this Agreement and to perform its obligations hereunder, and that *Buyer would incur a significant loss of the goodwill being purchased as part of the transactions contemplated hereby if either the Company or the Stockholder were to breach any of the provisions of this Section 7.4.* Therefore, in order to facilitate the consummation of the transactions contemplated hereby, the Company and the Stockholder, jointly and severally, agree that for the Restricted Period (as defined below), neither the Company nor the Stockholder will, in any such case or in any manner whatsoever, engage directly or indirectly (whether through Affiliates or otherwise) in all or any portion of the Business as conducted as of the Closing Date anywhere in North America; <u>provided</u>, <u>however</u>, that the passive ownership of less than 1% of the outstanding stock of any publicly-traded corporation will not be deemed, solely by reason thereof, a violation of this

5

Section 7.4.  In addition, for the applicable Restricted Period, the Company and the Stockholder, jointly and severally, agree that neither the Company nor the Stockholder will, in any such case (i) recruit, offer employment, employ, engage as a consultant, lure or entice away any Person who is or was an employee or independent contractor of the Company at any time during the twelve (12) month period preceding the date on which any of the foregoing actions would take place, (ii) solicit business from any Person (or any successor in interest to any such Person) which is or was during the twelve (12) month period preceding the Closing Date a contractor, customer, supplier or service provider with or to the Company for the purpose of securing business or contracts related to the Business, or (iii) solicit, encourage, initiate or participate in discussions or negotiations with, or provide any information to, any present or future contractor, supplier or service provider with or to the Company with respect to the termination or adverse alteration of his, her or its relationship with the Company.  For purposes of this Section 7.4, "Restricted Period" means a period of five years from and after the Closing Date….

(the "Restrictive Covenant") (Emphasis added in bolded italics.)

14.     The Defendants explicitly acknowledged and agreed that a breach of the Restrictive Covenant would cause Bus Air to incur a significant loss of goodwill and that the protections were a material inducement for Bus Air to enter into the asset purchase. See Exhibit 1, Section 7.4.

15.     The Defendants explicitly acknowledged and agreed not to directly *or indirectly* compete against Bus Air in the Business. See Exhibit 1, Section 7.4.

16.     The Defendants explicitly acknowledged and agreed not to solicit any current or potential customer or employee of Bus Air. See Exhibit 1, Section 7.4.

6

17.    Under the APA, the Defendants' obligations under the Restrictive Covenant continue in full force and effect until September 25, 2022.  See Exhibit 1, Section 7.4.

## B.    The Defendants -- Personally And Through Affiliates And Others -- Knowingly Violate the Restrictive Covenant

### i.    Chad and Adam Whitton

18.    Despite being bound by the Restrictive Covenant until 2022, information developed through industry vendors and Bus Air competitors has established that the Defendants have created a new and competing business to harm Bus Air's Business acquired under the APA.

19.    Indeed, Bus Air recently discovered from a Decatur, Texas resident, that, upon information and belief,  Mr. Woods' youngest son, Ty Woods, told certain persons close to him in connection with the Business, "my father [Mr. Woods] sold his first empire and he is starting up a new one,"  within the last month.

20.    Mr. Woods' son's comments are consistent with statements made by an industry service person to Bus Air's Warranty Manager, Kris Culver, that the Defendants and Chad Whitton (identified more fully below) were going to "steal all of [Bus Air's largest client] Longhorn's business and do install in Decatur."

7

21.     The Defendants have attempted to actively conceal from Bus Air their activities in violation of the Restrictive Covenant.  As a result, Bus Air does not presently know the extent of these activities, but has learned the following facts from different sources of information:

　　　　a.　　the Defendants created shell companies to cover the Defendants' unlawful conduct; and

　　　　b.　　the Defendants enlisted Chad Whitton and Adam Whitton (jointly, the "Whittons") to carry out the Defendants' efforts to compete against Bus Air and solicit away Bus Air's business and employees.

22.     Upon information and belief, the Whittons are Mr. Woods' nephews or otherwise closely related to Mr. Woods.

23.     Chad Whitton and Adam Whitton are not signatories to the APA; however, the Whittons are both former employees of Old Co.

24.     After the Closing, the Whittons, like Mr. Woods, became employees of Bus Air subject to certain at-will employment agreements.  Solely as a result of their relationship with the Defendants, the Whittons had access to detailed information about the Business and used this information for on behalf of and with the direct assistance of the Defendants to compete with Bus Air.

8

25.     The Whittons were informed, aware or otherwise on notice of the APA and the various obligations the Defendants owed thereunder, including Restrictive Covenant, and thus knew the Defendants were barred from reentering the Business for a set time and within a set geographical area.

26.     After the Closing, the Defendants paid approximately $1,000,000 to Chad Whitton and $465,000 to Adam Whitton.  See Exhibit 2 appended hereto, which is a true and accurate copy of a December 12, 2017 email from Mr. Woods to Chad Whitton forwarding an email from earlier that same day concerning monies paid the Whitton's from the Closing proceeds.

27.     Upon information and belief, the Whittons did not and do not have the financial means or expertise on their own to create and operate a new company engaged in the Business, while the Defendants do have such resources.  After the Whittons' employment with Bus Air terminated in February 2018, and Mr. Wood's employment terminated in June 2018, Mr. Woods did not take up new employment.  The Whittons took up work as roofers.

28.     Due to their close personal relationship as detailed herein, the Whittons are beholden to the Defendants personally, professionally and financially.

9

ii.     **The Defendants Compete Directly or Indirectly With, and Solicit Directly or Indirectly From and Against Bus Air**

29.     On or about September 19, 2018, the Defendants formed Building 380.  See Exhibit 3.

30.     Building 380 acts as a shell to conceal the actual ownership of real property upon which the Defendants have set up a venture to compete with Bus Air.

31.     On or about November 13, 2018, the Whittons formed WW with, upon information and belief, the substantial assistance and financial backing of and at the direction of the Defendants.  As described herein, upon information and belief, the Whittons and WW act as a front for the Defendants to engage in activities that are covered by the Restrictive Covenant, for the sole purpose of concealing the Defendants' continuing violations of the Restrictive Covenant.  See Exhibit 4.

32.     A mere three calendar days after WW was formed, on November 16, 2018, the Defendants, through Building 380, purchased real property located in Decatur, Texas (the "Premises").  See Exhibit 5.

33.     Thereafter, the Defendants constructed a facility on the Premises specifically designed, engineered and outfitted to service buses, including the installation and maintenance of air conditioning systems, as well as final inspection

10

and wash, all part of the services Old Co. provided prior to the sale to Bus Air (i.e., the "Business").  See Exhibit 6.

34.     The Defendants intended for WW to, and WW presently does directly compete with Bus Air by performing the same Business the Defendants engaged in prior to the Closing.

35.     Upon information and belief, Building 380 and WW and/or the Whittons entered into a lease or some other arrangement for the occupation and use of the Premises for the sole and express purpose of permitting the Defendants to compete in the Business through Building 380, the Whittons and/or WW.

36.     The Defendants benefit from WW's occupancy of the Premises in a variety of ways, including but not limited to the following:

a.  the Defendants are financially backing WW and/or the Whittons and their business activities in direct competition with Bus Air; and

b.  the Defendants also receive benefits from the income generated from the lease or other arrangement that Building 380 has with WW and/or the Whittons – i.e., income derived from a building expressly and intentionally designed, engineered and outfitted to house operations that compete directly with Bus Air's Business.

37.     WW and/or the Whittons operate the competing business at the Premises serving buses for a variety of entities, including Bus Air's customers such

11

as Longhorn and ISDs.   However, despite its active business activities, WW seemingly has no website or other presence in the internet, further evidencing the Defendants' attempts to conceal their activities.

38.   For and at the direction of the Defendants, WW and/or the Whittons have directly targeted Bus Air's customers intending to solicit them away from Bus Air by, among other methods, acting as outside installer of aftermarket bus air conditioning for Bus Air's principal competitor, Bergstrom Inc. ("Bergstrom"). The Whittons and/or WW perform their work for Bus Air competitor Bergstrom on the Premises, which further benefits the Defendants.

39.   The Defendants had a long-standing relationship with Bergstrom prior to the Closing and, in violation of the Restrictive Covenant, have used that connection to directly or indirectly divert business from Bus Air to WW and/or the Whittons.   See e.g., Exhibit 7 appended hereto, which is a true and accurate screen shot taken from Bergstrom's Facebook page showing Chad Whitton (on the right side) and Adam Whitton (on the left side) being publicly touted as a "partners" with Bergstrom.

40.   To assist in the Whittons' and/or WW's efforts for the Defendants, and for and at the direction of the Defendants, Chad Whitton also solicited away the entire Bus Air Installation team in April 2019, who now work at the Premises. These Bus Air employees were targeted because they possessed confidential and

12

proprietary Bus Air information that would allow the installers to repair Longhorn electrical systems that, prior to the installer's arrival, WW and the Whittons could not accomplish.  Chad Whitton also attempted to solicit the services of a Bus Air delivery driver Jerry Easterwood.

41.     In addition, for and at the direction of the Defendants, the Whittons contacted industry suppliers, including, but not limited to Brad Hickman of Texas Coils, Pat Hennessy of DCM Manufacturing (concerning fans, motors and blowers), Andre Garcia of Mortex Products (concerning refrigeration coils), Earl Armstrong of Cary Products (concerning injection molded and vacuum formed plastic components) and Dave Manning of AMCO Enterprises (concerning fasteners and other specific assembly hardware) about buying products specific to the manufacture, assembly and installation of bus air conditioning  systems.

42.     In one of the more egregious examples of the Whitton's vendor outreach for and at the direction of the Defendants, the Whittons contacted David Manning, VP of Operations at AMCO Fasteners ("AMCO") via telephone, twice, in April 2019.

    a.  As reported by Mr. Manning:

        i.  he has known Mr. Woods for decades and the Whittons for nearly as long;

13

  ii. during the first telephone call by the Whittons to Mr. Manning they attempted to leverage those relationships into Mr. Manning supplying WW the same product he used to supply Old Co.;

  iii. given what Mr. Manning knew of the Defendants' and the Whittons' relationship, Mr. Manning understood Mr. Woods was behind WW;

  iv. Mr. Manning knew Mr. Woods was barred from competing against Bus Air;

  v. as such, Mr. Manning refused to supply WW because of the Bus Air issue; and

  vi. the Whittons were upset Mr. Manning so refused given their long history with him.

 b. Mr. Manning further reported the following information:

  i. Chad Whitton called Mr. Manning a second time shortly after the first telephone call referred to in "a" above and told Mr. Manning that WW was performing Bus Air spillover work for Longhorn;

  ii. Mr. Manning knew Longhorn was a significant Bus Air client;

  iii. Mr. Manning told Chad Whitton that he would check with Andy Beard, Bus Air's present VP Operations and Old Co.'s

14

former Chief Operating Officer and Mr. Wood's former direct report, to determine if Bus Air agreed with Chad Whitton's representations and with AMCO supplying WW, whom Mr. Manning understood Mr. Woods was backing;

iv.   after that second call, Mr. Manning sent Chad Whitton an email dated April 30, 2019 about Mr. Manning's intention to reach out to Mr. Beard (see the true and accurate copy of that email appended hereto as <u>Exhibit 8</u>); and

v.   thereafter, Chad Whitton called Mr. Manning and told him to forget the issue and not call Mr. Beard.

43.    Upon information and belief, the Defendants, through the Whittons, contacted the above-referenced suppliers after the vendors did not return their calls, in large part, because they were aware of the Defendants' "non-compete" with Bus Air.

44.    Bus Air has also learned that the Defendants planned to violate the Restrictive Covenant.  For example, Bus Air learned that in the months prior to Closing, the Defendants told Mr. Beard, who was an employee of Old Co. at that time but is now an employee of Bus Air, that if there were ever a breakdown in the relationship with the parties, the Defendants would reenter the industry and compete with Bus Air.  Bus Air did not learn this information until after Closing.

15

45.    Bus Air has also recently confirmed that, in the months prior to Closing, the Defendants instructed Old Co. staff members to purge personnel files of Old Co.  Bus Air did not learn this information until after Closing.

46.    Prior to discovering the conduct complained of herein, Bus Air did not reasonably believe the Defendants would reengage the market or Business, either directly or indirectly.

47.    Prior to discovering the conduct complained of herein, Bus Air intended to rely upon the Restrictive Covenant to protect its interests from improper competition and solicitation by Defendants.

48.    The Defendants' misconduct described herein has caused significant harm to Bus Air's Business and, left unrestrained, will continue to inflict irreparable harm on Bus Air.

49.    There is immediate risk Bus Air will continue to have its good will and market share impacted, for which there is not adequate remedy at law, if the Defendants not enjoined from their direct and indirect misconduct described herein.

50.    Also, there is immediate risk Bus Air will continue to lose Business if the Defendants are not enjoined from their misconduct described herein.

16

**C.     The Defendants Orchestrated An Improper Preemptory Civil Action In Texas To Avoid Delaware And Their APA Obligations**

51.     Having learned of the Defendants' activities through various sources, Bus Air conducted a preliminary investigation into the facts and issued a cease and desist demand and litigation hold letter to the Defendants and others on June 5, 2019 (the "Demand").

52.     The Defendants owed a response to the Demand by June 12, 2019.

53.     Instead of responding to the Demand allegations in good faith and otherwise complying with the Demand, the Defendants caused their personal counsel to file (i) a preemptory declaratory judgment action in Texas on behalf of WW and the Whittons (the "Texas Action"), as well as (ii) a motion for the Defendants and Building 380 to intervene in the Texas Action ("Defendants' Texas Intervention").  See Exhibit 9.

54.     The APA clearly provides that Delaware law shall govern any dispute between the parties and that any action between the parties shall be instituted in the Delaware courts. See Exhibit 1, Section 10.3. The Defendants filed the Texas Action and the Defendants' Texas Intervention in an overt attempt to avoid the Delaware prosecution called for under the APA.

55.     By the Texas Action and the Defendants' Texas Intervention, the Defendants effectively admit to engaging in conduct in violation of the Restrictive

17

Covenant and seek the Texas court's blessing the same through a declaratory judgment. See <u>Exhibit 9</u>. Specifically, the Defendants describe their conduct that is in violation of the Restrictive Covenant (<u>Exhibit 9</u>, Defendants' Texas Intervention, at ¶ 14), and then ask the Texas court to declare that the Defendants are not liable for any alleged violations of the Restrictive Covenant, or any breach of the APA (<u>Exhibit 9</u>, Defendants' Texas Intervention, at ¶ 19).

56.   The Defendants' filing in the Texas Action demonstrates they never intended to comply with the Restrictive Covenant or Section 10.3 of the APA.

57.   Contemporaneously with the filing of this action, Bus Air is moving to strike the Defendants' Texas Intervention based upon, among other grounds, that the disputes as between Bus Air and the Defendants must be adjudicated by agreement under APA Section 10.3 in Delaware.

58.   Contemporaneously with the filing of this action, Bus Air is moving to abate / stay the Texas Action on, among other grounds, that the Texas Action was filed for the improper purpose of assisting the Defendants in avoiding this Court and further, was improperly brought under the Texas Declaratory Judgment Statute.

59.   Bus Air satisfied all conditions precedent to filing this action.

## V.    RESERVATION OF RIGHTS

60.    In light of the Defendants' extensive and well-organized efforts to conceal relevant conduct and information, Bus Air may discover that additional individuals or entities subject to this Court's jurisdiction have participated in the wrongdoing described herein, or that individuals mentioned in this Complaint have played a more integral role in directly harming Bus Air than Bus Air currently understands. Bus Air reserves the right to amend this Complaint as necessary upon discovery of additional information and/or claims.

## VI.    CAUSES OF ACTION

### COUNT I

### (Breach of Restrictive Covenants)

61.    Bus Air incorporates the foregoing allegations by reference as if fully set forth herein.

62.    The APA is a valid and enforceable contract between Bus Air and the Defendants.

63.    The Restrictive Covenant of the APA is valid and enforceable as drafted.

64.    As a direct and proximate result of the Defendants' direct or indirect misconduct described more fully above, they are in material breach of the APA.

19

65.     As a direct and proximate result of the Defendants' direct or indirect misconduct described more fully above, Bus Air has suffered and will continue to suffer irreparable harm and other injuries and damages.

66.     Bus Air will continue to suffer such harm unless and until the Court restrains continuing violations of the Restrictive Covenant.

## COUNT II

### (Indemnification)

67.     Bus Air incorporates the foregoing allegations by reference as if fully set forth herein.

68.     Section 8.1(a) of the APA requires the Defendants to indemnify Bus Air "from, against and in respect of any and all actions, liabilities, . . . fees, costs (including costs of investigation, defense and enforcement of [the APA]), expenses or amounts paid in settlement . . . whether or not involving a Third Party Claim . . ." for any action related to the APA.  See Exhibit 1, Section 8.1(a).

69.     Section 8.1(a) requires the Defendants to indemnify Bus Air in connection with the Texas Action and the Defendants' Texas Intervention.

70.     Section 8.1(a) requires the Defendants to indemnify Bus Air in the present action for, among other things, its fees and costs.

PHIL1 8086819v.6

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Bus Air, LLC respectfully requests that the Court:

1.     Enter an Order allowing the Bus Air's requests for expedited relief.

2.     Enter judgment in favor of Bus Air in an amount to be determined at trial.

3.     Enter a preliminary and permanent injunction until September 25, 2022 enjoining the Defendants from engaging directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) in all or any portion of the Business anywhere in North America.

4.     Enter a preliminary injunction ordering the Defendants and their Affiliates to:

   a.   immediately terminate all agreements they  have directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendants) with any entity or person in the Business concerning bus air conditioning related services;

   b.   immediately cease and desist soliciting customers directly or indirectly (be it by or through, Building 380, LLC, WW Sales, LLC,

21

Chad Whitton, Adam Whitton or others affiliated with the Defendants) in any manner relating to the Business;

c. immediately cease and desist soliciting Bus Air employees directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendant);

d. immediately cease and desist taking payment of rent or any other form of consideration for use of the Premises associated with anything related to the Business;

e. immediately cease and desist using the Premises for anything related to the Business;

f. immediately terminate and cease to implement any contract, agreement or arrangement (written, verbal or otherwise) concerning the Business by and among the Defendants, Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendants;

g. certify to the Court, with a copy to Bus Air's counsel, within three (3) calendar days from the date of the Order, that the Defendants have taken the actions required by paragraphs 4(a)-(f) above;

h. provide a written accounting to the Bus Air's counsel of record, no later than seven (7) calendar days from the Court's Order listing:

1. the names, addresses and other contact data for all entities and/or persons the Defendants directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) solicited and/or actually contracted with to provide goods or services related to the Business since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC);

2. the names, addresses and other contact data for all entities and/or persons the Defendants directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) solicited for employment or services on behalf of the Defendants or any of their Affiliates since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC); and

3. of all monies and/or other consideration the Respondents received from entities and/or persons the Defendants directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with

23

the Defendants) solicited and/or actually contracted with since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC).

5.      Preliminarily and permanently enjoin the Defendants from taking any action prohibited by APA.

6.      Award Bus Air its attorneys' fees and costs pursuant to APA Section 8.1(a); and

7.      Award Bus Air such other relief as the Court deems just and proper.

Dated: July 10th, 2019

**KLEHR HARRISON**
**HARVEY BRANZBURG LLP**

*/s/Richard M. Beck*
Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

*Attorneys for Bus Air, LLC*

**OF COUNSEL**

Thomas T. Reith
Kelly Kirby
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone (617) 345-3000
treith@burnslev.com
kkirby@burnslev.com

24

EFiled:  Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of the 25th day of September, 2017 (the "Effective Date") by and among (i)BUS AIR, LLC, a Delaware limited liability company ("Buyer"), (ii) BUS AIR MANUFACTURING, LLC, a Texas limited liability company (the "Company"), and (iii) Anthony R. Woods (the "Stockholder").

WHEREAS, the Stockholder owns all of the membership interests of the Company;

WHEREAS, the Company is engaged in the business of designing, engineering, providing, manufacturing, installing, servicing and providing parts to the motor vehicle air conditioning industry (the "Business"); and

WHEREAS, Buyer desires to purchase the Business by acquiring substantially all of the assets owned by the Company used in the Business, and the Company and the Stockholder desire to sell all such assets used in the Business to Buyer, subject to and in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, each of Buyer, the Company and the Stockholder agrees as follows:

1. PURCHASE AND SALE.

    1.1. Acquired Assets. Subject to the terms and conditions set forth in this Agreement, at the Closing (as defined in Section 4 below), the Company shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and take assignment and delivery of, of all of the following assets of the Company (collectively, the "Acquired Assets"), expressly excluding the Excluded Assets specified in Section 1.2:

        (a) All of the Company's rights under the licenses, permits and approvals, including those described on Schedule 1.1(a) hereto (the "Company Permits");

        (b) All of the Company's rights under any and all Contracts, purchase orders and agreements related to the Company's operations, in each case including those described on Schedule 1.1(b) hereto, and including all claims and other rights arising under or relating thereto (collectively, the "Company Contracts");

        (c) All of the Company's trademarks, trade names, business names, domain names, websites, telephone numbers, designs, processes, inventions, know-how, ideas, trade secrets, patents, licenses (as licensee or licensor), software, copyrights, applications with respect to any of the foregoing, technical information, customer lists, sales and promotional materials, creative materials, confidential information and data, and all other intellectual property rights of any kind or nature, as well as all rights thereunder and all goodwill associated therewith, including those described on Schedule 1.1(c) hereto (the "Intangibles");

(d)      All of the Company's furniture, fixtures, equipment, installations, tools, supplies, materials and other personal property, including that personal property described on Schedule 1.1(d) hereto (the "Tangibles");

(e)      All of the Company's books, records and ledgers, related to the Business, employment and personnel records for all current and former employees of the Company, information systems and all other documents and records relating to the Acquired Assets;

(f)      All of the Company's title to, interest in and rights under the leases of real property, including those described on Schedule 1.1(f) hereto, as modified pursuant to the requirements of Section 4.2(g) (the "Real Property Leases");

(g)      All of the Company's title to, interest in and rights under the leases of personal property, including those described on Schedule 1.1(g) hereto (the "Personal Property Leases");

(h)      All of the Company's inventories, including inventory in transit, and including those described on Schedule 1.1(h) hereto (the "Inventories");

(i)      Those assets set forth on Schedule 1.1(i) hereto;

(j)      All (i) causes of action, judgments, claims and demands of the Company; (ii) rights associated with any liability to be assumed by Buyer under this Agreement; (iii) restrictive covenants and other obligations of present and former employees of the Company; (iv) deposits and prepaid expenses acceptable to Buyer; and (v) trade or industry association memberships including any prepaid dues with respect thereto; and

(k)      All accounts or notes receivable held by the Company, including those described on Schedule 1.1(k) hereto, and any security, claim, remedy, or other right related to any of the foregoing.

1.2.    Excluded Assets.  Notwithstanding the foregoing, the Company is not selling and Buyer is not purchasing, pursuant to this Agreement, and the term "Acquired Assets" shall not include, any of the following assets (the "Excluded Assets"):

(a)      The consideration received by the Company pursuant to this Agreement;

(b)      The rights of the Company and the Stockholder under this Agreement;

(c)      All of the Company's cash on hand as of the Closing Date, less prepaid expenses and security deposits related to the Business or the other Acquired Assets;

(d)      All of the Company's records relating solely to the capital stock and the actions of the stockholders, directors and officers of the Company;

(e)      Those assets set forth on Schedule 1.2(f) hereto; and;

(f)        All other assets of the Company other than the Purchased Assets.

2.        ASSUMED LIABILITIES; EXCLUDED LIABILITIES.

At the Closing, Buyer shall assume, and agree to pay, perform, fulfill and discharge, all obligations and liabilities:  (a) which arise after the Closing and which relate to events which transpire subsequent to the Closing, under (i) the Company Permits, (ii) Company Contracts, (iii) Company Personal Property Leases and (iv) Company Real Property Leases, each to the extent they relate exclusively to the Business and by their terms are to be fulfilled after the Closing in the ordinary course of business; and (b) those accounts payable and accruals of the Company that are expressly included in the Closing Net Working Capital pursuant to Section 3.2 below (collectively, the "Assumed Liabilities").  Anything in this Agreement to the contrary notwithstanding, Buyer shall not assume, and shall not be deemed to have assumed, any liability or obligation of the Company of any kind or nature whatsoever, other than the Assumed Liabilities as specifically set forth herein (all such liabilities and obligations so not assumed, collectively, the "Excluded Liabilities").

3.        ACQUISITION OF ACQUIRED ASSETS; PURCHASE PRICE.

3.1.        Acquisition of Acquired Assets and Delivery of Purchase Price.  At the Closing, Buyer shall acquire the Acquired Assets for an aggregate purchase price of up to $20,190,000.00 (the "Purchase Price").  An amount equal to $18,190,000 of the Purchase Price shall be paid to the Company in cash at the Closing.  The Company shall be entitled to additional Purchase Price in the form of an earnout (the "Earnout") of up to an additional to $2,000,000 (the "Maximum Earnout Payment").  The Earnout shall be calculated pursuant to the following formula, which formula is based on EBITDA of $3,540,000, as calculated in the RSM Quality of Earnings Report dated May 11, 2017 (the "RSM Report"): 5.7 x the difference between (a) Seller's EBITDA with respect to the trailing twelve (12) months ending December 31, 2018 calculated on the same basis as the RSM Report (the "Earnout Date") with a cap on EBITDA of  $3,540,000 and ( b) $3,189,000 (the amount determined pursuant to such formula, the "Earnout Amount"); *provided*, that for purposes of clarity, in the event that (a) is less than (b) there shall be no payment and in no event shall Buyer be obligated to pay Seller more than the Maximum Earnout Payment.  Any Earnout Amount to be made by Buyer to Seller hereby shall be paid to Seller within 10 Business Days after the Earnout Payment is finally determined by Buyer based on its audited financial statements.  Any disagreement between Buyer and Seller with respect to the calculation of the Earnout Amount shall be resolved by the Independent Accounting Firm in the same manner and pursuant to the same procedures as are set forth in Section 3.2(e) for resolutions of disputes regarding Final Closing Amounts.  The Purchase Price is subject to adjustment as provided in Sections 3.2 and 8.6 below.  At the Closing, the Purchase Price shall be subject to the following deductions and paid as follows:

(a)        $2,019,000.00 of the Purchase Price (the "Holdback Amount") will be paid by Buyer to the Escrow Agent by wire transfer in such amount, such Holdback Amount to be held by the Escrow Agent in accordance with this Agreement and the Escrow Agreement;

(b)        That portion of the Purchase Price which is equal to the aggregate

amount of all Indebtedness and Transaction Expenses of the Company outstanding on the Closing Date shall be paid by Buyer, on behalf of the Company, directly to the creditors and service providers to whom such Indebtedness or Transaction Expenses are owed in discharge thereof as set forth on the Certificate of Indebtedness and Transaction Expenses (defined in Section 4.2(d) below); and

(c)     The balance of the Purchase Price, after deducting all amounts in subsections (a) through (c) (such amount after all deductions, the "Closing Payment"), shall be paid by Buyer to the Company by wire transfer in the amount of the Closing Payment.

3.2.     Purchase Price Adjustments.

(a)     As used herein:  (i) "Closing Net Working Capital" means, as of the Closing Date, the amount by which the sum of all accounts receivable included in the Acquired Assets exceed the sum of all accounts payable and accruals included in the Assumed Liabilities, in all cases determined in accordance with GAAP and the methodologies used in preparing Buyer's sample calculation set forth on Schedule 3.2(a); and (ii) "Target Net Working Capital" means $1,525,000, which the parties acknowledge and agree represents a mutually determined amount of working capital based upon a trailing 12 month average for each of receivables, payables and accruals, in all cases determined in accordance with GAAP, and the methodologies used in preparing Buyer's sample calculations as set forth on Schedule 3.2(a).

(b)     At the Closing, the Purchase Price shall be subject to adjustment in accordance with paragraph (c) below, based on an amount equal to the Company's good faith calculation of the estimated Net Working Capital (the "Estimated Closing Amounts").  A written statement setting forth the Company's good faith calculation of the Estimated Closing Amounts, prepared in accordance with GAAP (except for the absence of normal year-end adjustments and the absence of footnotes) and the methodologies used in preparing Schedule 3.2(a), has been provided by the Company to Buyer at least one (1) business day prior to the Closing Date.  The Estimated Closing Amounts shall be reasonably acceptable to Buyer.

(c)     If the Closing Net Working Capital is less than the Target Net Working Capital, the Purchase Price payable at the Closing shall be reduced by an amount equal to such deficiency (such deficiency to reduce the Closing Payment payable to the Company at Closing). If the Closing Net Working Capital is greater than the Target Net Working Capital, the Purchase Price payable at the Closing shall be increased by an amount equal to such excess (such excess to increase the Closing Payment payable at Closing).  The adjustment made at Closing pursuant to the preceding sentence is referred to herein as the "Initial Adjustment", and shall be subject to subsequent adjustment as provided in paragraphs (d), (e) and (f) below.

(d)     Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to the Company its calculation of actual Closing Net Working Capital prepared in accordance with GAAP and the methodologies used in preparing Buyer's calculation of the Target Net Working Capital (the "Final Closing Amounts").  As reasonably requested by the Company, Buyer shall make available to the Company (or its accountants) the schedules and calculations used in the preparation of the Final Net Working Capital and shall permit the

Company (or its accountants) to review the same.

(e) When Buyer delivers each of the Final Closing Amounts, Buyer shall also deliver a statement containing Buyer's calculations of the actual adjustment to the Purchase Price based on the Final Closing Amounts and taking into account the Initial Adjustment (the "Buyer's Proposed Calculations"). Within fifteen (15) days after receipt of the Final Closing Amounts, the Company shall notify Buyer of its agreement or disagreement with the accuracy of any of Buyer's Proposed Calculations. If the Company disputes any aspect of Buyer's Proposed Calculations, then the Company shall have the right, at the Company's expense, to review the Final Net Working Capital. The Company shall complete its review within fifteen (15) days after the date the Company disputes Buyer's Proposed Calculations. If the Company, after such review, still disagrees with Buyer's Proposed Calculations, and Buyer does not accept the Company's proposed alternative calculations (the "Company's Proposed Calculations"), the Company and Buyer shall work together in good faith to attempt to resolve their differences concerning the Final Net Working Capital and if the Company and Buyer are unable to resolve such differences within fifteen (15) days after delivery of the Company's Proposed Calculations to Buyer, then the Company and Buyer shall direct an independent regional accounting firm to be mutually agreed upon by both parties (the "Independent Accounting Firm") to resolve the remaining disputed items (the "Remaining Disputed Items") within fifteen (15) days after the date of Buyer's rejection of the Company's Proposed Calculations by conducting its own review of the Final Net Working Capital and thereafter selecting either the Company's Proposed Calculations of the Remaining Disputed Items or Buyer's Proposed Calculations of the Remaining Disputed Items or an amount in between the two. Each of the Company and Buyer agrees that it shall be bound by the Independent Accounting Firm's determination of the Remaining Disputed Items. The fees and expenses of the Independent Accounting Firm shall be paid one-half by the Company and one-half by Buyer; provided, that if the difference between the Final Adjustment (as defined below) and the Final Adjustment that would have resulted from the use of the Proposed Calculations of one of the parties hereto (the "Erroneous Party") is more than twice as great as the difference between the Final Adjustment and the Final Adjustment that would have resulted from the use of the other party's Proposed Calculations, the Erroneous Party shall pay all of the fees and expenses of the Independent Accounting Firm.

(f) Upon the determination pursuant to subsection (e) above of the Final Closing Amounts, the Purchase Price shall be recalculated pursuant to the formula contained in subsection (c) above, using the amounts so determined pursuant to Section 3.2(e) in lieu of the amounts used in the Initial Adjustment. If the Purchase Price as adjusted pursuant to this paragraph (f) (the "Final Adjustment") is greater than the Purchase Price as adjusted pursuant to the Initial Adjustment, Buyer shall pay the difference to the Company. If the Purchase Price as adjusted pursuant to the Final Adjustment is lower than the Purchase Price as adjusted pursuant to the Initial Adjustment, Buyer shall recover any such deficiency from the Holdback Amount (to the extent that the funds contained therein are sufficient), in which event Buyer and the Company shall execute and deliver to the Escrow Agent written disbursement instructions authorizing the Escrow Agent to promptly make such disbursement to Buyer from the Holdback Amount. If the Closing Adjustments Holdback Amount is not sufficient, the entire Holdback Amount shall be delivered to Buyer and the Company and the Stockholder, jointly and severally,

shall pay the balance of such deficiency to Buyer.  Any payment by either Buyer or the Company pursuant to this subsection (e) shall be made in cash or same day funds within ten (10) days after the determination of the Final Adjustment pursuant to this subsection (e).

       3.3.    <u>Allocation of Acquired Assets, Assumed Liabilities and Purchase Price</u>.  Buyer and the Company shall allocate the gross purchase price for the Acquired Assets, as determined for U.S. federal income Tax purposes (taking into account the Assumed Liabilities), among the Acquired Assets as set forth on <u>Schedule 3.3</u> hereto (the "<u>Allocation</u>").  The Allocation shall be binding upon Buyer and the Company for all purposes, including for federal income Tax purposes.  Buyer and the Company shall modify the Allocation of the gross purchase price as appropriate in accordance with the principles and procedures used in determining the Allocation set forth on <u>Schedule 3.3</u> to reflect any adjustments in the gross purchase price paid hereunder, as determined for federal income Tax purposes, made following the Closing in accordance with this Agreement.  Each of Buyer and the Company further agrees that it will not take any position inconsistent with such Allocation.  The Company and Buyer agree to consult with each other with respect to all issues related to the Allocation in connection with any Tax audits, controversies, or litigation.

      4.     CLOSING.

       4.1.    <u>Time and Place</u>.  The closing of the transfer and delivery of all documents and instruments necessary to consummate the transactions contemplated by this Agreement (the "<u>Closing</u>") shall be held on the date hereof (such date, the "<u>Closing Date</u>").

       4.2.    <u>Transactions at Closing</u>.  At the Closing:

          (a)     The Company shall execute and deliver to Buyer such certificates of title or other instruments of assignment and transfer with respect to the Acquired Assets as Buyer may reasonably request and as may be necessary to vest in Buyer good and marketable title to all of the Acquired Assets, in each case subject to no Encumbrance.

          (b)     Buyer shall execute and deliver to the Company such instruments of assumption and other documents with respect to the Assumed Liabilities as the Company may reasonably request.

          (c)     The Company, Buyer and the Escrow Agent shall execute and delivered an escrow agreement in the form of <u>Exhibit A</u> hereto (the "<u>Escrow Agreement</u>").

          (d)     The Company shall prepare and deliver to Buyer a certificate (the "<u>Certificate of Indebtedness and Transaction Expenses</u>") certifying as to the amount of Indebtedness and Transaction Expenses of the Company outstanding on the Closing Date, and specifying the amount owed to each creditor or service provider listed thereon.  The Company shall have caused (i) its creditors to deliver pay-off letters and lien discharges and (ii) its service providers to provide confirmations of payment in full, each as by, and in form satisfactory to, Buyer, with respect to such Indebtedness and Transaction Expenses.  Buyer shall pay and

discharge all outstanding Indebtedness and Transaction Expenses of the Company described on the Certificate of Indebtedness in accordance with Section 3.1(c) above.

(e)    The Company shall cause to be executed and delivered to Buyer (i) employment offer letters with Buyer, in the form of <u>Exhibit B</u> hereto, executed by each of the individuals set forth on <u>Schedule 4.2(e)</u> and (ii) a consulting agreement with Buyer, in the form of Exhibit C hereto, executed by Andrew Beard.

(f)    The Company will deliver evidence of the consent, approval, authorization, exemption or waiver (including all governmental approvals), each in form and substance satisfactory to Buyer, to the consummation of the transactions contemplated by this Agreement by each party to any of the Company Contracts, Company Permits, Personal Property Leases and other contracts described on <u>Schedule 5.14</u> (other than the Real Property Leases) under which such transactions would constitute a default, would accelerate obligations of the Company or Buyer or would permit cancellation of any such Company Contract or Company Permit and shall have obtained any other governmental authorizations or approvals required to enable Buyer to operate the Business as currently conducted after the Closing.

(g)    The Company will deliver new lease agreements for the Company's leased facilities at Rhome, Texas and Tulsa, Oklahoma, in form of <u>Exhibit D</u>, leasing such facilities to Buyer.

(h)    The Company shall execute and deliver to Buyer a Secretary's Certificate as to the resolutions of the Company's stockholders and directors authorizing the execution, delivery and performance of all transactions contemplated by this Agreement.

(i)    The Company shall deliver to Buyer good standing certificates for the Company from its jurisdiction of organization and each jurisdiction in the Company is qualified to do business as a foreign entity, in each case dated as of a recent date prior to the Closing Date.

(j)    Buyer shall deliver the Closing Payment to the Company in accordance with Section 3.1(d) above.

(k)    The Company shall execute and deliver as applicable, to Buyer such other agreements, certificates, instruments and documents as are reasonably required by Buyer in order to effect and all transactions contemplated by this Agreement.

5.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE STOCKHOLDER.

The Company and the Stockholder, jointly and severally, represent and warrant to Buyer as follows:

5.1.    <u>Organization of the Company; Authority</u>.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of Texas.  The Company is duly qualified and in good standing as a foreign limited liability company in all

jurisdictions in which the character of the properties owned or leased or the nature of the activities conducted by it makes such qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of the Company.  The Company has delivered to Buyer complete and correct copies of its Articles of Organization, Operating Agreement and all amendments to either of the foregoing.  The Company has all requisite power and authority to own and hold the Acquired Assets, to carry on the Business as such business is now conducted and to execute and deliver this Agreement and the other documents, instruments and agreements contemplated hereby (collectively, the "Transaction Documents") to which it is a party and to carry out all actions required of it pursuant to the terms of the Transaction Documents.  The Company has no Subsidiaries and has not had any Subsidiaries since its formation.

     5.2.   <u>Approvals; Binding Effect</u>.  The Company has obtained all necessary authorizations and approvals from its stockholders and directors required for the execution and delivery of the Transaction Documents to which it is a party and the consummation of all transactions contemplated thereby.  Each of the Transaction Documents to which the Company is a party has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company enforceable against it in accordance with its terms, except where the enforceability thereof may be limited by any applicable bankruptcy, reorganization, insolvency or other laws affecting creditors' rights generally or by general principles of equity.

     5.3.   <u>Non-Contravention</u>.  Except as set forth on <u>Schedule 5.3</u>, the execution and delivery by the Company of the Transaction Documents to which it is a party and the consummation by the Company of the transactions contemplated thereby will not (a) violate or conflict with any provision of the Articles of Organization or Operating Agreement of the Company; or (b) constitute a violation of, or be in conflict with, or constitute or create a default under, or result in the creation or imposition of any Encumbrance upon any property of the Company pursuant to (i) any agreement or instrument to which the Company is a party or by which the Company or any of its properties is bound or to which the Company or any of such properties is subject, or (ii) any statute, judgment, decree, order, regulation or rule of any court or governmental or regulatory authority applicable to the Company.

     5.4.   <u>Governmental Authorities; Transferability of Business Permits</u>.  Except as set forth on <u>Schedule 5.4</u>, no consent, approval or authorization of, or registration, qualification or filing with, any governmental agency or authority (foreign, federal, state or local) is required for the execution and delivery by the Company of the Transaction Documents to which it is a party or for the consummation by the Company of the Contemplated Transactions.  The Company has and maintains, and the Permits listed on <u>Schedule 3.3</u> include, all Permits as are necessary for the conduct of the Business (the "<u>Business Permits</u>").  All of the Business Permits are transferable to Buyer as a result of the Contemplated Transactions, and true and complete copies of such Business Permits have previously been delivered to Buyer.  The Company has caused all Business Permits to be duly transferred to Buyer from the Company and the Permits will continue to be valid and in full force and effect for the benefit of Buyer, on identical terms following the consummation of the transactions contemplated hereby.

5.5.    Capitalization.    The entire authorized, issued and outstanding membership interests of the Company is as set forth on Schedule 5.5.  All of the outstanding membership interests of the Company have been duly authorized, validly issued, and are fully paid and non-assessable.  The Company has not violated any Legal Requirements or any preemptive or other similar rights of any Person in connection with the issuance or redemption of any of its membership interests.  All of the outstanding shares of membership interests of the Company are held of record and beneficially owned by the Persons and in the respective amounts set forth in Schedule 5.5.  There are no preemptive rights or other similar rights in respect of any membership interests in the Company.  Except as imposed by applicable Legal Requirements, there are no Encumbrances on, or other contractual obligations relating to, the ownership, transfer or voting of any capital stock in the Company, or otherwise affecting the rights of any member of the Company.  There is no contractual obligation or provision in the organizational documents of the Company which obligates it to purchase, redeem or otherwise acquire, or make any payment (including any distribution) in respect of, any membership interests in the Company.  There are no convertible instruments, options, warrants or other rights to acquire membership interests in the Company.  There are no phantom, appreciation or other quasi-equity rights granted or issued by the Company.

5.6.    Financial Statements.    The Company has delivered the following financial statements (the "Financial Statements") to Buyer, which are attached as Schedule 5.6 hereto: (a) the internally prepared balance sheets of the Company  as of December 31, 2014, December 31, 2015 and December 31, 2016 (the December 31, 2016 balance sheet being referred to herein as the "2016 Balance Sheet"), (b) the internally prepared statements of income of the Company for the fiscal year and portion thereof, as applicable, then ended, and (c) the internally prepared balance sheet of the Company as at July 31, 2017 and the related statement of income for the seven month period then ended (collectively, the "Interim Financials").  Each of the Financial Statements and the Interim Financials are true and complete and have been prepared in accordance with GAAP, consistently applied (subject, in the case of the Interim Financials, to the absence of footnotes and to normal recurring year-end review adjustments); each of such balance sheets fairly and accurately presents the financial condition of the Company as of its respective date; and such statements of income fairly and accurately present the results of operations of the Company for the periods covered thereby.

5.7.    No Undisclosed Liabilities.  Except to the extent (a) reflected or reserved against in the 2016 Balance Sheet, (b) incurred in the ordinary course of business after the date of the 2016 Balance Sheet and either discharged prior to Closing or reflected or reserved against on the Final Closing Statement or (c) described on Schedule 5.7 hereto, the Company does not have any liabilities or obligations of any nature, whether accrued, absolute, contingent or otherwise (including without limitation as guarantor or otherwise with respect to obligations of others), other than ordinary course performance obligations with respect to the Company Contracts that would not be required to be reflected or reserved against on a balance sheet prepared in accordance with GAAP.

5.8.    Absence of Certain Changes.  Except as set forth on Schedule 5.8, since December 31, 2016, the Company has carried on its business only in the ordinary course, and there has not

been (a) any change in the assets, liabilities, sales, income or business of the Company or in its relationships with suppliers, lessors, other than changes which were both in the ordinary course of business and have not been, either in any case or in the aggregate, materially adverse; (b) any acquisition or disposition by the Company of any asset or property other than in the ordinary course of business; (c) any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting, either in any case or in the aggregate, the property or business of the Company; (d) any declaration, setting aside or payment of any distribution or other payment in respect of the Company's membership interests; (e) any increase in the compensation or other benefits payable or to become payable by the Company to any of its officers or employees, or any bonus payments or arrangements made to or with any of them; (f) any forgiveness or cancellation of any Indebtedness or claim by the Company or any waiver of any right of material value; (g) any entry by the Company into any transaction other than in the ordinary course of business except for the transactions contemplated hereby; (h) any incurrence by the Company of any obligations or liabilities, whether absolute, accrued, contingent or otherwise (including, without limitation, liabilities as guarantor or otherwise with respect to obligations of others), other than obligations and liabilities incurred in the ordinary course of business; (i) any Encumbrance on any of the assets, tangible or intangible, of the Company; or (j) any discharge or satisfaction by the Company of any Encumbrance or payment by the Company of any obligation or liability (fixed or contingent) other than (A) current liabilities included in the 2016 Balance Sheet and (B) current liabilities incurred since the date of the 2016 Balance Sheet in the ordinary course of business.

     5.9.   <u>Litigation, Etc</u>.  Except as set forth on <u>Schedule 5.9</u> hereto, no action, suit, proceeding, investigation or other claim is pending or, to the Knowledge of the Company, threatened, relating to or affecting any of the Acquired Assets, the Business or the Company, or which questions the validity of any of the Transaction Documents or challenges any of the transactions contemplated thereby.  To the Knowledge of the Company, there is no basis for, nor are there any facts or circumstances that would give rise to or otherwise permit, any action, suit, proceeding, investigation or claim with respect to any of the foregoing.

     5.10.  <u>Legal Compliance; Illegal Payments; Permits</u>.  Except as set forth on <u>Schedule 5.10</u>, the Company has complied in all material respects with, and is in compliance in all material respects with (a) all Legal Requirements and all judicial or administrative tribunal orders, judgments, writs, injunctions, decrees or similar commands applicable to such Person or any of its assets, and (b) all terms and provisions of all Permits, contracts, agreements and indentures to which such Person is a party, or by which such Person or any of its assets is subject.  The Company has not committed, been charged with, nor, to the Knowledge of the Company, been under investigation with respect to, nor does there exist, any material violation of any provision of any Legal Requirements in respect of the Company or any of its assets.  In the conduct of its business, neither the Company nor any of its directors, officers, employees or agents, has (x) directly or indirectly, given, or agreed to give, any illegal gift, contribution, payment or similar benefit to any supplier, customer, governmental official or employee or other Person who was, is or may be in a position to help or hinder the Company or made, or agreed to make, any illegal contribution, or reimbursed any illegal political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office or (y) established or maintained any

unrecorded fund or asset or made any false entries on any books or records for any purpose. The Company has been duly granted all Permits under all Legal Requirements necessary for the conduct of its business and the lawful occupancy and use of the Company Real Property. Schedule 5.10 describes each Permit affecting, or relating to, the Company or its business. Except as disclosed on Schedule 5.10, (i) the Permits are valid and in full force and effect, (ii) the Company is not in breach or violation of, or default under, any such Permit, and, to the Knowledge of the Company, no basis exists which, with notice or lapse of time or both, would constitute any such breach, violation nor default and (iii) the Permits will continue to be valid and in full force and effect, on identical terms following the consummation of the transactions contemplated hereby.

5.11.   Title to Acquired Assets; Sufficiency.   The Company is the lawful owner of and has good and valid record and marketable title to all of the Acquired Assets, and has the full right to sell, convey, transfer, assign and deliver the Acquired Assets, without the need to obtain the consent or approval of any third party except as set forth on Schedule 5.3 or Schedule 5.4 hereto. Except for liens described on Schedule 5.9 hereto which secure Indebtedness and which will be discharged at or prior to the Closing, all of the Acquired Assets are entirely free and clear of any security interests, liens, claims, charges, options, mortgages, debts, leases (or subleases), conditional sales agreements, title retention agreements, encumbrances of any kind, material defects as to title or restrictions against the transfer or assignment thereof (collectively, "Encumbrances"). All of the Acquired Assets are in good condition and repair (reasonable wear and tear excepted) and are adequate and sufficient to carry on the Business as presently conducted. At and as of the Closing, the Company will convey the Acquired Assets to Buyer by bills of sale, certificates of title and other instruments of assignment and transfer effective in each case to vest in Buyer, and Buyer will have, good and valid record and marketable title to all of the Acquired Assets of the Company, free and clear of all Encumbrances other than Encumbrances incurred by Buyer in connection with the consummation of the transactions contemplated hereby.

5.12.   Real Property; Safety, Zoning and Environmental Matters.

(a)      Schedule 5.12(a) hereto sets forth complete and accurate legal descriptions of all real property leased by the Company (the "Real Property"). The Company does not and has not owned any real property. To the Knowledge of the Company, there are no defects in the Real Property, as to title or condition that could have a material adverse effect on the Business. The Company has not received any notice that either the whole or any portion of the Real Property is to be condemned, requisitioned or otherwise taken by public authority. The Company has received notice of any public improvements which may result in special assessments against or otherwise affect the Real Property. The Company enjoys quiet possession of the properties covered by the Real Property Leases.

(b)      Except as set forth on Schedule 5.12(b):

(i)      Neither the Company nor, to the Knowledge of the Company, any operator of any real property presently or formerly leased or operated by the Company is in violation or alleged violation of any judgment, decree, order, law, license, rule or regulation

pertaining to environmental matters, including without limitation those arising under any foreign, federal, state or local statute, regulation, ordinance, order or decree relating to health, safety or the environment (collectively, "Environmental Laws") and the Company has complied and is in compliance with all Environmental Laws;

(ii)      The Company has not received notice from any third party, including without limitation any foreign, federal, state or local governmental authority, (A) that the Company or any predecessor in interest has been identified by the United States Environmental Protection Agency ("EPA") as a potentially responsible party under any Environmental Laws; (B) that any hazardous waste, any hazardous substance, any pollutant or contaminant or any toxic substance, oil or hazardous material or other chemical or substance (including, without limitation, asbestos in any form, urea formaldehyde or polychlorinated biphenyls) regulated by any Environmental Laws ("Hazardous Substances") which the Company or any predecessor in interest has generated, transported or disposed of has been found at any site at which a foreign, federal, state or local agency or other third party has conducted or has ordered that the Company or any predecessor in interest conduct a remedial investigation, removal or other response action pursuant to any Environmental Law; or (C) that the Company or any predecessor in interest is or shall be a named party to any claim, action, cause of action, complaint, (contingent or otherwise) legal or administrative proceeding arising out of any third party's incurrence of costs, expenses, losses or damages of any kind whatsoever in connection with the release of Hazardous Substances;

(iii)     No portion of any real property presently or formerly leased or operated by the Company has been used for the handling, manufacturing, processing, storage or disposal of Hazardous Substances except in accordance with applicable Environmental Laws; and no underground tank or other underground storage receptacle for Hazardous Substances is located on such properties.  In the course of any activities conducted by the Company or operators of any real property presently or formerly leased or operated by the Company, no Hazardous Substances have been generated or are being used on such properties except in accordance with applicable Environmental Laws.  All real properties presently or formerly leased or operated by the Company are free from contamination of every kind, including without limitation, groundwater, surface water, soil, sediment and air contamination, and such properties do not contain any Hazardous Substances, except in each case to the extent that the presence of Hazardous Substances on such properties does not violate any applicable Environmental Laws. There have been no releases or threatened releases of Hazardous Substances on, upon, into or from any real property presently or formerly owned, leased or operated by the Company, except in accordance with applicable Environmental Laws.  There have been no releases on, upon, from or into any real property in the vicinity of any real property presently or formerly leased or operated by the Company which, through soil or groundwater contamination, may have come to be located on such real property except for Hazardous Substances whose presence on such real property does not violate any applicable Environmental Laws; and

(iv)     No real property presently or, to the Knowledge of the Company, formerly leased or operated by the Company is or shall be subject to any applicable environmental

cleanup responsibility law or environmental restrictive transfer law or regulation, by virtue of the transactions set forth herein and contemplated hereby.

(c)       Attached as part of Schedule 5.12(c) is a list of all material reports, site assessments data or other material documents in the possession of the Company or the Stockholder which contain any material information with respect to potential environmental liabilities associated with any real property presently or formerly leased or operated by the Company and relating to compliance with Environmental Laws or the environmental condition of such properties and adjacent properties.  The Company has furnished to Buyer complete and accurate copies of all of the documents and other materials listed on Schedule 5.12(c) hereto.

5.13.   Contracts.  Schedule 5.13 sets forth a true, complete and accurate list of the following Contracts to which the Company is a party or by which the Company is bound or to which the Company or any of its assets is subject:  (a) supplier agreements, any other in-bound Contracts relating to the acquisition of materials or services for use by the Company, customer agreements, distribution agreements, and any other Contracts relating to the marketing or sale of the Company's products or services; (b) contracts and other agreements with any current or former officer, director, employee, consultant or shareholder or any partnership, corporation, joint venture or any other entity in which any such person has an interest; (c) bonds or other security agreements provided by any party in connection with the business of the Company; (d) contracts and other agreements for the sale of the Company's assets or properties other than in the ordinary course of business or for the grant to any person of any preferential rights to purchase the Company's assets or properties; (e) joint venture agreements relating to the assets, properties or business of the Company or by or to which it or any of its assets or properties are bound or subject; (f) contracts or other agreements under which the Company agrees to indemnify any party, to share tax liability of any party, or to refrain from competing with any party; (g) any contracts or other agreements with regard to Indebtedness; (h) Capital Leases, Operating Leases and leases of Company Real Property; and (i) any contract which will result or is reasonably expected to result in the receipt of payment by the Company of $10,000 or more in any twelve (12) month period or the expenditure by the Company of $10,000 or more in any twelve (12) month period not listed pursuant to one of the prior categories.  The Company has delivered to Buyer true, correct and complete copies of all Contracts listed on Schedule 5.13 (or accurate descriptions of all oral Contracts so listed), together with all modifications and supplements thereto. Each of the Contracts listed on Schedule 5.13 hereto or any of the other Schedules hereto is in full force and effect, the Company is not in breach of any of the provisions of any such Contract, nor, to the Knowledge of the Company, is any other party to any such Contract in default thereunder, nor does any event or condition exist which with notice or the passage of time or both would constitute a default thereunder.  The Company has performed all obligations required to be performed by it to date under each such Contract.  Subject to obtaining any necessary consents by the other party or parties to any such Contract (the requirement of any such consent being reflected on Schedule 5.13), (x) each is enforceable against each party to such contractual obligation, and is in full force and effect in accordance with the express terms thereof and will continue to be so enforceable and in full force and effect on identical terms following the consummation of the Contemplated Transactions, and (y) no Contract includes any written provision (or to the Knowledge of the Company, any oral provision) the effect of which may be

to enlarge or accelerate any obligations of Buyer to be assumed or transferred thereunder or give additional rights to any other party thereto or will in any other way be affected by, or terminate or lapse by reason of, the Contemplated Transactions. The Contracts set forth on <u>Schedule 5.13</u> represent all of the Contracts necessary to conduct the Business and operations of the Company as currently conducted.  The Company is not a party to or bound by any Contract (whether written or, to the Knowledge of the Company, oral) containing any covenant prohibiting the Company from competing in any business of any kind in any territory or from competing with any Person, or in any manner prohibiting the Company from doing any kind of business with any Person.

5.14.   <u>Indebtedness</u>.   Except for Indebtedness described on the Certificate of Indebtedness, the Company does not have any Indebtedness outstanding at the Closing Date. Except as disclosed on <u>Schedule 5.14</u> hereto, the Company is not in default with respect to any outstanding Indebtedness or any instrument relating thereto.  Complete and correct copies of all instruments (including all amendments, supplements, waivers and consents) relating to any Indebtedness of the Company have been furnished to Buyer.

5.15.   <u>Accounts Receivable; Inventories</u>.   All accounts receivable represent bona fide transactions made in the ordinary course of business and are valid, collectible obligations owing to the Company.  All inventory (a) is normal and merchantable and is of quality and quantity presently usable and salable in the ordinary course of business, none of which is slow-moving, defective, damaged or obsolete and (b) is in the physical possession of the Company or in transit to or from a customer or supplier of the Company. The quantities of each item of inventory (whether raw materials, work-in-process or finished goods) are not excessive but are reasonable in the present circumstances of the Company. The Company will have on hand as of the Closing such quantities of inventory as are reasonably required to continue the Business immediately after the Closing consistent with past practice. The Company has continued to purchase inventory in the ordinary course of business at all times since December 31, 2016. No inventory is held by the Company on consignment from others, and, no inventory is held by others on consignment from the Company.

5.16.   <u>Material Contractual Relationships</u>.   <u>Schedule 5.16</u> accurately lists the ten (10) largest (based on dollar volume) customers of and suppliers to the Business for the year ended December 31, 2016, together with aggregate sales by such customers and aggregate purchases by such suppliers during such period, respectively.  None of such customers or suppliers of the Business has within the preceding twelve (12) months provided any written notice or, to Knowledge of the Company, made any express oral statement that it plans to cease or materially and adversely alter their business with the Business and, to Knowledge of the Company, there is no reasonable reason why any such customer or supplier may be unable or unwilling to continue its relationship with the Business as a result of any Seller action or inaction prior to the Closing. Neither a Stockholder (or any relative of such person) nor the Company has any direct or indirect interest in any supplier or customer with whom the Company does business.  Except as set forth on <u>Schedule 2.13</u>, the Company does not have or utilize any rebate, allowance, discount, incentive or similar programs payable to or benefiting customers of the Business in connection such customers' purchases from the Company.

5.17.   <u>Intellectual Property</u>.

(a)      Schedule 5.17(a) hereto sets forth a complete and accurate list of (i) all patents, trademarks, trade names and copyrights registered in the name of the Company, and all applications therefor, (ii) all other patents, trademarks, trade names, domain names and copyrights used or proposed to be used by the Company, all applications therefor, and all licenses (as licensee or licensor) and other agreements relating thereto, and (iii) all written or oral agreements relating to other technology, know-how and processes which the Company is licensed or authorized by others to use or which the Company has licensed or authorized for use by others. Except to the extent set forth in Schedule 5.17(a), the Company, (x) owns or has the sole and exclusive right to use all patents, trademarks, trade names and copyrights referred to in clause (i) of the preceding sentence, (y) has the right without restriction to use all patents, trademarks, trade names, domain names and copyrights referred to in clause (ii) of the preceding sentence, and (z) has the right to use all technology, know-how and processes used or necessary for the ordinary course of business as presently conducted or proposed to be conducted, and the consummation of the transactions contemplated hereby will not alter or impair, or cause Buyer to incur any additional cost in connection with, any such right.  No claims have been asserted, and no claims are pending, by any Person regarding the use of any such patents, trademarks, trade names, domain names, copyrights, technology, know-how or processes, or challenging or questioning the validity or effectiveness of any license or agreement, and to the knowledge of the Company there is no basis for such claim.  The use by the Company of such patents, trademarks, trade names, domain names, copyrights, technology, know-how or processes in the ordinary course of business does not infringe on the rights of any Person.

(b)      None of the Company nor any of its employees, contractors or consultants has infringed or made unlawful use of, or is infringing or making unlawful use of, any proprietary or confidential information of any Person, including without limitation any former employer of any past or present employee, contractor or consultant of the Company.  The activities of the Company's employees, contractors and consultants in connection with their employment or engagement do not violate any agreements or arrangements that any such employees, contractors or consultants have with any former employer or any other Person.

(c)      The Company has maintained commercially reasonable practices in accordance with industry standards to protect the confidentiality of the Company's confidential information and trade secrets and, except as disclosed on Schedule 5.17(c), have required any employee or third party with access to the Company's confidential information to execute enforceable contracts requiring them to maintain the confidentiality of such information and use such information only for the benefit of the Company.

(d)      The Company's use and dissemination of any personally-identifiable information concerning individuals, including medical records and information, is in compliance with all applicable privacy policies, terms of use, Legal Requirements, and contractual obligations applicable to the Company and the Business or to which the Company is bound.  The Company maintains policies and procedures regarding data security and privacy and maintain administrative, technical, and physical safeguards that are commercially reasonable and, in any event, in compliance with all applicable Legal Requirements and contractual obligations applicable to the Company or to which the Company is bound.  There have been no security

Page 15 of 32

breaches relating to, or violations of any security policy regarding, or any unauthorized access of, any data or information used by the Company.

      5.18.   Taxes.

      (a)     The Company has duly and timely filed with the appropriate government agencies all Tax Returns and reports required to have been filed by it, and all such Tax Returns were correct and complete.  Except as set forth on Schedule 5.18(a), no waiver of any statute of limitations relating to Taxes has been executed or given by the Company.  All Taxes, assessments, fees and other governmental charges upon the Company or upon any of its properties, assets, revenues and income with respect to any periods ending on or before the Closing Date have been timely paid, other than those that are currently payable without penalty or interest.  Except as set forth on Schedule 5.18(a), no federal Tax Return of the Company is currently under audit by the IRS, and no other Tax Return of the Company is currently under audit by any other Tax Authority, and there are no other pending or active legal or administrative proceedings involving Tax matters of the Company.  Neither the IRS nor any other Tax Authority is now asserting or, to the Knowledge of the Company, threatening to assert against the Company any deficiency or claim for additional Taxes.  There are no liens for Taxes on any of the assets of the Company, other than any liens for Taxes not yet due and payable.

      (b)     The Company has delivered to Buyer all Tax Returns filed by the Company for the three full calendar years immediately prior to the Closing Date.  The Company has not requested or been granted an extension of the time for filing any Tax Return that has not yet been filed.  No Tax Authority with which the Company does not file Tax Returns has claimed that the Company is or may be required to file Tax Returns with that Tax Authority.  Except as set forth on Schedule 5.18(b), the Company does not have a permanent establishment in any country with which the United States of America has a relevant Tax treaty, as defined in such relevant Tax treaty, and does not otherwise operate or conduct business through any branch in any country other than the United States.

      (c)     The Company has timely withheld and paid all Taxes required to have been withheld or paid in connection with amounts paid or owing to any employee, creditor, independent contractor or third party.  The Company does not have any liability for Taxes, benefits or compensation as a result of the misclassification of (i) employees as independent contractors or (ii) independent contractors as employees.

      (d)     Neither Buyer nor any of its Affiliates will be required pursuant to section 1445(a) of the Code to deduct or withhold any consideration or amount paid in connection with this Agreement.

      (e)     The Company has not participated (i) in any "tax shelter" within the meaning of Section 6111 of the Code (as in effect prior to the enactment of P.L. 108-357 or any comparable laws of jurisdictions other than the United States) or (ii) in any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4(b) or any comparable laws of jurisdictions other than the United States.

(f)      Since its formation, for federal and applicable state and local income tax purposes the Company has been, and as of the Closing the Company will be, a limited liability company classified and treated as a partnership under the Code.  The Company has not filed any election to change its status for federal or any applicable state or local income tax purposes.

(g)      The Company is not a party to any Tax exemption, Tax holiday or other Tax reduction agreement, approval or order of any Tax Authority.

5.19.   <u>Employee Matters</u>.  <u>Schedule 5.19</u> hereto sets forth a complete and accurate list of each employee of the Company, the date of hire and title of such employee, and the rate, character and amount of the compensation (base pay, bonuses and benefits) paid to such employee for the fiscal year ended December 31, 2015 and for the two month period ending February 29, 2016.  There have been no changes in such compensation since February 29, 2016.  Except as listed in <u>Schedule 5.19</u> hereto, the Company does not have any employment agreement, written or oral, with any currently active employee, including any agreement to provide any bonus or benefit to any such employee.  Any employee of the Company who, at the Closing Date, is on short or long term disability is accurately listed as such on <u>Schedule 5.19</u>.  Except as set forth on <u>Schedule 5.19</u>, the Company is in compliance with all Legal Requirements respecting employment and employment practices, terms and conditions of employment, wages and hours, employee classification and nondiscrimination in employment, and is not engaged in any unfair labor practice.  Except as set forth on <u>Schedule 5.19</u>, there is no charge pending or, to the Knowledge of the Company, threatened against the Company alleging unlawful discrimination in, or other violations of, employment practices before any court or agency and there is no charge of or proceeding with regard to any unfair labor practice against the Company pending before the National Labor Relations Board or any similar entity.  No one has petitioned within the last three (3) years, and no one is now petitioning or organizing, for union representation of, or other collective bargaining for, the Company's employees.  None of the employees of the Company is covered by any collective bargaining agreement, and no collective bargaining agreement is currently being negotiated by the Company.

5.20.   <u>Employee Benefit Plans</u>.

(a)      Except for the arrangements set forth on <u>Schedule 5.20(a)</u>, the Company does not now maintain or contribute to, and it has not in the current or preceding three (3) calendar years maintained or contributed to, any pension, profit-sharing, deferred compensation, bonus, stock option, share appreciation right, severance, group or individual health, dental, medical, life insurance, survivor benefit, or similar plan, policy or arrangement, whether formal or informal, for the benefit of any member, manager, director, officer, consultant or employee, whether active or terminated, of the Company.  Each of the arrangements set forth on <u>Schedule 5.20(a)</u> is hereinafter referred to as an "<u>Employee Benefit Plan</u>".  None of such arrangements is a multi-employer plan.

(b)      The Company has delivered to Buyer true, correct and complete copies of each Employee Benefit Plan, and with respect to each such Plan (i) any associated trust, custodial, insurance or service agreements and (ii) any material disclosure documentation

(including specifically any summary plan descriptions) distributed to participants or beneficiaries thereunder in the current or any of the three (3) preceding calendar years.

(c)      Each Employee Benefit Plan is and has heretofore been, maintained and operated in compliance with the terms of such Plan and with all applicable Legal Requirements (whether as a matter of substantive law or as necessary to secure favorable tax treatment).  No Employee Benefit Plan is intended to qualify under Section 401(a) of the Code.

(d)      Except as set forth on Schedule 5.20(d),

(i)      there is no pending or, to the Knowledge of the Company, threatened legal action, proceeding or investigation concerning any Employee Benefit Plan or any fiduciary or service provider thereof and, to the Knowledge of the Company, there is no basis for any such legal action or proceeding;

(ii)      no communication, report or disclosure has been made which, at the time made, did not accurately reflect the terms and operations of any Employee Benefit Plan;

(iii)      no Employee Benefit Plan provides welfare benefits subsequent to termination of employment to employees or their beneficiaries (except to the extent required by applicable state insurance laws and Title I, Part 6 of ERISA);

(iv)      no benefits due under any Employee Benefit Plan have been forfeited subject to the possibility of reinstatement (which possibility would still exist at or after Closing); and

(v)      the Company has not undertaken to maintain any Employee Benefit Plan for any period of time and each such Plan is terminable at the sole discretion of the sponsor thereof, subject only to such constraints as may be imposed by applicable law.

(e)      Except as set forth on Schedule 5.20(e) hereto, the execution of this Agreement and the consummation of the transactions contemplated hereby and by the other Transaction Documents will not result in any payment (whether of severance pay or otherwise) becoming due from any Employee Benefit Plan to any current or former member, manager, director, officer, consultant or employee of the Company or result in the vesting, acceleration of payment or increases in the amount of any benefit payable to or in respect of any such current or former member, manager, director, officer, consultant or employee.

(f)      For purposes of this Section 5.20, "multi-employer plan" has the same meaning assigned such terms under Sections 3, 4043(b) or 4001(a) of ERISA, and "affiliate" means any entity which under Section 414 of the Code is treated as a single employer with the Company.

5.21.   Insurance.   Schedule 5.21 hereto lists all policies of fire, liability, workmen's compensation, life, property and casualty, director and officer, and other insurance owned or held by the Company.  All such policies (a) are in full force and effect, (b) are sufficient for compliance

by the Company with all Legal Requirements and all agreements to which it is a party and (c) provide that they will remain in full force and effect at the coverages and through the respective dates set forth in such Schedule.  The Company is not in default with respect to its obligations under any of such insurance policies and it has not received any notification of cancellation of any such insurance policies.  In addition, Schedule 5.21 contains a list of all pending claims and all claims submitted during the previous three (3) years under any insurance policy maintained by the Company and of all such pending and submitted claims for the two month period ending February 29, 2016.  No insurer has (a) questioned, denied or disputed (or otherwise reserved its rights with respect to) the coverage of any claim pending under any insurance policy or (b) to the Knowledge of the Company, threatened to cancel any insurance policy. Except as disclosed on Schedule 5.21, to the Knowledge of the Company, no insurer plans to raise the premiums for, or alter the coverage under, any such insurance policy.

5.22.   Conflicts of Interest; Affiliate Transactions.  Except as set forth on Schedule 5.22 hereto, no officer, director, stockholder, employee or Affiliate of the Company (a) owns, directly or indirectly, any interest in (excepting not more than 1% stock holdings for investment purposes in securities of publicly held and traded companies) or is an officer, director, manager, employee or consultant of any Person which is a competitor, lessor, lessee, customer or supplier of the Company; (b) owns, directly or indirectly, in whole or in part, any tangible or intangible property which the Company is using or the use of which is necessary for the business; (c) has threatened any cause of action or other claim whatsoever against (or, to the Knowledge of the Company, has any cause of action or claim against), or owes any amount to, the Company, except for claims in the ordinary course of business, such as for accrued vacation pay, accrued benefits under Employee Benefit Plans and similar matters and agreements; or (d) is a party to any agreement, contract or commitment with the Company or has received any loan, advance or investment from the Company that has not been repaid in full prior to the date hereof.

5.23.   Brokers.  Except for Strange Transaction Advisory Services, the fees and expenses of which are the sole responsibility of the Stockholder, neither the Company nor the Stockholder has retained, utilized or been represented by any broker, agent, finder or intermediary in connection with the sourcing, negotiation or consummation of the transactions contemplated by this Agreement and no compensation is due to any of the foregoing.

5.24.   Disclosure.  No representation or warranty made by the Company and the Stockholder in this Agreement or in any Exhibit, Schedule, written statement, certificate or other document delivered to Buyer pursuant hereto or in connection with the consummation of the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading.

6.   REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer represents and warrants to the Company and the Stockholder as follows:

6.1.   Organization of Buyer; Authority.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.   Buyer has all requisite

power and authority to execute and deliver the Transaction Documents to which it is a party and to carry out all of the actions required of it pursuant to the terms of such Transaction Documents.

6.2.    <u>Approval; Binding Effect</u>.  Buyer has obtained all necessary authorizations and approvals required for the execution and delivery of the Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby.  Each of the Transaction Documents to which Buyer is a party has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforceability thereof may be limited by any applicable bankruptcy, reorganization, insolvency or other laws affecting creditors' rights generally or by general principles of equity.

6.3.    <u>Non-Contravention</u>.  The execution and delivery by Buyer of the Transaction Documents to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby will not (a) violate or conflict with any provisions of the formation or organizational agreements of Buyer, each as amended to date; or (b) constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any lien upon any property of such Buyer pursuant to (i) any agreement or instrument to which Buyer is a party or by which Buyer or any of its properties is bound or to which Buyer or any of its properties is subject, or (ii) any statute, judgment, decree, order, regulation or rule of any court or governmental authority to which Buyer is subject.

6.4.    <u>Governmental Consents</u>.  No consent, approval or authorization of, or registration, qualification or filing with, any governmental agency or authority is required for the execution and delivery by Buyer of the Transaction Documents to which it is a party or for the consummation by Buyer of the transactions contemplated hereby or thereby.

6.5.    <u>Brokers</u>.  Buyer has not retained, utilized or been represented by any broker, agent, finder or intermediary in connection with the sourcing, negotiation or consummation of the transactions contemplated by this Agreement and no compensation is due to any of the foregoing.

7.    CERTAIN COVENANTS.

7.1.    <u>Transaction Expenses; Indebtedness</u>.  At or prior to the Closing, the Stockholder and the Company will, jointly and severally, cause to be paid and satisfied in full (a) any and all Transaction Expenses and Indebtedness whether or not set forth on the Certificate of Indebtedness and Transactions Expenses required pursuant to Section 4.2(d), and (b) any consent or similar fee required to be paid in connection with obtaining any consent required to be set forth on <u>Schedule 5.3</u>, <u>Schedule 5.4</u> or <u>Schedule 5.10</u>.

7.2.    <u>Publicity</u>.  No public announcement or disclosure will be made by any party with respect to the subject matter of this Contemplated Transactions without the prior written consent of Buyer; <u>provided</u>, <u>however</u>, that the provisions of this Section 7.2 will not prohibit (a) any disclosure required by any applicable Legal Requirements (in which case the disclosing party will provide Buyer with prompt notice of any such disclosure, to the extent legally permissible),

or (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement.

7.3.    Confidentiality.    The Company and the Stockholder hereby agree, jointly and severally, not to, and that the Company and each Stockholder will cause its, his or her Affiliates not to, at any time on or after the Closing Date, directly or indirectly, disclose or use in any manner, any confidential or proprietary information involving or relating to the Company or the Business, without the prior written consent of Buyer in each instance. Except for that information that is required to be reported the Company or a Stockholder pursuant to Legal Requirements applicable to Taxes (and only to the extent required), prior to any such disclosure the Company or such Stockholder shall provide prompt, prior written notice to Buyer (to the extent legally permissible) thereof.

7.4.    Noncompetition and Nonsolicitation.    The Company and each Stockholder, jointly and severally, hereby acknowledge and agree that the covenants and agreements set forth in this Section 7.4 are a material inducement to Buyer to enter into this Agreement and to perform its obligations hereunder, and that Buyer would incur a significant loss of the goodwill being purchased as part of the transactions contemplated hereby if either the Company or the Stockholder were to breach any of the provisions of this Section 7.4. Therefore, in order to facilitate the consummation of the transactions contemplated hereby, the Company and the Stockholder, jointly and severally, agree that for the Restricted Period (as defined below), neither the Company nor the Stockholder will, in any such case or in any manner whatsoever, engage directly or indirectly (whether through Affiliates or otherwise) in all or any portion of the Business as conducted as of the Closing Date anywhere in North America; provided, however, that the passive ownership of less than 1% of the outstanding stock of any publicly-traded corporation will not be deemed, solely by reason thereof, a violation of this Section 7.4. In addition, for the applicable Restricted Period, the Company and the Stockholder, jointly and severally, agree that neither the Company nor the Stockholder will, in any such case (i) recruit, offer employment, employ, engage as a consultant, lure or entice away any Person who is or was an employee or independent contractor of the Company at any time during the twelve (12) month period preceding the date on which any of the foregoing actions would take place, (ii) solicit business from any Person (or any successor in interest to any such Person) which is or was during the twelve (12) month period preceding the Closing Date a contractor, customer, supplier or service provider with or to the Company for the purpose of securing business or contracts related to the Business, or (iii) solicit, encourage, initiate or participate in discussions or negotiations with, or provide any information to, any present or future contractor, supplier or service provider with or to the Company with respect to the termination or adverse alteration of his, her or its relationship with the Company. For purposes of this Section 7.4, "Restricted Period" means a period of five years from and after the Closing Date. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 7.4 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the

invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

7.5.     Use of Name.  Buyer is acquiring all of the Company's and the Stockholder's rights to the current and prior business names of the Company used in the Business and, therefore, the Company and the Stockholder, jointly and severally, agree that neither the Company nor the Stockholder shall be entitled to use the name "Bus Air", any predecessor name or any variations thereof for any commercial purposes of any kind or nature whatsoever anywhere in the world from and after the Closing.  The Stockholder shall, within two (2) business days following the Closing, take all necessary action to change the name of the Company to a new name bearing no resemblance to any of its present or predecessor names so as to permit the use of such names by Buyer.

7.6.     Further Assurances.  From and after the Closing Date, upon the request of either the Company or Buyer, each of the parties hereto will do, execute, acknowledge and deliver, without further consideration, all such further acts, assurances, deeds, assignments, transfers, conveyances and other instruments and papers as may be reasonably required or appropriate to carry out and/or evidence the transactions contemplated hereby.

7.7.     Unassigned Company Contracts.

(a)     To the extent that any Company Contract, Company Permit, Personal Property Lease, or Real Property Lease (an "Assumed Contract") is not capable of being transferred by the Company to Buyer pursuant to this Agreement without the consent, approval or waiver of a third person, and such consent, approval or waiver is not obtained prior to Closing (and the Closing still occurs) or the Company is unable, after using commercially reasonable efforts, to obtain consent after Closing, or if such transfer or attempted transfer would constitute a breach thereof or a violation of any law, rule or regulation, nothing in this Agreement will constitute a transfer or an attempted transfer thereof.

(b)     The Company shall use commercially reasonable efforts and Buyer shall reasonably cooperate with the Company to obtain, at the Company's expense, such consents, approvals and waivers necessary to transfer the Assumed Contracts.

(c)     In the event that such consents, approvals and waivers referred to in paragraph (a) are not obtained by the Company and the Closing occurs, then, the Company shall use commercially reasonable efforts to (i) obtain such consents after Closing, (ii) provide to Buyer the benefits and burdens of any Assumed Contract referred to in paragraph (a) above, (iii) cooperate with Buyer in any reasonable and lawful arrangement designed to provide such benefits and burdens to Buyer without incurring any obligation to any other Person other than to provide such benefits to Buyer, including without limitation, the appointment of Buyer as the agent of the Company for purposes of such Assumed Contract, and (iv) enforce, at the request of Buyer for the account of Buyer, any rights of the Company arising from such Assumed Contract (including without limitation the right to terminate such Assumed Contract in accordance with the terms thereof upon the request of Buyer).

(d)        No consent, approval or waiver of a third person with respect to the transfer of, or any novation with respect to, any Assumed Contract, shall cause an Excluded Liability to be deemed for purposes of this Agreement to have become an Assumed Liability or otherwise affect the rights of Buyer under Section 8 hereof.

8.        INDEMNIFICATION.

8.1.    Indemnity by the Company and the Stockholder.

(a)        Subject to all terms set forth in this Section 8, the Company and the Stockholder will, jointly and severally, indemnify and hold harmless Buyer and each of its Affiliates and their respective directors, managers, officers, shareholders, partners, members, employees, agents, attorneys and advisors (each, a "Buyer Indemnified Person"), from, against and in respect of any and all actions, liabilities, government orders, Encumbrances, losses, damages, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' and experts fees and expenses) whether or not involving a Third Party Claim (collectively, "Losses"), which any such Buyer Indemnified Person may suffer, sustain or become subject to as a result of, arising out of or relating to: (i) any breach of, or inaccuracy in, any representation or warranty made by the Company and the Stockholder in this Agreement, or in any document, schedule, instrument or certificate delivered pursuant to this Agreement; (ii) any actions, suits, proceedings, investigations or other claims related to the Acquired Assets, the Business or the Company which are based upon fact and circumstances arising prior to the Closing; (iii) any covenant of the Company or the Stockholder; (iv) any and all Excluded Liabilities; (v) any fraud committed by the Company or the Stockholder; (vi) product warranty claims resulting from or related to Business conducted by the Company prior to the Closing, to the extent such claims result in Losses in excess of the closing balance warranty reserve of $340,000; or (vii) a breach of any  one or more of the second through sixth sentences of Section 5.15.

(b)        The Company and the Stockholder will have no obligation to indemnify Buyer Indemnified Persons pursuant to Section 8.1(a)(i) in respect of Losses arising from the breach of, or inaccuracy in, any representation or warranty described therein unless the aggregate amount of all such Losses incurred or suffered by Buyer Indemnified Persons exceeds $201,900 (the "Basket") (at which point the Company and the Stockholder will indemnify Buyer Indemnified Persons only for such Losses as are in excess of the Basket), and the Company's and the Stockholder's aggregate liability in respect of claims for indemnification pursuant to Section 8.1(a)(i) will not exceed $2,019,000 (the "Cap"); provided, however, that the Basket and the Cap shall not apply to (i) claims for indemnification pursuant to breaches of, or inaccuracies in, representations and warranties set forth in Sections 5.1, 5.2, 5.3, 5.4, 5.5, 5.11, 5.18, 5.20 and 5.23 (collectively, the "Fundamental Representations"), or (ii) those matters set forth on the "Claims Schedule" attached to this Agreement, or (iii) Claims for indemnification pursuant to any provision of Section 8.1(a)(ii)-(vii); and provided, further, that the Company's and the Stockholder's indemnification obligation to Buyer Indemnified Persons hereunder, other than claims based upon fraud or any obligations of the Company and the Stockholder under Section 7, shall not exceed the aggregate of the amount of Purchase Price.  All aggregate amounts of

liability set forth herein shall be exclusive of Losses resulting from a Buyer Indemnified Person's enforcement of its rights hereunder, which Losses shall be in addition to any such aggregate amount.

8.2.   <u>Indemnity by Buyer</u>.

(a)   Subject to all terms set forth in this Section 8, Buyer will indemnify and hold harmless the Company, the Stockholder and their respective Affiliates (each, a "<u>Seller Indemnified Person</u>"), from, against and in respect of any and all Losses which any such Seller Indemnified Person may suffer, sustain or become subject to as a result of, arising out of or directly or indirectly relating to: (i) any breach of, or inaccuracy in, any representation or warranty made by Buyer in this Agreement, or in any document, schedule, instrument or certificate delivered pursuant to this Agreement; (ii) any actions, suits, proceedings, investigations or other claims related to Buyer which are based upon fact and circumstances arising prior to the Closing; (iii) Buyer's use of the Acquired Assets in the operation of Buyer's business after the Closing; and (iv) any covenant of any member of Buyer or fraud committed by Buyer.

(b)   Buyer's indemnification obligation to the Seller Indemnified Persons hereunder, other than claims based upon fraud or any obligations of Buyer under Section 7, shall not exceed the aggregate of the amount of Purchase Price paid by Buyer hereunder.  All aggregate amounts of liability set forth herein shall be exclusive of Losses resulting from the Seller Indemnified Person's enforcement of its rights hereunder, which Losses shall be in addition to any such aggregate amount.

8.3.   <u>Time for Claims</u>.  No claim may be made or suit instituted seeking indemnification pursuant to Sections 8.1(a)(i) or pursuant to 8.2(a)(i) unless a written notice describing such breach or inaccuracy in reasonable detail in light of the circumstances then known to the party seeking indemnification hereunder (the "<u>Indemnified Party</u>"), is provided to the party from which indemnification is sought (the "<u>Indemnifying Party</u>") on or before the date that is fifteen (15) months following the Closing Date; <u>provided</u>, that such limitation shall not apply to any of the Fundamental Representations or any of Buyer's representations set forth in Section 6, for which a claim may be made or a suit may be instituted at any time following the Closing Date through the date that is thirty (30) days following the statute of limitations applicable thereto.  Claims may be made or suits may be instituted pursuant to Sections 8.1(a)(ii)-(v) or 8.2(a)(ii)-(iii) at any time after the Closing Date.

8.4.   <u>Application of Materiality Qualifications</u>.  For purposes of determining Losses to which an Indemnified Party is entitled pursuant to this Section 8 based upon the breach of a particular representation or warranty (but, for purposes of clarity, not for determining whether or not any such representation or warranty has been breached), such representation or warranty will be read as if all qualifications as to materiality were deleted therefrom.

8.5.   <u>Third Party Claim Procedures</u>.

(a)   If any third party notifies an Indemnified Party with respect to any matter which may give rise to an Indemnified Claim against an Indemnifying Party under this Section 8

(a "<u>Third Party Claim</u>"), then the Indemnified Party will promptly give written notice to the Indemnifying Party of such Third Party Claim; <u>provided</u>, <u>however</u>, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party will relieve the Indemnifying Party from any obligation under this Section 8, except to the extent such delay actually and materially prejudices the Indemnifying Party.

(b)     The Indemnifying Party, at its sole cost and expense, will be entitled to participate in the defense of any Third Party Claim and will have the right to defend the Indemnified Party against the Third Party Claim by appointing reputable counsel reasonably acceptable to the Indemnified Party and so long as (i) the Indemnifying Party gives written notice to the Indemnified Party within fifteen days that it will indemnify the Indemnified Party from and against the entirety of any and all Losses the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Third Party Claim involves only claims for monetary damages and does not seek an injunction or other equitable relief against the Indemnified Party, (iii) the Indemnified Party has not been advised by counsel that a conflict exists between the Indemnified Party and the Indemnifying Party in connection with the defense of the Third Party Claim, (iv) the Third Party Claim does not relate to or otherwise arise in connection with Taxes (to the extent such Third Party Claim could affect the Tax Liability of Buyer following the Closing) or any criminal or regulatory enforcement action, (v) settlement of, an adverse judgment with respect to or the Indemnifying Party's conduct of the defense of the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to be adverse to the Indemnified Party's reputation or continuing business interests (including its relationships with current or potential customers, suppliers or other parties material to the conduct of its business) and (vi) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently.  The Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim; provided, however, that the Indemnifying Party will pay the fees and expenses of separate co-counsel retained by the Indemnified Party that are incurred prior to Indemnifying Party's assumption of control of the defense of the Third Party Claim.

(c)     The Indemnifying Party will not consent to the entry of any judgment or enter into any compromise or settlement with respect to a Third Party Claim without the prior written consent of the Indemnified Party unless such judgment, compromise or settlement (i) provides for the payment by the Indemnifying Party of money as the sole relief for the claimant, (ii) results in the full and general release of Buyer Indemnified Persons or Seller Indemnified Persons, as applicable, from all liabilities arising or relating to, or in connection with, the Third Party Claim and (c) involves no finding or admission of any violation of Legal Requirements or the rights of any Person and no effect on any other claims that may be made against the Indemnified Party.

(d)     If the Indemnifying Party does not deliver the notice contemplated by Section 8(b)(i) within 15 days after the Indemnified Party has given notice of the Third Party Claim, at any time fails to conduct the defense of the Third Party Claim actively and diligently or is or becomes unable to conduct the defense of the Third Party Claim pursuant to Section 8.5(b), the Indemnified Party may defend, and may consent to the entry of any judgment or enter

into any compromise or settlement with respect to, the Third Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, the Indemnifying Party in connection therewith). If such notice is given on a timely basis and the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently but any of the other conditions in Section 8.5(b) is or becomes unsatisfied, the Indemnified Party may defend, and may consent to the entry of any judgment or enter into any compromise or settlement with respect to, the Third Party Claim; provided, however, that the Indemnifying Party will not be bound by the entry of any such judgment consented to, or any such compromise or settlement effected, without its prior written consent (which consent will not be unreasonably withheld or delayed). In the event that the Indemnified Party conducts the defense of the Third Party Claim pursuant to this Section 8.5(d), the Indemnifying Party will (i) advance the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) and (ii) remain responsible for any and all other Losses that the Indemnified Party may incur or suffer resulting from, arising out of, relating to, in the nature of or caused by the Third Party Claim to the fullest extent provided in this Section 8.

8.6.    <u>Manner of Payment</u>.    Any payment to be made by the Company and the Stockholder or Buyer, as the case may be, pursuant to this Section 8 will be effected by wire transfer of immediately available funds from the Company and the Stockholder, jointly and severally, or Buyer, as the case may be, to an account designated by such party within ten (10) business days after the determination thereof. Any such indemnification payments will include interest at the rate announced in The Wall Street Journal "Money Rates" column as the "Prime Rate", plus two percent (2%) per annum, from the date any such Loss is suffered or sustained to the date of payment. Any payment amounts owing from any member of the Company and the Stockholder pursuant to this Section 8 will first be made to the extent possible from the Holdback Amount and thereafter will be made directly by the Company and Stockholder, jointly and severally, in accordance with the terms herein; provided, that Buyer Indemnified Persons will also be entitled to (but will not be required to) set off any amounts due or payable to any of Buyer Indemnified Persons by the Company and the Stockholder pursuant to this Section 8 by setting off against any other amounts otherwise due and payable by any of Buyer Indemnified Persons or any of their Affiliates to the Company or the Stockholder.

8.7.    <u>Knowledge and Investigation</u>.    The right of any Buyer Indemnified Person or Seller Indemnified Person to indemnification pursuant to this Section 8 will not be affected by any investigation conducted for or on behalf of any party, or knowledge acquired (or capable of being acquired) at any time by any party or any party's Representatives, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any representation or warranty, or performance of or compliance with any covenant or agreement. The waiver of any condition contained in any of the Transaction Documents based on the breach of, or inaccuracy in, any such representation or warranty, or of the performance of or compliance with any such covenant or agreement, will not affect the right of any Buyer Indemnified Person or Seller Indemnified Person to indemnification pursuant to this Section 8 based on such representation, warranty, covenant or agreement.

8.8.   <u>Effect of Insurance Coverage</u>.   The amount of any Losses subject to indemnification hereunder shall be net of (a) any cash amounts actually recovered by the Indemnified Party pursuant to any indemnification by or indemnification agreement with any third party, and (b) any Company insurance policy cash proceeds or other cash receipts from third party sources of reimbursement actually received or paid to such Indemnified Party as an offset against such Loss (each Person named in clauses (a) and (b), a "<u>Collateral Source</u>" and, collectively, "<u>Collateral Sources</u>"); <u>provided</u>, <u>however</u>, that in no event shall this Agreement be construed to require any Indemnified Party to carry or maintain any insurance policies or secure any Collateral Sources or to file any claim or otherwise seek recovery under any such policies or against any Collateral Sources. All costs of collection, deductibles and any increases in policy premiums, as applicable, that are the result of an Indemnified Party collecting from Collateral Source shall nonetheless be Losses subject to indemnification pursuant to this Section 8.

8.9.   <u>Tax Treatment</u>. All indemnification and other payments under this Section 8 will, to the extent permitted by law, be treated for all income Tax purposes as adjustments to the Purchase Price. Neither Buyer nor the Company nor the Stockholder will take any position on any Tax return, or before any Governmental Authority, that is inconsistent with such treatment unless otherwise required by any applicable Legal Requirement.

9.   DEFINITIONS. As used herein the following terms not otherwise defined have the following respective meanings:

"<u>Affiliate</u>":   As applied to any Person (as defined in this Section 9), any Person controlling, controlled by or under common control with such Person.

"<u>Code</u>":  The Internal Revenue Code of 1986, as amended.

"<u>Contracts</u>," when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, understandings, arrangements, leases, subleases, licenses, sublicenses, registrations, mortgages, bonds, notes, instruments, indentures, deeds of trust, guaranties or other obligation or undertakings, whether written or oral, and any amendments, modifications or supplements thereto, to which such Person is a party or to which or by which such Person or the property of such Person is subject or bound, excluding any Permits.

"<u>Escrow Agent</u>" means Wells Fargo, N.A..

"<u>Indebtedness</u>":  As applied to any Person (as defined in this Section 9), all indebtedness of such Person for borrowed money, whether current or funded, or secured or unsecured, including without limitation, (a) all indebtedness of such Person for the deferred purchase price of property or services represented by a note, (b) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (c) all indebtedness of such Person secured by a purchase money mortgage or other lien to secure all or part of the purchase price of property subject to such mortgage or lien, (d) all obligations under leases which

shall have been or must be, in accordance with generally accepted accounting principles, recorded as capital leases in respect of which such Person is liable as lessee, (e) any liability of such Person in respect of banker's acceptances or letters of credit, (f) all interest, fees and other expenses owed with respect to the indebtedness referred to above, and (g) all indebtedness referred to above which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"IRS":  The United States Internal Revenue Service.

"Knowledge of the Company" (or similar phrase) means the knowledge, after reasonable investigation, of the Stockholder.

"Legal Requirement" means any United States federal, state or local or foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any government order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"Permits" means, with respect to any Person, any license, accreditation, bond, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued by, or otherwise granted by, any governmental authority or any other Person to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"Person":  A corporation, an association, a partnership, a limited liability company, an organization, a business, an individual, a trust, a government or political subdivision thereof or a governmental agency.

"Subsidiary" or "Subsidiaries": Any corporation, limited liability company, partnership, association, trust, or other business entity, of which the designated parent at any time owns or controls, directly or indirectly, (a) at least a majority (by number of votes) of the outstanding shares of capital stock (or other shares of beneficial interest) entitled ordinarily to vote for the election of such business entity's directors (or in the case of a business entity that is not a corporation, for those Persons exercising functions similar to directors of a corporation), or (b) in the case of a Person other than a corporation, a fifty percent (50%) or greater interest in the capital and/or profits of such Person.

"Tax": Any federal, state, local, foreign and other income, profits, franchise, capital, capital stock, net worth, withholding, unemployment insurance, social security, occupational, production, severance, gross receipts, value added, sales, use, excise, stamp, registration, real or personal property, ad valorem, occupancy, transfer, employment, disability, workers' compensation, estimated tax or other similar tax, customs, duty or other governmental charge (including all interest and penalties thereon and additions thereto).

"Tax Authority": With respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

"Transaction Expenses" shall mean (a) unpaid fees and expenses incurred by the Company or the Stockholder relating to this Agreement, the sale of the Business or the transactions contemplated hereby, including legal, accounting, consulting, investment banking, brokers' and finders' and other similar fees, costs and expenses; and (b) all amounts (plus any Taxes thereon) payable by the Company or the Stockholder, whether immediately or in the future, under any "change of control," retention, incentive, termination, compensation, redundancy, severance or other similar arrangements as a result of the consummation of the transactions contemplated hereby (including any such amounts payable to any employee, director or consultant (as applicable) of the Company at the election of such employee, director or consultant (as applicable) pursuant to any such arrangements) to the extent unpaid prior to the Closing.

"Tax Return": Any return, declaration, report, claim for refund, information return, statement or other document (including any related or supporting estimates, elections, schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any law, regulation or administrative requirements relating to any Tax.

10.    GENERAL.

10.1.    Notices.   All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided: (a) by hand (in which case, it will be effective upon delivery); (b) by electronic mail in which case it will be effective upon receipt); or (c) by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the next business day after being deposited with such courier service), in each case, to the address listed below:

If to the Company or the Stockholder, to:

E3Rivers, LLC
4163 South FM 730
Decatur, Texas 76234
Attn: Anthony R. Woods
Email: Tonyrwoods@hotmail.com

with a copy sent contemporaneously to:

The Wright Firm, LLP
8150 N. Central Expressway, Suite 775
Dallas, Texas 75206
Attn: Paul F. Wright
Email: paul@thewrightlawyers.com

If to Buyer, to:

        Bus Air, LLC
        c/o KODA Enterprises Group, LLC
        Two University Office Park
        51 Sawyer Road, Suite 420
        Waltham, Massachusetts  02453
        Attn:  William S. Karol
        Email: wkarol@koda.com

with a copy sent contemporaneously to:

        Burns & Levinson LLP
        125 Summer Street
        Boston, Massachusetts  02110
        Attn:  Mark W. Manning, Esq.
        Email:  mmanning@burnslev.com

      Each of the parties to this Agreement may specify a different address or facsimile number by giving notice in accordance with this Section 10.1 to each of the other parties hereto.

      10.2.   <u>Entire Agreement</u>.  This Agreement contains the entire understanding of the parties, supersedes all prior agreements and understandings relating to the subject matter hereof and shall not be amended except by a written instrument hereafter signed by all of the parties hereto.

      10.3.   <u>Governing Law; Venue</u>.  The validity and construction of this Agreement shall be governed by the internal laws (and not the choice-of-law rules) of the State of Delaware.  All disputes, litigation, proceedings or other legal actions by any party to this Agreement shall be instituted exclusively in the courts of the State of Delaware or of the United States in the State of Delaware.

      10.4.   <u>Sections and Section Headings</u>.  The headings of sections and subsections are for reference only and shall not limit or control the meaning thereof.

      10.5.   <u>Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.   Neither this Agreement nor the obligations of any party hereunder shall be assignable or transferable by such party without the prior written consent of the other party hereto; <u>provided</u>, <u>however</u>, that nothing contained in this Section 10.5 shall prevent Buyer, without the consent of the Company or the Stockholder, (a) from, after Closing, transferring or assigning this Agreement or its rights or obligations hereunder to another entity controlling, under the control of, or under common control with Buyer or (b) from assigning all or part of its rights or obligations hereunder by way of collateral assignment to any bank or financing institution or other lender providing financing for

the acquisition contemplated hereby or (c) from transferring or assigning this Agreement or its rights or obligations hereunder to another Person in connection with a sale of substantially all of the assets of Buyer, but no such transfer or assignment made pursuant to clauses (a) or (b) shall relieve such Buyer of its obligations under this Agreement.

10.6.   <u>Severability</u>.  In the event that any covenant, condition, or other provision herein contained is held to be invalid, void, or illegal by any court of competent jurisdiction, the same shall be deemed to be severable from the remainder of this Agreement and shall in no way affect, impair, or invalidate any other covenant, condition, or other provision contained herein.

10.7.   <u>Further Assurances</u>.  The parties agree to take such reasonable steps and execute such other and further documents as may be necessary or appropriate to cause the terms and conditions contained herein to be carried into effect.

10.8.   <u>No Implied Rights or Remedies</u>.  Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person, firm or corporation, other than the Company, the Stockholder and Buyer and their respective members, any rights or remedies under or by reason of this Agreement.

10.9.   <u>Interpretations</u>.   For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein and (d) when implied from the context, any defined term may be used in either the singular or plural form, regardless of whether defined in the singular or the plural: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

10.10.   <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  To the extent this Agreement or any writing required or permitted hereby is signed and/or delivered by means of facsimile, .pdf or other electronic transmission, such facsimile, .pdf or other electronic transmission shall be treated in all manner and respects as an original signed counterpart thereof and shall nonetheless be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of this page left blank.  Signature page to follow.]*

Page 31 of 32

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Asset Purchase Agreement to be duly executed and delivered as a sealed instrument as of the date and year first above written.

BUYER:

BUS AIR, LLC

By: _____
Name:  James H. Peden
Title:   Vice President


SELLER:

BUS AIR MANUFACTURING, LLC


By: _____
Name: Anthony R. Woods
Title:   President


STOCKHOLDER:


_____
Anthony R. Woods


4818-3367-2784.2

*[Signature Page to Asset Purchase Agreement]*

Page 33 of 33

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Asset Purchase Agreement to be duly executed and delivered as a sealed instrument as of the date and year first above written.

BUYER:

BUS AIR, LLC

By:_____
Name:  James H. Peden
Title:   Vice President

SELLER:

BUS AIR MANUFACTURING, LLC

By:_____
Name:  Anthony R. Woods
Title:   President

STOCKHOLDER:

_____
Anthony R. Woods

4818-3367-2784.2

*[Signature Page to Asset Purchase Agreement]*

Page 33 of 33

# EXHIBIT 2

**Andy Beard**

From:          Tony Woods <tony@busair.com>
Sent:          Tuesday, December 12, 2017 6:41 PM
To:            Chad Whitton
Subject:       Fwd: Payroll checks - Confidential

Government is dropping it in your ass.
But here is the totals as you can see your
Told me he did not know what yours was.
I did not send this to Adam as I thought you

Sent from my iPhone

Begin forwarded message:

**From:** Cory Strange <cory@strangecpa.com>
**Date:** December 12, 2017 at 4:17:37 PM CST
**To:** "tim.dreslinski@benefitmall.com" <tim.dreslinski@benefitmall.com>
**Cc:** "Tony Woods (tony@busair.com)" <tony@busair.com>, Scott Strange - LPL <scott.strange@lpl.com>
**Subject: Payroll checks - Confidential**

Hello Tim,

1

We appreciate your help on this as I said there are 2 payrolls being processed by you and need these checks cut from the entity with employer identification number

The name of the entity use to be Bus Air Manufacturing LLC and is now 3 Rivers, LLC.

If you have any questions please call me at 972.670.2071 or Tony Woods 817.247.5828 these checks are extremely confidential and no other ee's are privy to this information.

Please have checks cut and mailed to Tony Woods attention with checks dated December 13, 2017 and confirm the EIN you are using for this payroll ?

3 Rivers, LLC

|  | Chad Whitton | Adam Whitton |
| --- | --- | --- |
| Gross | $1,000,000.00 | $465,000.00 |
| Withholding | $380,000.00 | $153,450.00 |
| Social Security | $0.00 | $2,867.13 |
| Medicare | $14,500.00 | $6,742.50 |
| Additional Medicare Tax .90% | $6,750.00 | $1,935.00 |
| Net | $598,750.00 | $300,005.37 |

Thank you,

Cory Strange, CPA
Cory@StrangeCPA.com

Strange & Coats, PC CPAs

140 E. Main Street, Suite 200 Lewisville TX 75057
T: 972-353-6446 F: 972-420-6997

www.StrangeCPA.com

Confidentiality Notice

2

This e-mail/fax message, including any attachments, is for the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Disclaimer Notice:

Any tax advice included in this written or electronic communication was not intended or written to be used, and it cannot be used by the taxpayer, for the purpose of avoiding any penalties that may be imposed on the taxpayer by any governmental taxing authority or agency.

# EXHIBIT 3





# Franchise Tax Account Status

As of : 01/29/2019 12:57:42

**This Page is Not Sufficient for Filings with the Secretary of State**

### BUILDING 380, LLC

| | |
|---:|:---|
| **Texas Taxpayer Number** | 32068423063 |
| **Mailing Address** | 4163 S FM 730 DECATUR, TX 76234-4956 |
| **❷ Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 09/19/2018 |
| **Texas SOS File Number** | 0803122164 |
| **Registered Agent Name** | ANTHONY WOODS |
| **Registered Office Street Address** | 4163 SOUTH FM 730 DECATUR, TX 76234 |

EXHIBIT 4

Taxable Entity Search Results

Page 1 of 1





# Franchise Tax Account Status

As of : 05/14/2019 13:44:19

**This Page is Not Sufficient for Filings with the Secretary of State**

### WW SALES, LLC

|  |  |
|---|---|
| **Texas Taxpayer Number** | 32068933624 |
| **Mailing Address** | 724 ZION RHOME, TX 76078-4301 |
| ❓ **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 11/13/2018 |
| **Texas SOS File Number** | 0803165396 |
| **Registered Agent Name** | CHAD WHITTON |
| **Registered Office Street Address** | 724 ZION ROAD RHOME, TX 76078 |

# EXHIBIT 5

# WISE COUNTY

Home  Return to Search      Print

**Property Year 2019**                                                   Information Updated 5/14/2019

Property ID:  R002160391   Geo ID:  R2813.0005.00

**\*\* PROPERTY ALERT \*\*** 2019 value(s) are preliminary and not certified.

### Property Details

| Ownership | Available Actions |
|---|---|
| BUILDING 380 LLC | File Notice of Protest for this Property |
| 4163 D FM 730 | * Protest is date sensitive. Please refer to the protest deadline on |
| DECATUR, TX 76234 | the Notice of Appraised Value. |
| Ownership Interest: 1.0000000 | |
| 1409 | |

### Qualified Exemptions

Not Applicable

### Legal Information

Legal: Acres: 38.250, Lot: 5, Subd: STONEWOOD ADDITION

Situs: CR 4004 389

### Property Valuation History

| Values by Year | | 2019 | 2018 | n/a | n/a | n/a | n/a |
|---|---|---|---|---|---|---|---|
| Improvements | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Land | + | $725,020 | $0 | $0 | $0 | $0 | $0 |
| Production Market | + | $0 | $313,590 | $0 | $0 | $0 | $0 |
| Personal | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Mineral | + | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Market | = | $725,020 | $313,590 | $0 | $0 | $0 | $0 |
| Agricultural Loss | - | $0 | $311,410 | $0 | $0 | $0 | $0 |
| Homestead Cap Loss | - | $0 | $0 | $0 | $0 | $0 | $0 |
| Total Assessed | = | $725,020 | $2,180 | $0 | $0 | $0 | $0 |

Property Information

| Improvement / Buildings | Improvement Value: $0 | | | | | |
|---|---|---|---|---|---|---|
| Group Sequence | Code | Building Description | Year Built | Square Footage | Perimeter Footage |

| Land Details | Market Value: $725,020 | Production Market Value: $0 | Production Value: $0 | | | | |
|---|---|---|---|---|---|---|---|
| Land Code | Acres | Sq. Ft. | Front Ft. | Rear Ft. | Depth | Mkt. Value | Prd. Value |
| 1T | 13.438 | 585,359 | 0 | 0 | | 503,925 | 0 |
| L0 | 24.812 | 1,080,811 | 0 | 0 | | 221,097 | 0 |

| Deed History | | | | | |
|---|---|---|---|---|---|
| Sold By | | Volume | Page | Deed Date | Instrument |
| CLABORN DAVID | | | | 11/16/2018 | 201813380 |
| n/a | | | | n/a | |

Property Tax Estimation by Entity / Jurisdiction

| Code | Description | Taxable Value | Tax Rate per $100 | Tax Factor applied to Taxable Value | Estimated Tax |
|---|---|---|---|---|---|
| LTR | WISE FM FLOOD-LATERA | 725,020 | $0.0375 | 0.000375 | $271.88 |
| SDE | DECATUR ISD | 725,020 | $1.305 | 0.01305 | $9,461.51 |
| WCM | WISE CO BRANCH MAINTENANCE | 725,020 | $0.044 | 0.00044 | $319.01 |
| WIS | WISE COUNTY | 725,020 | $0.3225 | 0.003225 | $2,338.19 |
| WT1 | WCID #1 | 725,020 | $0.009358 | 0.00009358 | $67.85 |
| | Total Estimation | | $1.718358 | 0.01718358 | $12,458.44 |

## The above property tax estimation is not a tax bill.  Do not pay.

Southwest Data Solutions provides this information "as is" without warranty of any kind.

Southwest Data Solutions is not responsible for any errors or omissions.

FILTER

Refine Your Search:

- Filter Matches
- Names
- Types
- Filed Date

Clear ¦ Update

- Recent Searches

**Texas: Wise County Clerk Records Search**

Go To County                    ▼
County Info

- New Search

**Set Default View:**

| • Standard View | Card View | Table View | Quick View |
| --- | --- | --- | --- |

Save

- •
- •
- •
- •

Add to Cart ¦ Add to MyFile
Export Search Results As... ▼
Export
14 Records

| Filed Date | Type | Number\|Bk\|Vol-Pg | Grantor | Grantee | Legal Desc. (show all) |
| --- | --- | --- | --- | --- | --- |
| | | | | | (see reference) |
| 11/16/2018 | Warranty Deed | 201813380 N/A \| N/A - N/A | • Claborn David | • Building 380 Llc | • **Subdivision:** STONEWOOD ADDN • Lot: 5 |

**County Type:** Wd
**Pages:** N/A
**Reference Info:**
STONEWOOD ADDN 5
**Reference Documents:**
N/A

| | | | | | (see reference) |
| --- | --- | --- | --- | --- | --- |
| 11/16/2018 | Deed Of Trust | 201813381 N/A \| N/A - N/A | • Woods Anthony Member • Building 380 Llc | • First State Bank | • **Subdivision:** STONEWOOD ADDN • Lot: 5 |

**County Type:** Dt
**Pages:** N/A
**Reference Info:**
STONEWOOD ADDN 5
**Reference Documents:**
N/A

| | | | | | (see reference) |
| --- | --- | --- | --- | --- | --- |
| 11/16/2018 | Assignment | 201813382 N/A \| N/A - N/A | • Woods Anthony Member • Building 380 Llc | • First State Bank | • **Subdivision:** STONEWOOD ADDN • Lot: 5 |

**County Type:** As
**Pages:** N/A
**Reference Info:**
STONEWOOD ADDN 5
**Reference Documents:**
N/A

# EXHIBIT 6

















# EXHIBIT 7

**Thomas T. Reith**



# EXHIBIT 8

## Thomas T. Reith

**From:**        Andy Beard <abeard@proairllc.com>
**Sent:**         Friday, June 14, 2019 5:06 PM
**To:**            Thomas T. Reith; Mark Smith
**Subject:**      FW: Hardware

**From:** David Manning <dmanning@amcoenterprises.com>
**Sent:** Friday, June 14, 2019 3:32 PM

**To:** Andy Beard <abeard@proairllc.com>
**Subject:** Fwd: Hardware

Begin forwarded message:

**From:** David Manning <dmanning@amcoenterprises.com>
**Subject: Hardware**
**Date:** April 30, 2019 at 12:07:29 PM CDT
**To:** chad@wwwsales.com

Mr Chad,
I will get wit Andy in the next couple of days and see what he thinks about your mention of doing work on some of the buses for PROAIR ( LONGHORN BUS) . If he in fact does not have a problem with AMCO supplying fasteners we can talk later.  He may be out of town but I will be out there in the morning and visit with him if he is in the office.

Best Regards,

David Manning
817-281-7697
dmanning@amcoenterprises.com

This email has been scanned for spam and viruses. Click here to report this email as spam.

EXHIBIT 9



CASEY GRIFFITH
D 214.446.6022
casey.griffith@griffithbarbee.com

June 12, 2019

**Via email: treith@burnslev.com**

Thomas T. Reith
Burns Levinson
125 Summer Street
Boston, MA 02110

Re:   **Bus Air, LLC Demand to Cease and Desist and Provide Accounting**

Mr. Reith:

This firm has been retained by WW Sales LLC, Adam Whitton, Chad Whitton, E3Rivers, LLC, Building 380, LLC, and Anthony R. Woods in connection with the false accusations directed to all of them in your June 5, 2019 correspondence. Given the relationships between the parties, I am astounded that Bus Air chose to have you communicate the unfounded suspicions set forth in your correspondence.

Adam Whitton, Chad Whitton, and WW Sales (collectively, the "Whittons") are running a business and will not allow Bus Air's spurious allegations to interfere with their right to continue to do so. Consequently, they instituted litigation against Bus Air in the 271st Judicial District in Wise County, Texas to clear themselves. A copy of the Whittons' Original Petition for declaratory judgment is enclosed with this correspondence.

Given that they have an interest in the subject matter of the litigation the Whittons instituted, and Bus Air accused them of engaging in a conspiracy with the Whittons, Tony Woods, E3 Rivers, and Building 380 (the "Woods Parties") have intervened in the Whittons' litigation against Bus Air. A copy of the Woods Parties' Petition in Intervention is also enclosed with this correspondence.

Please advise if you will accept service of the Petitions on behalf of Bus Air.

I look forward to hearing from you.

Sincerely,

Casey Griffith

cc:   Michael Barbee, Esq.
      Ryan Funderburg, Esq.



Griffith Barbee PLLC
1722 Routh Street, Suite 710
Dallas, Texas 75201

O 214.446.6020
F 214.446.6021
griffithbarbee.com

Filed 6/11/2019 5:26 PM
Brenda Rowe, District Clerk
Wise County, Texas
By: Janean Kerr

Cause No. CV19-06-482

| | | |
|---|---|---|
| WW Sales, LLC, Adam Whitton, and Chad Whitton, | § § § | In the District Court |
| *Plaintiffs* | § § | 271st Judicial District |
| v. | § § | |
| Bus Air, LLC, | § § | Wise County, Texas |
| *Defendant* | § § | |

### Plaintiffs' Original Petition and Request for Disclosure

Pursuant to Tex. Civ. Prac. & Rem. Code § 37.003, Plaintiffs WW Sales, LLC, Adam Whitton, and Chad Whitton (collectively, "Plaintiffs" or "the Whittons") file this Original Petition against Defendant Bus Air, LLC ("Bus Air") for declaratory judgment.

## DISCOVERY CONTROL PLAN

1.      The Whittons intend to conduct discovery under a Level 3 Discovery Control Plan.

## PARTIES

2.      Plaintiff WW Sales, LLC ("WW") is a Texas limited liability company with its principal place of business located at 724 Zion, Rhome, Texas 76078.

3.      Plaintiff Adam Whitton is an individual residing in Parker County, Texas.

4.      Plaintiff Chad Whitton is an individual residing in Wise County, Texas.

5.      Defendant Bus Air, LLC is a Delaware limited liability company doing business in the State of Texas, with its principal office located at 6630 East Highway 114, Haslet, Texas 76052. Because Bus Air is engaging in business in this state and has not designated or maintained a registered agent in this state as required by TEX. BUS. ORG. CODE § 9.001, it may be served through the Texas Secretary of State, who shall then forward service of process to Bus Air's home office located at 6630 East Highway 114, Haslet, Texas 76052. TEX. CIV. PRAC. & REM. CODE § 17.044.

## JURISDICTION AND VENUE

6.      While the Whittons do not seek any monetary relief, this Court has jurisdiction over their claims for declaratory relief in accordance with § 8, Article V of the Texas Constitution.

7.      Venue is proper in Wise County under Texas Civil Practice and Remedies Code §§ 15.002(a)(1) and (3), because a substantial part of the events giving rise to the Whittons' claims occurred in Wise County and Bus Air's principal and home office is in Wise County.

## BACKGROUND

8.      On or around September 25, 2017, Bus Air entered into an Asset Purchase Agreement (the "APA") with Bus Air Manufacturing, LLC ("BSM") and Anthony R. Woods ("Tony Woods"). When the parties executed the APA, BSM was a Texas limited liability company with its principal office located in Haslet, Texas, and Woods was its only stockholder. The Whittons are not parties to the APA.

9.      Section 7.4 of the APA contains a non-compete and non-solicitation clause that attempts to restrict BSM and Woods from engaging in "Business" for *five years* anywhere in *North America*.

10.     On June 5, 2019, Bus Air sent a letter to the Whittons that accused them of unlawfully competing against it and attempting to contact and recruit its employees in violation of § 7.4 of the APA.

11.     In its June 5, 2019 letter, Bus Air makes several allegations against the Whittons, including, but not limited to:

     a.      The Whittons formed WW on November 13, 2018;

     b.      The Whittons, through WW, intended to, and presently do, directly compete with Bus Air by performing the same business that BSM performed prior to the closing of the APA;

     c.      WW provides bus air conditioning services to a variety of entities, including Bus Air's customers;

     d.      Chad Whitton has repeatedly contacted Bus Air's vendors relating to buying products specific to the manufacture, assembly, and installation of bus air conditioning systems; and

     e.      Chad Whitton has repeatedly contacted Bus Air's employees and attempting to recruit them to work at WW.

12.     Based on these allegations, among others, Bus Air asserts that the Whittons are unlawfully competing and soliciting in violation of § 7.4 of the APA.

13.     Through its June 5, 2019 letter, Bus Air asserts that if the Whittons do not "immediately cease and desist" from competing in the Business and soliciting Bus Air's customers, it will file suit to enjoin the Whittons from their "unlawful competition and solicitation."

## CAUSES OF ACTION

### Count 1: Declaratory Judgment (Non-liability under § 7.4 of the APA)

14.     The Whittons incorporate by reference the preceding paragraphs.

15.     A justiciable controversy exists as to the rights, status and other legal relations between the Whittons and Bus Air arising under § 7.4 of the APA.

16.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.004, the Whittons, as interested persons, request that the Court construe their rights, status, and other legal relations affected by the APA. Specifically, they bring this action for declaratory judgment seeking declarations that: (i) Adam Whitton, Chad Whitton, and WW are not parties to the APA; (ii) Adam Whitton, Chad Whitton, and WW are not contractually or otherwise legally bound by any obligation(s) set forth in § 7.4 of the APA; and (iii) Adam Whitton, Chad Whitton, and WW are not liable for any alleged violations of § 7.4 of the APA.

**Count 2: Declaratory Judgment (Unenforceability of § 7.4 of the APA)**

17.     The Whittons incorporate by reference the preceding paragraphs.

18.     A justiciable controversy exists as to the rights, status and other legal relations between the Whittons and Bus Air arising under § 7.4 of the APA.

19.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.004, the Whittons, as interested persons, request that the Court construe their rights, status, and other legal relations affected by the APA. Specifically, they bring this action for declaratory judgment seeking declarations that: (i) § 7.4 of the APA is invalid and unenforceable; and (ii) § 7.4's geographic scope, temporal scope, and scope of activities limited are unreasonable and unnecessarily broad.

## DEMAND FOR JURY TRIAL

20.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.007, the Whittons demand a trial by jury.

## REQUEST FOR DISCLOSURE

21.     Pursuant to Rule 194, the Whittons request that Bus Air disclose, within 50 days of service of this original petition, the information and material described in Rule 194.2.

## PRAYER FOR RELIEF

The Whittons pray that the Court enter judgment declaring the rights, status, and other relations between the parties as described above.

June 11, 2019

Respectfully submitted,

### GRIFFITH BARBEE PLLC

/s/ *Casey Griffith*

Casey Griffith
Texas Bar No. 24036687
Casey.Griffith@griffithbarbee.com

Michael Barbee
Texas Bar No. 24082656
Michael.Barbee@griffithbarbee.com

Ryan Funderburg
Texas Bar No. 24101776
Ryan.Funderburg@griffithbarbee.com

One Arts Plaza
1722 Routh St., Ste. 710
Dallas, Texas 75201
(214) 446-6020 | main
(214) 446-6021 | fax

**Counsel for Plaintiffs**

Cause No. CV19-06-482

| | | |
|---|---|---|
| WW Sales, LLC, Adam Whitton, and Chad Whitton, | § § § | In the District Court |
| *Plaintiffs* | § § | |
| and | § § | |
| E3Rivers, LLC fka Bus Air Manufacturing, LLC, Building 380, LLC, and Anthony R. Woods, | § § § § § | 271st Judicial District |
| *Intervenor-Plaintiffs* | § § § | |
| v. | § § | |
| Bus Air, LLC, | § § | |
| *Defendant* | § | Wise County, Texas |

## Intervenors' Petition in Intervention

Pursuant to Tex. R. Civ. Pro. 60, Intervenor-Plaintiffs E3Rivers, LLC fka Bus Air Manufacturing, LLC, Building 380, LLC, and Anthony R. Woods (collectively, "Intervenors") file this Petition in Intervention against Defendant Bus Air, LLC for declaratory judgment under Tex. Civ. Prac. & Rem. Code § 37.003.

## STANDARD FOR INTERVENTION

Pursuant to Texas Rule of Civil Procedure 60, a party may intervene to join a lawsuit already in progress if it has a justiciable interest in the lawsuit, and its interest will be affected by the litigation. On June 11, 2019, Plaintiffs WW Sales, LLC, Adam Whitton, and Chad Whitton ("the Whittons") instituted this litigation by filing their Original Petition seeking declaratory judgment relief in connection with Defendant's June 5, 2019 assertions that they are violating non-compete and non-solicitation provisions to which Intervenors Woods and E3Rivers are contractually bound. Intervenors have a direct interest in the underlying issues in this litigation and seek declarations on their own behalf. On or around September 25, 2016, an Asset Purchase Agreement ("APA"), Bill of Sale and Assignment and Assumption Agreement, Escrow Agreement, Employment Agreement, and Flow of Funds Statement (collectively, the "Contract") was executed by Defendant and Intervenors Woods and E3Rivers[1]. In the same June 5 communication in which Defendant asserted the Whittons were violating non-solicitation and non-compete provisions, Defendant accused Intervenors of conspiring with the Whittons to violate those same provisions, and further threatened, among other things, to sue Intervenors Woods and E3Rivers for breach of contract. Intervenors' interest in this lawsuit is not remote—rather, Intervenors have a direct, justiciable interest that will be affected by this litigation. Accordingly, this Petition in Intervention is proper.

## DISCOVERY CONTROL PLAN

1.      Intervenors intend to conduct discovery under a Level 3 Discovery Control Plan.

## PARTIES

2.      Intervenor E3Rivers, LLC ("E3Rivers") is a Texas limited liability company with its principal place of business located at 4163 S FM 730, Decatur, Texas 76234.

3.      Intervenor Building 380, LLC ("Building 380") is a Texas limited liability company with its principal place of business located at 4163 S FM 730, Decatur, Texas 76234.

4.      Intervenor Woods is an individual residing in Wise County, Texas.

---

[1]   At the time the Contract was executed, E3Rivers was named Bus Air Manufacturing, LLC.

INTERVENORS' PETITION IN INTERVENTION                                                    1

5.      Plaintiff WW Sales, LLC ("WW") is a Texas limited liability company with its principal place of business located at 389 County Road 4004, Decatur, Texas 76234.

6.      Plaintiff Adam Whitton is an individual residing in Parker County, Texas.

7.      Plaintiff Chad Whitton is an individual residing in Wise County, Texas.

8.      Defendant Bus Air, LLC is a Delaware limited liability company doing business in the State of Texas, with its principal office located at 6630 East Highway 114, Haslet, Texas 76052. Because Defendant is engaging in business in this state and has not designated or maintained a registered agent in this state as required by TEX. BUS. ORG. CODE § 9.001, it may be served through the Texas Secretary of State, who shall then forward service of process to Bus Air's home office located at 6630 East Highway 114, Haslet, Texas 76052. TEX. CIV. PRAC. & REM. CODE § 17.044.

## JURISDICTION AND VENUE

9.      While Intervenors do not seek any monetary relief, this Court has jurisdiction over their claims for declaratory relief in accordance with § 8, Article V of the Texas Constitution.

10.     Venue is proper in Wise County under Texas Civil Practice and Remedies Code §§ 15.002(a)(1) and (3), because a substantial part of the events giving rise to Intervenors' claims occurred in Wise County and Defendant's principal and home office is in Wise County.

11.     Additionally, venue is proper under the Contract, which contains a forum selection clause specifying exclusive jurisdiction in Texas.

## BACKGROUND

12.     On or around September 25, 2017, Bus Air entered into the Contract with E3Rivers and Woods. When the parties executed the Contract, E3Rivers was a Texas limited liability company with its principal office located in Haslet, Texas, and Woods, then and now a Wise County resident, was its only stockholder.

13.     The Contract contains non-compete and non-solicitation language. For example, the APA portion of the Contract purports to restrict E3Rivers and Woods from engaging in

"Business"[2] for *five years* anywhere in *North America*, and from soliciting business from any "contractor, customer, supplier or service provider" of Defendant. Further, the Employment Agreement portion of the Contract includes language purporting to bar Woods from, among other things, "induc[ing] or attempt[ing] to induce any customer, supplier, . . . or other business partner to cease doing business with [Defendant] or in any way interfere with the relationship between any such customer, supplier, . . . or other business partner and [Defendant]," and it purports to restrict Woods from "directly or indirectly, solicit[ing] the business of any person or entity known . . . to be a customer of [Defendant] . . . with respect to services or activities that compete in whole or in part with the business of [Defendant]."

14.     On June 5, 2019, Defendant sent a letter to Intervenors (the same letter sent to Plaintiffs), making several allegations against Intervenors, including, but not limited to:

    a.   Woods is knowingly breaching the Contract on a daily basis;

    b.   On or around September 19, 2018, Woods formed Building 380 with the intent to build, and has in fact built, a facility specifically designed, engineered and outfitted to service buses;

    c.   Woods, by through his alleged conspiracy with the Whittons, is directly competing with Defendant by performing the same business he and E3Rivers performed prior to closing the Contract;

    d.   On various occasions after closing the Contract, Woods contacted Defendant's vendors about buying products specific to the manufacture, assembly and installation of bus air conditioning systems; and

    e.   Woods is directly benefitting from the Whittons' business in violation of the Contract.

15.     Based on these allegations, among others, Defendant asserts that Intervenors, in conjunction with the Whittons, are unlawfully competing and soliciting in violation of the Contract.

---

[2]   The term "Business" is defined within the Contract.

16.     Through its June 5, 2019 letter, Defendant asserts that if Woods does not "immediately cease and desist" from competing in the "Business" and soliciting its customers, it will file suit to enjoin Intervenors from their "unlawful competition and solicitation," and bring an action against Woods for breach of contract.

## CAUSES OF ACTION

### Count 1: Declaratory Judgment (Non-liability under the Contract)

17.     Intervenors incorporate by reference the preceding paragraphs.

18.     A justiciable controversy exists as to the rights, status and other legal relationships between Intervenors and Bus Air arising out of the Contract.

19.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.004, Intervenors, as interested persons, request that the Court construe their rights, status, and other legal relations affected by the Contract. Specifically, they bring this action for declaratory judgment seeking declarations that: (i) E3 Rivers, Building 380, and Woods are not liable for any alleged violations of the non-compete and non-solicitation portions of the Contract; and (ii) E3 Rivers, Building 380, and Woods are not liable for breach of the Contract as asserted by Defendant.

### Count 2: Declaratory Judgment (Unenforceability of APA § 7.4 portion of the Contract)

20.     Intervenors incorporate by reference the preceding paragraphs.

21.     A justiciable controversy exists as to the rights, status and other legal relations between Intervenors and Defendant arising out of the Contract.

22.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.004, Intervenors, as interested persons, request that the Court construe their rights, status, and other legal relations affected by the Contract. Specifically, they bring this action for declaratory judgment seeking declarations that: (i) § 7.4 of the APA portion of the Contract is invalid and unenforceable; and (ii) § 7.4's geographic scope, temporal scope, and scope of activities limited are unreasonable and unnecessarily broad.

## DEMAND FOR JURY TRIAL

23.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.007, Intervenors demand a trial by jury.

## PRAYER FOR RELIEF

Intervenors pray that the Court enter judgment declaring the rights, status, and other relations between the parties as described above.

June 12, 2019                                         Respectfully submitted,

                                                     **GRIFFITH BARBEE PLLC**

                                                     /s/ *Casey Griffith*
                                                     —————————————————
                                                     Casey Griffith
                                                     Texas Bar No. 24036687
                                                     Casey.Griffith@griffithbarbee.com

                                                     Michael Barbee
                                                     Texas Bar No. 24082656
                                                     Michael.Barbee@griffithbarbee.com

                                                     Ryan Funderburg
                                                     Texas Bar No. 24101776
                                                     Ryan.Funderburg@griffithbarbee.com

                                                     One Arts Plaza
                                                     1722 Routh St., Ste. 710
                                                     Dallas, Texas 75201
                                                     (214) 446-6020 | main
                                                     (214) 446-6021 | fax

                                                     **Counsel for Intervenors**

EFiled:  Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

## VERIFICATION OF MARK SMITH

I, Mark Smith, President and CEO of ProAir Holdings Corp, which is the

parent of related entities Bus Air, LLC and ProAir, LLC, state that I am an

authorized representative of the Plaintiff in the above-captioned action. I have read

the forgoing *Verified Complaint* and affirm: (i) that the factual allegations

contained therein, insofar as they concern the acts of Bus Air, LLC are true and

correct to the best of my knowledge, information, and belief; and (ii) insofar as

they relate to the acts of any other person, are believed by Bus Air, LLC to be true

and accurate.  I understand that this verification is made under penalty of perjury.

Signature: _____

Name:          Mark Smith

Date: _____ 7/10/19 _____

Rodney L. Rodrichell II

EFiled:  Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

# VERIFICATION OF ANDREW BEARD

I, Andrew Beard, Vice President of Operations for Bus Air, LLC and

ProAir, LLC, state that I am an authorized representative of the Plaintiff in the

above-captioned action. I have read the forgoing *Verified Complaint* and affirm: (i)

that the factual allegations contained therein, insofar as they concern the acts of

Bus Air, LLC are true and correct to the best of my knowledge, information, and

belief; and (ii) insofar as they relate to the acts of any other person, are believed by

Bus Air, LLC to be true and accurate.  I understand that this verification is made

under penalty of perjury.

Signature: _____

Name:        Andrew Beard

Date:        7 / 10 / 19

26

**EFiled:  Jul 10 2019 04:05PM EDT**
**Transaction ID 63531729**
**Case No. 2019-0532-**

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. <u>Caption of Case</u>: Bus Air, LLC v. Anthony R. Woods and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC

2. <u>Date Filed</u>: July 10, 2019

3. <u>Name and address of counsel for plaintiff(s)</u>: Richard M. Beck (Bar No. 3370) and Sean M. Brennecke (Bar No. 4686), Klehr Harrison, 919 Market Street, Suite 1000, Wilmington, Delaware 19801

4. <u>Short statement and nature of claim asserted</u>:  Breach of terms of an Asset Purchase Agreement.

5. <u>Substantive field of law involved (check one)</u>:

| | | |
|---|---|---|
| ____Administrative law | ____Labor law | ____Trusts, Wills and Estates |
| ____Commercial law | ____Real Property | ____Consent trust petitions |
| ____Constitutional law | ____348 Deed Restriction | ____Partition |
| _X_Corporation law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
| ____Trade secrets/trade mark/or other intellectual property | | ____Other |

6. <u>Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills)</u>:  None.

7. <u>Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction)</u>: 10 *Del. C.* § 341

8. <u>If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.</u> Entry of a preliminary injunction prohibiting Defendants from continuing to engage in wrongful conduct and requiring Defendants to take steps to remedy harm already caused.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here <u>X</u>.  (If #9 is checked, a Motion to Expedite <u>must</u> accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause.  X

<u>        */s/ Richard M. Beck* (Bar No. 3370)        </u>
Signature of Attorney of Record & Bar ID

## <u>STATEMENT OF GOOD CAUSE</u>

The undersigned counsel for Plaintiff hereby states that good cause exists for this action not to be assigned to a Master in the first instance. This action seeks a preliminary injunction and expedited proceedings and requests the immediate attention of the Court. Therefore, it should proceed directly before the Chancellor or a Vice Chancellor.

**KLEHR HARRISON
HARVEY BRANZBURG LLP**

*/s/ Richard M. Beck*

Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

*Attorneys for Bus Air, LLC*

1

PHIL1 8092277v.1

EFiled:  Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Bus Air, LLC,                                    )
                                                 )
                        Plaintiff,               )
                                                 )
            v.                                   )   C.A. No. _____
                                                 )
Anthony R. Woods and                             )
E3 Rivers, LLC f/k/a Bus Air                     )
Manufacturing, LLC,                              )
                                                 )
                        Defendants.              )

## PLAINTIFF BUS AIR'S MOTION TO EXPEDITE PROCEEDINGS

Plaintiff Bus Air, LLC ("Bus Air") respectfully moves this Court for an Order, in the form attached hereto, expediting this action and setting a schedule culminating in a ruling on its motion for preliminary injunction. Bus Air seeks expedited treatment because if a preliminary injunction is not entered, Defendants Anthony R. Woods and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("Defendants") will have caused Bus Air such irreparable harm that it may not recover.

## STATEMENT OF FACTS

This is an action against Defendants for knowing, willful and ongoing breaches of restrictive covenants included in the September 25, 2017 Asset

Purchase Agreement by and between Bus Air and Defendants ("APA").[1] Bus Air recently discovered that Defendants are directly or indirectly breaching those covenants in, among other locations, Decatur, Texas.

## I.    Bus Air and Defendants

Bus Air is a well-established manufacturer, installer, service and parts provider of air conditioning systems to the motor vehicle market. Bus Air specializes in buses, emergency vehicles, and large trucks.

Mr. Woods is a sophisticated businessperson who is, among other things, (i) the sole and Managing Member of Building 380, LLC ("Building 380") (affiliate of Defendants), and (ii) a silent member, financial backer or beneficiary of WW Sales, LLC ("WW") (affiliate of Defendants). E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC is successor to APA signatory Bus Air Manufacturing, LLC ("Old Co.").

Mr. Woods has two close relatives named Chad Whitton and Adam Whitton (collectively, "the Whittons"), who are not signatories to the APA; however, the Whittons are both former employees of Old Co. Solely as a result of their relationship with the Defendants, the Whittons had access to detailed information about the Business.

---

[1] The facts presented herein are drawn from the Verified Complaint ("Complaint"). Where special emphasis is required, citation to the Complaint and exhibits attached thereto is provided. Otherwise, specific citations are omitted.

2

After the APA closed on September 25, 2017 (the "Closing"), the Whittons and Mr. Woods became employees of Bus Air subject to certain at-will employment agreements (which agreements are not subject to this or any other suit). Defendants paid approximately $1,000,000 to Chad Whitton and $465,000 to Adam Whitton from the Closing proceeds. The Whittons do not possess the financial means or expertise necessary to independently create and fund a new company in the Business (defined below), and are beholden to Defendants, personally, professionally and financially.

## II.   The APA

All parties to the APA were represented by separate counsel throughout the due diligence, negotiation and Closing.[2] As it relates to this suit, the APA defines "Business" as "the business of designing, engineering, providing, manufacturing, installing, servicing and providing parts to the motor vehicle air conditioning industry." Exhibit 1, p.1. The Business of Bus Air is the same Business as Old Co.

Bus Air paid Defendants $18,190,000 in cash consideration for, among other things, agreement to Section 7.4 of the APA and its restrictive covenants, including Noncompetition and Nonsolicitation clauses, which remain in full force and effect until September 25, 2022. Defendants agreed and acknowledged that "the covenants and agreements set forth in this Section 7.4 are a material inducement to

---

[2] The APA is attached to the Complaint as Exhibit 1.

Buyer," and that "Buyer would incur a significant loss of the goodwill being purchased as part of the transactions contemplated hereby if either the Company or the Stockholder were to breach any of the provisions of this Section 7.4." Exhibit 1, at §7.4.

## III.   Defendants Breach APA

On or about September 19, 2018, Defendants formed Building 380, which acts as a shell to conceal Defendants' actual ownership of a parcel upon which Defendants set up a venture to compete with Bus Air.

On or about November 13, 2018, the Whittons formed WW with the financial backing and at the direction of Defendants; the Whittons and WW act as a front for Defendants to engage in activities that are covered by the Restrictive Covenant.

Three days after WW was formed, Defendants, through Building 380, purchased a certain parcel of land (the "Premises") on November 16, 2018. Defendants built a facility on the Premises specifically designed, engineered and outfitted to service buses, including the installation and maintenance of their air conditioning systems, as well as final inspection and wash—all Business activities. WW directly competes with Bus Air by performing the same Business Defendants did prior to the Closing at the Premises. For example, Building 380 and WW entered into a lease for the occupation and use of the Premises for the express

4

purpose of permitting Defendants to compete in the Business via the Whittons and WW.

Defendants benefit from WW's use of the Premises as a result of Mr. Woods's financial backing of WW, and further benefit from the income generated from the lease that Building 380 has with WW – i.e., income derived from operations that compete directly with Bus Air's Business.

Bus Air has learned through industry vendors and competitors that Defendants have been planning, and indeed have begun, to compete and solicit present and potential customers and employees of Bus Air, all in violation of Section 7.4. Bus Air's discovery of Defendants' unlawful competitive and solicitous behavior is an ongoing process, as individuals continuously come forward to share information regarding Defendants' behavior. As set forth more fully in its Verified Complaint ("Complaint"), Bus Air has learned the following:

- Mr. Woods's son told certain persons "my father sold his first empire and he is starting up a new one";

- Industry serviceperson made statements to Bus Air employee that Defendants and Chad Whitton were going to "steal all of [Bus Air's largest client] Longhorn's business and do install in Decatur"; and

- At the direction of Defendants:

- WW services buses at Premises for a variety of entities, including Bus Air's customers like Longhorn;

- WW directly targeted Bus Air's customers and solicited them by acting as an outside installer for Bus Air's principal competitor, Bergstrom;

- Chad Whitton attempted to and actually solicited Bus Air installers to work at the Premises;

- the Whittons contacted industry suppliers regarding the Business; and

- the Whittons contacted a Bus Air supplier twice in April 2019: (1) to supply WW the same products it supplied Old Co., and (2) to represent that WW was performing Bus Air spillover work for Longhorn; however, supplier refused because it was aware of the restrictive covenants in the APA.

As described further in the Complaint, Defendants have also concealed their attempts to start anew in the Business:

- Defendants created shell companies to cover their unlawful conduct and enlisted the Whittons to carry out their efforts to compete against and solicit away Bus Air's customers and employees;

6

- Prior to Closing, Defendants threatened a then Old Co. employee, and now Bus Air employee, that a breakdown in their relationship would prompt Defendants to unlawfully compete; and

- Prior to Closing, Defendants instructed staff members to purge personnel files of Old Co.

Bus Air has already suffered and will continue to suffer irreparable harm, other injuries and damages a result of Defendants' direct or indirect misconduct. Left unrestrained, there is an immediate risk that Defendants will continue to inflict irreparable harm on Bus Air's goodwill and market share, for which there is not adequate remedy at law. Upon learning of Defendants' misconduct, Bus Air issued a cease and desist demand and litigation hold letter on June 5, 2019.

## ARGUMENT

### I.   Legal Standard

"The burden on a plaintiff in seeking an expedited proceeding is not high. A party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted." *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2013 WL 209124, at *1 (Del. Ch. Jan. 18, 2013) (citations omitted). "Exceptions to the norm are rare." *In re Ness Techs., Inc.*, 2011 WL 3444573, at *2 (Del. Ch. Aug. 3, 2011) (internal quotation omitted).

7

To warrant expedited treatment, a plaintiff need only share "a sufficiently colorable claim and … a sufficient possibility of a threatened irreparable injury." *Laborers Local 235 Benefit Funds v. Starent Networks, Corp.,* 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009) (citation omitted). In making its determination, the Court need not reach the merits of the Complaint, but rather must accept the allegations and claims in the Complaint as true for purposes of adjudicating the requested relief. *Morton v. Am. Mktg. Indus. Holdings, Inc.,* 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995).

## II.    Bus Air Has a Sufficiently Colorable Claim

To determine whether a claim is sufficiently colorable, this Court accepts the allegations of the complaint as true and does not judge the legal sufficiency of the pleadings. *See, e.g.*, *TCW Tech. Ltd. P'Ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1478537, at *2 (Del. Ch. Oct. 2, 2000). Here, Plaintiff's Complaint details how Defendants covertly planned to unfairly compete against Bus Air while Mr. Woods still worked for Bus Air, and then indeed did directly and indirectly compete against Bus Air in violation of Section 7.4. The Complaint further details how Defendants directly and indirectly solicited employees, current customers, and potential customers of Bus Air in violation of the non-solicitation provision of Section 7.4. Upon this basis, Bus Air's Complaint states a colorable claim for breach of contract.

PHIL1 8092823v.1

### A.     *APA's Restrictive Covenants Are Enforceable*

Under Delaware law, a restrictive covenant is enforceable if: "(1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) ("*Kan-Di-Ki*"). "If the restrictive covenant in question was obtained as part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract." *Id.*

### 1) Restrictive Covenants Are Part of a Valid Contract

Defendants received ample consideration from Bus Air for the purchase of Old Co., including Bus Air's purchase of Old Co.'s goodwill, which was protected by Section 7.4. *See Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (citations omitted) ("*Tristate Courier*") ("A promise not to compete was made, valid consideration … was given, and no performance has been excused."). The APA is a valid and binding contract between Bus Air and Defendants.

### 2) Time and Geographic Scope

Delaware courts have found a five-year restriction on competition or solicitation to be reasonable in the context of a sale of business. *See e.g. O'Leary*,

9

2011 WL 379300, at *5, n. 27 (up to ten-years reasonable for sale of a business) (citation omitted); *Kan-Di-Ki*, 2015 WL 4503210, at *19 (five years reasonable).

"In Delaware, 'the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect.'" *O'Leary*, 2011 WL 379300, at *5 (quoting *Weichert Co. of Pennsylvania v. Young,* 2007 WL 4372823 at *3 (Del.Ch.2007)). Specifically, "[a] national scope can be particularly necessary in today's world where so many businesses operate on a national or even global scale." *Id.* at *5. Bus Air's Business is national. The 5-year national restriction in the APA is reasonable in its scope of temporal and geographic limitations.

### 3) Advances Economic Interest of Bus Air

As a party to the APA, Defendants acknowledged and agreed that the covenants and agreements set forth in Section 7.4 were "a material inducement to Buyer to enter into this Agreement and to perform obligations hereunder," and that Bus Air would incur a "significant loss of the goodwill being purchased" upon breach of Section 7.4. Through the APA, Defendants explicitly acknowledged that the restrictive covenants contained within the APA advance the economic interests of Bus Air.

"A non-compete covenant … [is] *for the protection of the purchaser,* for his or its enjoyment of the business, and to build good will." *O'Leary*, 2011 WL 379300, at *4. A company's interest in protecting the goodwill of its clients has long been recognized as a legitimate economic interest. *Tristate Courier,* 2004 WL 835886, at *10, n. 128 (citation omitted). Goodwill is "vulnerable to misappropriation" if the company's "former employees are allowed to solicit its customers shortly after changing jobs." *Id.* (where former employee had complete knowledge of business's strategies, logistics, and costs, company had legitimate interest in preventing information from being used in business against it).

Bus Air has a legitimate business interest in protecting the goodwill of its current and prospective customers that it purchased from Defendants as part of the APA.

### 4) **Balance of Equities**

Defendants and Bus Air negotiated the APA with the representation of counsel. As Defendants acknowledged in agreeing to Section 7.4, the restrictive covenants were an essential term for Bus Air, and of great value. "Delaware courts are strongly in favor of enforcement of contracts freely entered into by parties, and the Court will only set aside the agreement 'upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even

11

stronger than the freedom of contract.'" *O'Leary,* 2011 WL 379300, at \*5 (quoting *Libeau v. Fox,* 880 A.2d 1049, 1056–57 (Del.Ch.2005)).

The balance of the equities clearly weighs in favor of granting an injunction against any further breaches of Section 7.4 by Defendants. *See e.g., Tristate Courier,* 2004 WL 835886, at \*13–14.

### B.    Defendants Breached the APA

The APA prohibits Defendants' direct *or indirect* aiding of unfair competition against Bus Air. *See* Exhibit 1, §7.4 ("[Seller] will [not] … engage directly or indirectly (whether through Affiliates or otherwise) in … the Business …."). Delaware courts have found such indirect unfair competition to be unlawful. *See e.g., Kan-Di-Ki,* 2015 WL 4503210, at \*21 (analyzing non-compete which prohibited seller of business from engaging in competitive business *indirectly* and directly).

Section 7.4 further prohibits Defendants from (i) soliciting employees or contractors of Bus Air, (ii) soliciting business related to the Business from any contractor, customer, supplier, or service provider of Bus Air, or (iii) soliciting, encouraging, initiating or participating in discussions or negotiations with any present or future contractor, supplier or service provider with Bus Air to detriment of Bus Air. Exhibit 1, §7.4.

12

For the reasons set forth in this Motion and the Complaint, Defendants, through their own acts and through their direction of the Whittons' acts, have breached the APA by unlawfully competing in Bus Air's Business, and unlawfully soliciting current and potential customers and employees of Bus Air.

## III.   Threat of Irreparable Injury

Bus Air has shown a possibility of irreparable injury. Absent expedited relief, Defendants will continue to unfairly compete, solicit and divert new sales leads and existing customers and employees away from Bus Air. This wrongful conduct irreparably damages Bus Air through their loss of an unquantifiable amount of business, ability to exclusively benefit from developed business relationships, and competitive advantage among bus repair companies offering similar services. *See, e.g.*, *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *10 (Del. Ch. Mar. 27, 2014) ("[Plaintiff] correctly asserts that it has no adequate remedy at law for the value of any business lost...through [defendant's] solicitation efforts"); *Simplexity, LLC v. Zeinfeld*, 2013 WL 1457726, at *14 (Del. Ch. Apr. 5, 2013) ("[T]his Court has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached.") (quotations omitted)).

The irreparable harm from Defendants' actions "is the loss (or foreseeable loss) of client goodwill, and the suffering of the use of client connections against it," which is precisely what Bus Air sought to protect with Section 7.4. *Tristate*

*Courier,* 2004 WL 835886, at *13. "The harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable." *Id.* at *13, n.147 (citation omitted). The Chancery Court has "reject[ed], in this context, the argument that an award of damages would be sufficient to remedy any tortious interference with contract." *Id.*

An additional basis for finding irreparable injury is Defendants' agreement that violating Section 7.4 would cause Bus Air "[to] incur a significant loss of the goodwill being purchased." Exhibit 1, §7.4. Delaware courts have found such agreements sufficient to show irreparable harm. *See, e.g.*, *Vitalink Pharm. Servs., Inc. v. Grancare, Inc.*, 1997 WL 458494, at *9 (Del. Ch. Aug. 7, 1997) (contractual stipulation "alone suffices to establish the element of irreparable harm").

As this Motion and the Complaint demonstrates, Bus Air has suffered and will continue to suffer irreparable harm as a result of Defendants' breach. Defendants, through their own acts and through their direction of the Whittons' acts, have caused Bus Air irreparable harm by soliciting current and potential customers and employees and unfairly competing in Bus Air's Business. For example, solicited-away Bus Air installers are using confidential and proprietary Bus Air information at the Premises to create fixes for Longhorn that, prior to those installer's arrival, WW could not accomplish. Bus Air has already lost

Business as a result of Defendants' conduct, and is at risk to lose more if Defendants are not enjoined. There is further immediate risk Bus Air will continue to have its goodwill and market share impacted, for which there is not adequate remedy at law.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Bus Air's motion to expedite and enter an appropriate schedule for Bus Air's motion for a preliminary injunction.

Dated: July 10, 2019

**KLEHR HARRISON
HARVEY BRANZBURG LLP**

*/s/ Richard M. Beck*
Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

**OF COUNSEL**

Thomas T. Reith
Kelly Kirby
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone (617) 345-3000
treith@burnslev.com
kkirby@burnslev.com

*Attorneys for Bus Air, LLC*

**WORDS: 2,902**

15

PHIL1 8092823v.1

EFiled: Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| Anthony R. Woods, and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER EXPEDITING PROCEEDINGS

The Court having considered Plaintiff's Motion to Expedite Proceedings and

having found good cause therefore,

IT IS HEREBY ORDERED this _____ day of July 2019:

1.     The Motion is GRANTED.

2.     The following schedule shall govern discovery and briefing for

Plaintiff's motion for a preliminary injunction:

| (a) | Deadline for Defendants to file and serve answer to Verified Complaint | 7 days from date of service ("Starter date") |
|---|---|---|
| (b) | Deadline for parties to serve document requests and interrogatories related to Plaintiff's motion for a preliminary injunction | Starter date + 7 days |
| (c) | Deadline to respond to document requests and interrogatories related to Plaintiff's motion for a preliminary injunction | Starter date +14 days |
| (d) | Deadline for parties to complete document | Starter date + 21 days |

|     | production related to Plaintiff's motion for a preliminary injunction |  |
| --- | --- | --- |
| (e) | Deadline for Defendants to grant Plaintiff access to the premises at issue located at 4163D FM 730, Decatur, TX 76234 | July 25, 2019 |
| (f) | Deadline to complete depositions related to Plaintiff's motion for a preliminary injunction | Starter date + 35 days |
| (g) | Plaintiff files and serves its Opening Preliminary Injunction Brief | To be set by Court |
| (h) | Defendants file and serve Answering Preliminary Injunction Brief | To be set by Court |
| (i) | Plaintiff files and serves his Reply Preliminary Injunction Brief | To be set by Court |
| (j) | Hearing on Preliminary Injunction | To be set by Court |

3.     The parties shall work together in good faith on scheduling of depositions to ensure timely completion.

4.     The parties may amend the dates set forth in subparagraphs 2(a)-(f) of this Order by written agreement, without Court approval. All other deadlines, and the hearing date, may be amended only by order of the Court.

_____
[Vice] Chancellor

4816-3578-6395.1

PHIL1 8092284v.1

EFiled: Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| Anthony R. Woods, and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF BUS AIR'S MOTION FOR A PRELIMINARY INJUNCTION

As prayed for in the Verified Complaint filed herewith at Prayers 3 through 5, Plaintiff Bus Air, LLC ("Bus Air") respectfully moves for a preliminary injunction prohibiting Defendants Anthony R. Woods and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("Defendants") from engaging in conduct set forth in Bus Air's Proposed Order on its Motion for a Preliminary Injunction, submitted herewith, and ordering the Defendants to account for certain conduct. The grounds for this motion will be set forth more fully in Bus Air's Opening Brief to be filed pursuant to a schedule agreed to by the parties and/or entered by the Court.

Dated: July 10, 2019

**KLEHR HARRISON
HARVEY BRANZBURG LLP**

*/s/ Richard M. Beck*
Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

**OF COUNSEL**

Thomas T. Reith
Kelly Kirby
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone (617) 345-3000
treith@burnslev.com
kkirby@burnslev.com

*Attorneys for Bus Air, LLC*

**WORDS: 103**

4849-3792-8604.1

EFiled: Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| Anthony R. Woods, and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER ON PLAINTIFF BUS AIR'S MOTION FOR A PRELIMINARY INJUNCTION

WHEREAS, Plaintiff Bus Air, LLC has filed a Motion for a Preliminary Injunction in the above-referenced action; and

WHEREAS, the Court considered the Motion for a Preliminary Injunction, the Verified Complaint, supporting materials, and any arguments submitted by the parties and has found good cause for issuance of a preliminary injunction;

IT IS HEREBY ORDERED, this _____day of _____2019, that:

1. Plaintiff Bus Air's Motion for a Preliminary Injunction is GRANTED.

2. Defendants Anthony R. Woods and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("Defendants"), until September 25, 2022, are enjoined from engaging directly or indirectly (be it by or through Building 380, LLC, WW Sales,

LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) in all or any portion of the Business anywhere in North America.

3. Defendants shall:

   a. immediately terminate all agreements they have directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendants) with any entity or person in the Business concerning bus air conditioning related services;

   b. immediately cease and desist soliciting customers directly or indirectly (be it by or through, Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendants) in any manner relating to the Business;

   c. immediately cease and desist soliciting Bus Air employees directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendant);

   d. immediately cease and desist taking payment of rent or any other form of consideration for use of the Premises associated with anything related to the Business;

   e. immediately cease and desist using the Premises for anything related to the Business;

f.  immediately terminate and cease to implement any contract, agreement or arrangement (written, verbal or otherwise) concerning the Business by and among the Defendants,  Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton or others affiliated with the Defendants;

g.  certify to the Court, with a copy to Bus Air's counsel, within three (3) calendar days from the date of this Order, that the Defendants have taken the actions required by paragraphs 3(a)-(f) above;

h.  provide a written accounting to the Bus Air's counsel of record, no later than seven (7) calendar days from this Order listing:

   i.  the names, addresses and other contact data for all entities and/or persons the Defendants directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) solicited and/or actually contracted with to provide goods or services related to the Business since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC);

   ii.  the names, addresses and other contact data for all entities and/or persons the Defendants directly or indirectly (be it by or

through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) solicited for employment or services on behalf of the Defendants or any of their Affiliates since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC); and

iii. of all monies and/or other consideration the Respondents received from entities and/or persons the Defendants directly or indirectly (be it by or through Building 380, LLC, WW Sales, LLC, Chad Whitton, Adam Whitton, or others affiliated with the Defendants) solicited and/or actually contracted with since the Closing (and the 6 months prior to the extent not solely and exclusively for the benefit of Bus Air Manufacturing, LLC).

4. Defendants are permanently enjoined from taking any action prohibited by APA.

5. This Order shall remain in full force and effect until such time as this Court specifically orders otherwise.

_____
[Vice] Chancellor

4823-2578-9852.1

PHIL1 8092283v.1

EFiled:  Jul 16 2019 10:20AM EDT
Transaction ID 63549830
Case No. 2019-0532-JRS

**KLEHR HARRISON**
**HARVEY BRANZBURG**LLP

Sean M. Brennecke
Direct Dial: (302) 552-5518
Email: SBrennecke@klehr.com

July 16, 2019

**VIA LEXIS NEXIS FILE & SERVE**

Register in Chancery
Court of Chancery
Kent County Courthouse
38 The Green
Dover, DE 19901

    Re:   ***Bus Air, LLC v. Woods et al.*, C.A. No. 2019-0532-JRS**

Dear Register in Chancery:

Please issue summonses for defendants Anthony R. Woods ("Woods") and E3Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("E3Rivers").  Pursuant to 10 *Del. C.* §3104, and the terms of the Limited Liability Company Agreement at issue in this action, Woods will be served via overnight mail, signature required, sent to:

        Anthony R. Woods
        c/o E3Rivers, LLC
        4163 South FM 730
        Decatur, Texas 76234

919 N. MARKET STREET  |  SUITE 1000  |  WILMINGTON, DE 19801  |  t 302.426.1189  |  f 302.426.9193  |  www.klehr.com
PENNSYLVANIA  |  NEW JERSEY  |  DELAWARE

PHIL1 8092803v.1



Register in Chancery
July 16, 2019
Page 2

Pursuant to 10 *Del. C.* §3104, and the terms of the Limited Liability Company Agreement at issue in this action, E3Rivers will be served via overnight mail, signature required, sent to:

> E3Rivers, LLC
> 4163 South FM 730
> Decatur, Texas 76234
> Attn: Anthony R. Woods

Please contact me when the summonses are prepared.  If you have any questions or concerns please do not hesitate to contact me at (302) 552-5518.

Respectfully,

*/s/ Sean M. Brennecke*

Sean M. Brennecke
DE Bar No. 4686

WORDS: <u>131</u>

EFiled:  Jul 16 2019 11:31AM EDT
Transaction ID 63550298
Case No. 2019-0532-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 2019-0532 JRS |
| v. | ) |
| | ) |
| Anthony R. Woods, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MOTION FOR ADMISSION *PRO HAC VICE* OF
## KELLY KIRBY, ESQUIRE TO REPRESENT BUS AIR, LLC

I, Sean M. Brennecke, a member of the Delaware bar, pursuant to Court of

Chancery Rule 170, move the admission pro hac vice of Kelly Kirby, of Burns &

Levinson LLP, 125 Summer Street  Boston, MA 02110 to represent Bus Air, LLC,

in the above-captioned action.  Movant certifies that he finds the Applicant to be a

reputable and competent attorney, and Movant is in a position to recommend the

Applicant's admission.  The Applicant is admitted for the practice of law in the

Commonwealth of Massachusetts.

Dated: July 16, 2019

**KLEHR HARRISON
HARVEY BRANZBURG LLP**

*/s/ Sean M. Brennecke*
Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

**OF COUNSEL**

*Attorneys for Bus Air, LLC*

Thomas T. Reith
Kelly Kirby
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone (617) 345-3000
treith@burnslev.com
kkirby@burnslev.com

**WORDS: <u>85</u>**

2

**EFiled:  Jul 16 2019 11:31AM EDT**
**Transaction ID 63550298**
**Case No. 2019-0532-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 2019-0532 JRS |
| v. | ) |
| | ) |
| Anthony R. Woods, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CERTIFICATION OF KELLY KIRBY, ESQUIRE IN SUPPORT OF MOTION FOR HER ADMISSION *PRO HAC VICE* BUS AIR LLC

Kelly Kirby, Esquire (the "Applicant"), hereby certifies:

1.     That Applicant is a member in good standing of the bar of the Commonwealth of Massachusetts.

2.     That Applicant shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended.

3.     That Applicant and all attorneys of the Applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court.

4.     That Applicant consents to the appointment of the Register in Chancery of the county in which the matter pends as agent upon whom service of

process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under Court of Chancery Rule 170 and any activities related thereto.

5.     That Applicant has not appeared in any actions in a court of record of Delaware in the preceding twelve months.

6.     That a payment for the pro hac vice admission assessment determined by the Delaware Supreme Court is attached to be deposited in the Supreme Court registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.     That Applicant has not been disbarred or suspended and is not the object of any pending disciplinary proceedings in any jurisdiction where the Applicant has been admitted generally, *pro hac vice*, or in any other way.

8.     That Applicant is also admitted for the practice of law in the following states or jurisdictions:

   •     The United States District Court for the Districts of Massachusetts and Connecticut; and

   •     The State of Connecticut.

Dated: July 10, 2019

Kelly Kirby, Esquire.

**EFiled:  Jul 16 2019 11:31AM EDT**
**Transaction ID 63550298**
**Case No. 2019-0532-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 2019-0532 JRS |
| v. | ) |
| | ) |
| Anthony R. Woods, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## [PROPOSED] ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KELLY KIRBY, ESQUIRE <ins>TO REPRESENT BUS AIR, LLC</ins>

The foregoing application for admission to practice in this action *pro hac vice* of Kelly Kirby, Esquire, to represent Bus Air, LLC is hereby granted.

IT IS SO ORDERED this _____day of July, 2019

_____
Vice Chancellor Joseph R. Slights

PHIL1 8104594v.1

**EFiled:  Jul 16 2019 11:42AM EDT**
**Transaction ID 63550390**
**Case No. 2019-0532-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | )  C.A. No. 2019-0532 JRS |
| v. | ) |
|  | ) |
| Anthony R. Woods, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## MOTION FOR ADMISSION *PRO HAC VICE* OF
## THOMAS T. REITH, ESQUIRE TO REPRESENT BUS AIR, LLC

I, Sean M. Brennecke, a member of the Delaware bar, pursuant to Court of Chancery Rule 170, move the admission pro hac vice of Thomas T. Reith, of Burns & Levinson LLP, 125 Summer Street  Boston, MA 02110 to represent Bus Air, LLC, in the above-captioned action.  Movant certifies that he finds the Applicant to be a reputable and competent attorney, and Movant is in a position to recommend the Applicant's admission.  The Applicant is admitted for the practice of law in the Commonwealth of Massachusetts.

Dated: July 16, 2019

KLEHR HARRISON
HARVEY BRANZBURG LLP

/s/ Sean M. Brennecke
Richard M. Beck (DE Bar No. 3370)
Sean M. Brennecke  (DE Bar No. 4686)
919 Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5501
rbeck@klehr.com
sbrennecke@klehr.com

**OF COUNSEL**

*Attorneys for Bus Air, LLC*

Thomas T. Reith
Kelly Kirby
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone (617) 345-3000
treith@burnslev.com
kkirby@burnslev.com

**WORDS: <u>86</u>**

2

EFiled:  Jul 16 2019 11:42AM EDT
Transaction ID 63550390
Case No. 2019-0532-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 2019-0532 JRS |
| v. | ) |
| | ) |
| Anthony R. Woods, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CERTIFICATION OF THOMAS T. REITH, ESQUIRE IN SUPPORT OF MOTION FOR HIS ADMISSION ***PRO HAC VICE* TO REPRESENT BUS AIR, LLC**

Thomas T. Reith, Esquire (the "Applicant"), hereby certifies:

1.     That Applicant is a member in good standing of the bar of the Commonwealth of Massachusetts.

2.     That Applicant shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended.

3.     That Applicant and all attorneys of the Applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court.

4.     That Applicant consents to the appointment of the Register in Chancery of the county in which the matter pends as agent upon whom service of

process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under Court of Chancery Rule 170 and any activities related thereto.

5.     That Applicant has not appeared in any actions in a court of record of Delaware in the preceding twelve months.

6.     That a payment for the pro hac vice admission assessment determined by the Delaware Supreme Court is attached to be deposited in the Supreme Court registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.     That Applicant has not been disbarred or suspended and is not the object of any pending disciplinary proceedings in any jurisdiction where the Applicant has been admitted generally, *pro hac vice*, or in any other way.

8.     That Applicant is also admitted for the practice of law in the following states or jurisdictions:

- The United States Court of Appeals for the First Circuit; and

- The United States District Court for the District of Massachusetts.

Dated: July 10, 2019

_____

Thomas T. Reith, Esquire.

**EFiled:  Jul 16 2019 11:42AM EDT**
**Transaction ID 63550390**
**Case No. 2019-0532-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) C.A. No. 2019-0532 JRS |
| v. | ) |
|  | ) |
| Anthony R. Woods, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## [PROPOSED] ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF THOMAS T. REITH, ESQUIRE <u>TO REPRESENT BUS AIR, LLC</u>

The foregoing application for admission to practice in this action *pro hac vice* of Thomas T. Reith, Esquire, to represent Bus Air, LLC is hereby granted.

IT IS SO ORDERED this _____day of July, 2019

_____
Vice Chancellor Joseph R. Slights

EFiled: Jul 18 2019 12:26PM EDT
Transaction ID 63650281
Case No. 2019-0532-JRS

Case No. 2019-0532-JRS



**KLEHR HARRISON
HARVEY BRANZBURG** LLP

Sean M. Brennecke
Direct Dial: (302) 552-5518
Email: SBrennecke@klehr.com

July 16, 2019

<u>**VIA LEXIS NEXIS FILE & SERVE**</u>

*[handwritten: 7/18/19 - issued
(1) 3104 summons to
law firm (2 copies)]*

Register in Chancery
Court of Chancery
Kent County Courthouse
38 The Green
Dover, DE 19901

Re:  <u>***Bus Air, LLC v. Woods et al.*, C.A. No. 2019-0532-JRS**</u>

Dear Register in Chancery:

Please issue summonses for defendants Anthony R. Woods ("Woods") and

E3Rivers, LLC f/k/a Bus Air Manufacturing, LLC ("E3Rivers").  Pursuant to 10

*Del. C.* §3104, and the terms of the Limited Liability Company Agreement at issue

in this action, Woods will be served via overnight mail, signature required, sent to:

> Anthony R. Woods
> c/o E3Rivers, LLC
> 4163 South FM 730
> Decatur, Texas 76234

*[handwritten: 1d ℬ]*



Register in Chancery
July 16, 2019
Page 2

Pursuant to 10 *Del. C.* §3104, and the terms of the Limited Liability Company Agreement at issue in this action, E3Rivers will be served via overnight mail, signature required, sent to:

E3Rivers, LLC
4163 South FM 730
Decatur, Texas 76234
Attn: Anthony R. Woods

Please contact me when the summonses are prepared.  If you have any questions or concerns please do not hesitate to contact me at (302) 552-5518.

Respectfully,

*/s/ Sean M. Brennecke*

Sean M. Brennecke
DE Bar No. 4686

WORDS: <u>131</u>

PENNSYLVANIA    |    NEW JERSEY    |    DELAWARE

PHIL1 8092803v.1

EFiled:  Jul 10 2019 04:05PM EDT
Transaction ID 63531729
Case No. 2019-0532-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BUS AIR, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ANTHONY R. WOODS and | ) |
| E3 RIVERS, LLC f/k/a BUS AIR | ) |
| MANUFACTURING, LLC, | ) |
| | ) |
| Defendants. | ) |



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BUS AIR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CA #  2019-0532-JRS |
| | ) | |
| v. | ) | SUMMONS |
| | ) | |
| ANTHONY R. WOODS and E3 RIVERS LLC f/k/a BUS AIR MANUFACTURING, LLC, | ) | Pursuant to 10 Del.C. Sec. 3104 |
| | ) | |
| Defendants. | ) | |

**THE STATE OF DELAWARE**

**TO: KLEHR HARRISON HARVEY BRANZBURG LLP:**

**YOU ARE COMMANDED**:

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Sean M. Brennecke</u>, Esquire, Plaintiff's counsel, whose address is <u>Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801,</u> an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney name above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        July 18, 2019

_____
Register in Chancery

Case # 2019-0532-JRS

BUS AIR, LLC,

Plaintiff,

v.

ANTHONY R. WOODS and E3 RIVERS LLC f/k/a BUS AIR MANUFACTURING, LLC,

Defendants.

**SUMMONS**

Please effectuate service upon:

1.   Anthony R. Woods
     c/o E3Rivers, LLC
     4163 South FM 730
     Decatur, TX 76234

2.   E3Rivers, LLC
     4163 South FM 730
     Decatur, TX 76234
     Attn: Anthony R. Woods


Pursuant to 10 Del.C. Sec. 3104,
and the Terms of the Limited Liability Company Agreement at issue in this Action


SERVICE TO BE COMPLETED BY KLEHR HARRISON HARVEY BRANZBURG LLP -
Via Overnight Mail, Signature Required


Sean M. Brennecke, Esquire
Plaintiff's Attorney

**EFiled:  Jul 19 2019 08:18PM EDT**
**Transaction ID 63566830**
**Case No. 2019-0532-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. <u>2019-0532-JRS</u> |
| | ) |
| Anthony R. Woods, and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF SEAN M. BRENNECKE
## IN FURTHER SUPPORT OF PLAINTIFF'S VERIFIED COMPLAINT, PLAINTIFF'S MOTION TO EXPEDITE PROCEEDINGS, AND <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

I, Sean M. Brennecke, being duly sworn, deposes and says as follows:

1.      I am an associate with the law firm of Klehr Harrison Harvey

Branzburg LLP, and I represent Plaintiff Bus Air, LLC in the above-captioned

matter.

2.      I submit this affidavit in further support of Plaintiff's Verified

Complaint, Plaintiff's Motion to Expedite Proceedings, and Plaintiff's Motion for

Preliminary Injunction.

3.      Attached are true and correct copies of the following documents:

| Exhibit | Description |
|---------|-------------|
| 1 | Affidavit of David Manning |
| 2 | Affidavit of Jennifer Thomas |
| 3 | Affidavit of David Oberdorff |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

KLEHR HARRISON
HARVEY BRANZBURG LLP

Sean M. Brennecke (#4686)
919 Market Street, Suite 1000
Wilmington, DE 19801-3062
(302) 552-5508
sbrennecke@klehr.com

Sworn to and subscribed before me this
19th day of July, 2019

Notary Public

My commission expires:

STACEY F. TATE
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires October 25, 2019

EFiled:  Jul 19 2019 08:18PM EDT
Transaction ID 63566830
Case No. 2019-0532-JRS

# EXHIBIT 1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. <u>2019-0532</u> |
| v. | ) |
| | ) |
| Anthony R. Woods and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC, | ) |
| | ) |
| Defendants. | |

## AFFIDAVIT OF DAVID MANNING

I, David Manning, being duly sworn, depose and say as follows:

1.      I make this affidavit based upon my own personal knowledge.

2.      I am the Vice President of Operations for AMCO Enterprises ("AMCO").

3.      AMCO is a full-line distributor and vendor of fasteners, "class C" items, and specialty items.

4.      AMCO provides its products to Plaintiff Bus Air, LLC ("Bus Air"), for Bus Air's use in its business of designing, engineering, providing, manufacturing,

1

installing, servicing, and providing parts to the motor vehicle air conditioning industry ("Business").

5.     I have personal knowledge that Bus Air, LLC purchased the assets of Bus Air Manufacturing, LLC (now known as E3 Rivers, LLC) from Anthony and his company E3 Rivers, LLC (formerly known as Bus Air Manufacturing, LLC).

6.     I refer to Bus Air Manufacturing, LLC as "Old Co." in this Affidavit.

7.     I have been working with Bus Air on behalf of AMCO for close to three years, and with Old Co. on behalf of AMCO for decades before that.

8.     I have personal knowledge of the specific products that AMCO provides to Bus Air and previously provided to Old Co.

9.     AMCO provides the same products to Bus Air that it previously provided to Old Co.

10.     I have known the Defendant Anthony Woods ("Anthony") for approximately 30 years.

11.     I have known Chad Whitton, who is a nephew of Mr. Woods, for approximately 18 years.

12.     I have known Adam Whitton, who is a nephew of Mr. Woods, for approximately 18 years.

13.     I have personal knowledge that WW Sales, Inc. ("WW") is a company owned and operated by Chad Whitton and Adam Whitton (together, the "Whittons").

14.     In April 2019, the Whittons contacted me via telephone and asked me if AMCO would supply WW the same product that AMCO used to supply to Old Co. prior to Bus Air's purchase of Old Co.

15.     Given what I know about the relationship of Anthony and his nephews the Whittons, I understood that Anthony was behind WW and the Whittons' request.

16.     At the time I received this phone call, I knew that Anthony was barred from competing against Bus Air.

17.     Because I knew that Anthony was barred from competing against Bus Air, I refused to supply WW and the Whittons the requested parts.

18.     When I refused, the Whittons were upset with me given the long history I have with them and Anthony.

19.     Shortly after this first telephone call, Chad Whitton called me via telephone a second time in April 2019.

20.     During this second phone call, Chad Whitton told me that WW was performing Bus Air "spillover" work for Longhorn Bus Sales ("Longhorn").

21.     At the time I received this second phone call, I knew that Longhorn was a significant Bus Air client.

3

22.     During this second phone call, I told Chad Whitton that I would check with Andy Beard (Bus Air's present VP of Operations and Old Co.'s former Chief Operating Officer/Anthony's former direct report), to determine if Bus Air agreed with Chad Whitton's representation that WW was performing Bus Air's spillover work for Longhorn.

23.     I further told Chad Whitton that I would ask Mr. Beard if Bus Air agreed with AMCO supplying WW—a company that I understood Anthony to be backing—products for WW's use in "Bus Air's spillover work".

24.     After this second telephone call with Chad Whitton, I sent Chad Whitton an email dated April 30, 2019, about my intention to reach out to Mr. Beard. A true and accurate copy of that email is attached hereto as Exhibit A.

25.     After I sent the Exhibit A email to Chad Whitton, Chad Whitton called me and told me to forget the issue, and not to call Mr. Beard.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

David Manning

Sworn to and subscribed before me this 19 day of July, 2019

Notary Public

My commission expires: 06/19/2022

KAREN STEPHENS
NOTARY PUBLIC
ID# 6680843
State of Texas
Comm. Exp. 06-19-2022

4846-2030-0700.1

# Exhibit A

## Thomas T. Reith

| | |
|---|---|
| **From:** | Andy Beard <abeard@proairllc.com> |
| **Sent:** | Friday, June 14, 2019 5:06 PM |
| **To:** | Thomas T. Reith; Mark Smith |
| **Subject:** | FW: Hardware |

**From:** David Manning <dmanning@amcoenterprises.com>
**Sent:** Friday, June 14, 2019 3:32 PM

**To:** Andy Beard <abeard@proairllc.com>
**Subject:** Fwd: Hardware

Begin forwarded message:

**From:** David Manning <dmanning@amcoenterprises.com>
**Subject: Hardware**
**Date:** April 30, 2019 at 12:07:29 PM CDT
**To:** chad@wwwsales.com

Mr Chad,
I will get wit Andy in the next couple of days and see what he thinks about your mention of doing work on some of the buses for PROAIR ( LONGHORN BUS) . If he in fact does not have a problem with AMCO supplying fasteners we can talk later.  He may be out of town but I will be out there in the morning and visit with him if he is in the office.

Best Regards,

David Manning
817-281-7697
dmanning@amcoenterprises.com

This email has been scanned for spam and viruses. Click here to report this email as spam.

# EXHIBIT 2

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) C.A. No. <u>2019-0532</u> |
| v. | ) |
|  | ) |
| Anthony R. Woods and | ) |
| E3 Rivers, LLC f/k/a Bus Air | ) |
| Manufacturing, LLC, | ) |
|  | ) |
| Defendants. | ) |

## <u>AFFIDAVIT OF JENNIFER THOMAS</u>

I, Jennifer Thomas, being duly sworn, deposes and says as follows:

1.     I am of sound mind, capable of making this affidavit, and I have personal knowledge of the facts stated herein, which are all true and correct.

2.     I am employed as a paralegal for the law firm of Graves, Dougherty, Hearon & Moody, P.C. ("Graves, Dougherty"), in Austin, Texas.

3.     In the course of my employment with Graves, Dougherty, on or about June 18, 2019, I requested from Wise County, Texas, Public Works department the approved plat, septic plans and other documents on file for the Building 380, LLC, project located in Decatur, Texas.

1

4.     In response to my request, on June 19, 2019, I received an email from Erika Taylor, Chief Deputy Coordinator of Wise County Public works.  Attached to the email from Wise County were 19 pages of documents.  A true and accurate copy of the email I sent to Wise County and the email and records I received from Wise County are attached hereto as <u>Exhibit A</u>.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Jennifer Thomas

Sworn to and subscribed before me this 18th day of July, 2019



Notary Public

My commission expires:

Imelda Elizabeth Couvillo
Notary Public, State of Texas
Comm. Expires 06-28-2023
Notary ID 17710-5

# EXHIBIT A

**Thomas, Jennifer L.**

---

| | |
|---|---|
| **From:** | Taylor, Erika <erika.Taylor@co.wise.tx.us> |
| **Sent:** | Wednesday, June 19, 2019 7:43 AM |
| **To:** | Thomas, Jennifer L. |
| **Cc:** | Trickey, Christopher H.; McGar, Khristie |
| **Subject:** | RE: Building 380, LLC |
| **Attachments:** | 16485.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Jennifer,

Here is the septic permit.

I do not have a way to scan the whole subdivision plat.  But there is a copy of his tract in that subdivision included in the septic permit.

If you do need a copy of the entire subdivision plat, you can contact the Wise County Clerk's Office at 940-627-3351.


**Thank you,**
**Erika Taylor, Chief Deputy Coordinator**

**Wise County Public Works**
**PO Box 899**
**Decatur, TX  76234**
**940-627-9332 Office**
**940-627-6171 Fax**
**erika.taylor@co.wise.tx.us**
**Public Works office hours are Monday-Friday 7am to 5:30pm.**
**(I am usually not in the office on Fridays.)**

**AS OF 9-28-2015, our new location is:**
**2901 South FM 51, Building 100, Decatur, TX  76234 Building 100**

**All county forms can be found on the county website:  www.co.wise.tx.us under DOWNLOADS.**


**From:** Thomas, Jennifer L. [mailto:JThomas@gdhm.com]
**Sent:** Tuesday, June 18, 2019 2:37 PM
**To:** Taylor, Erika
**Cc:** Trickey, Christopher H.
**Subject:** Building 380, LLC

Hi Erika,

Per our phone conversation, can you please send me the approved plat and the septic plans (and anything else) you have on file for the Building 380, LLC project?  The information is below:

Building 380 LLC

1

Physical address:  389 CR 4004, Decatur 76234
Legal description of property: 38.250 acres, Lot 5, Subdivision: Stonewood Addition

Thank you very much for your help!

**Jennifer Thomas** | Paralegal
Direct: (512) 480-5670 | Fax: (512) 480-5826



401 Congress Avenue, Suite 2700
Austin, Texas 78701
www.gdhm.com

This electronic communication (including any attached document) may contain privileged and/or confidential information. If you are not an intended recipient of this communication, please be advised that any disclosure, dissemination, distribution, copying, or other use of this communication or any attached document is strictly prohibited. If you have received this communication in error, please notify the sender immediately by reply e-mail and promptly destroy all electronic and printed copies of this communication and any attached document.

# WISE COUNTY
# DEPARTMENT OF PUBLIC WORKS

P.O. BOX 899
DECATUR, TEXAS 76234
(940) 627-9332 OR 940-627-6655
FAX (940) 627-6171

## APPLICATION FOR INSTALLATION OF ON-SITE SEWAGE FACILITY
(APPLICATION UPDATED 11/27/06)          PERMIT NO. **16485**

☑ NEW CONSTRUCTION
☐ ALTER, EXTEND, OR REPAIR

PROPERTY OWNER'S NAME: _Tony Woods_

PERMANENT MAILING ADDRESS: _4163 South FM 730_   _Decatur TX 76234_
                                                  Street/Box                     City                     Zip

TELEPHONE: _____   _817-241-5828_
                       Home                            Work                            Mobile

911 ADDRESS: _5980   East Hwy 380   Decatur TX 76234_
                          Street/Box                     City                     Zip

LEGAL DESCRIPTION OF PROPERTY: (attach legal description) Acres _38.25_

Lot _5_   Block _____   Subdivision _Stonewood_   Phase _____

OR Abstract number _____   Survey Name _____

SOURCE OF WATER: ☑ Private Well OR ☐ Public Water from _____

SINGLE FAMILY RESIDENCE: Number of Bedrooms _____   Living Area (Sq. Ft.) _____

Has Water Saving Devices (WSD)? ☑ YES ☐ NO   Maximum Daily Water Consumption (gpd): _____

**_COMMERCIAL/INSTITUTIONAL_** _(Including multi-family residence) Type:_ _Service Shop._   _9000 sqft_

_No. Employees/Occupants ____ Days Occupied Per Week ____ Shifts ____ Max. Daily Water Consumption (gpd):_ ____

DESIGNER: _James Sims_   LICENSE NO. _37781_   EXP DATE _____

SITE EVALUATOR: _James M. Sims_   LICENSE NO. _37781_   EXP DATE _____

INSTALLER: _Lonnie Vann_   LICENSE NO. _773_   EXP DATE _4   2021_

INSTALLER'S PHONE NUMBERS: _817-994-3958_

I certify the above statements are true and correct to the best of my knowledge. Authorization is hereby granted to Wise County to enter upon the above-described private property for the purpose of lot evaluation and inspection of on-site sewage facilities. I understand approval of this application constitutes authorization for construction of the on-site sewage facility and that a permit to operate the facility will be granted following a successful inspection of the installed system which indicates that the system was installed in compliance with Wise County's "Construction Standards for On-Site Sewage Facilities".

_Tony Woods_                                  _MAY 8 - 2019_
       Owner's Signature                                    Date

16485



16485



05/17/2019 14:16

# WISE COUNTY
# DEPARTMENT OF PUBLIC WORKS

P.O. Box 899
Decatur, Texas 76234
(940) 627-9332
Fax (940) 627-6171



*PROTECTING TEXANS' HEALTH AND SAFETY BY PREVENTING AND REDUCING POLLUTION*

### PERMIT TO CONSTRUCT
### AN
### ON-SITE SEWER FACILITY

DATE __5·6·2019__

AMOUNT
RECEIVED __$ 360⁰⁰__

*CK# 15555 L Vann*

PERMIT № 16485

PROPERTY OWNER __Tony Woods__

MAILING ADDRESS __5980 E Hwy 380__
__Decatur Tx 76234__

PROPERTY LOCATION __Stonewood Addition Lot 5.__

_____ WISE COUNTY, TEXAS

This serves to notify all persons that an on-site sewer facility application, the related technical data, and the appropriate fees have been received by Wise County from the property owner. The application has been reviewed against the standards set forth by the county and the State of Texas. Approval is hereby granted to the owner for the construction as shown on the submitted plans.

Comments: __LPD__

_____
Application Reviewer

# Wise County
# Department of Public Works

**Tom Goode, Director**



P. O. Box 899
2901 South FM 51
Decatur, Texas 76234
(940) 627-6655

Permit No. *16485*

## License to Operate
## an
## Individual On-Site Sewerage Disposal Facility

Property Owner's Name: *Tony Woods*

Mailing Address *5980 E. Hwy 380   Decatur TX 76234*

Property Address/or Location _____

_____

_____

_____**Wise County, Texas**

This serves to notify all persons, that the on-site sewerage disposal facility serving the property noted above has satisfied design, construction, and installation requirements of Wise County Department of Public Works. This On-Site Sewerage Facility Permit is issued for the operation of the above-identified on site-sewerage facility.

**Any modification to the structure, system components, or changes of ownership may require a new permit.** The owner must notify this office of the aforementioned changes.

Additional Information or Note: _____

_____

_____

*#26814*

*Kenneth E. McCauley*
_____
Inspector

*5-17-19*
_____
Date

L. Vann

**PRECINCT:** __1__     **PERMIT #** __TW 785__

LPD PARTIAL

**HOMEOWNER:** __Tony Woods__

**911 SITE ADDRESS:** __5980 E. Hwy 380__     Decatur 76234

__✓__     **FEE:** Non-profit $10. ....Rep Std $180.... Std.$360....Rep Aero$.280.....Aero $560

__✓__     **Completed Application signed by Homeowner**

__✓__     **Permit completed with Directions or Map attached**

__✓__     **Completed site evaluation (soil test)**

__—__     _STANDARD:_ Design for standard system done by installer or homeowner

__✓__     Copy of the legal with date OR subdivision plat

__✓__     LPD Design by Engineer

__—__     Development Plans? Yes or No ... (_____Flood Plain, _____Topo)

__⁄__     _AEROBIC:_ _____ filed affd, _____ eng. design with soil , _____contract

__⁄__     Mortgage Affidavit: Gave to: _____

__⁄__     Letter from City......City Limits? Yes or No...............ETJ?  Yes    or    No

__✓__     **DEVELOPMENT PERMIT APPLICATION RECEIVED?**

Platted subdivision? (Yes) or  No   Lot 5     Stonewood Addition

Bought land from? _____ Relative? Yes or No

Rental Property? _____     Existing Structure? _____     New Construction? (WSD) __✓__

COMMERCIAL? _____ NOTES:_____

ANY OTHER HOMES ON TRACT?  Yes or No _____

SITE CONFIRMATION NEEDED?  YES (or NO) By: __Co__     Date: 5·6·2019

---

## ***REVIEW of PLANNING MATERIALS by D. R.***

_NOTES:_____

_____

_____

_Permit Disapproved By:_ _____     _Date:_ _____

_***Need to send a "denial" letter as recommended by TCEQ_

---

# 26814

Permit (ATC) Approved By: _Kennith E. McCauley_  Date: _5-7-19_

Called: _____

Call Lonnie if need more




# WISE COUNTY
# DEVELOPMENT SERVICES
2901 SOUTH FM 51, BUILDING 100 & 200
DECATUR, TEXAS 76234
(940) 627-9332
FAX (940) 627-6171

## ***Application for Development Permits***
### (UPDATED 9/28/2015)

I am applying for (check all that apply): ☐ 911 Address ☐ Driveway Permit ☐ Floodplain Permit ☑ Septic Permit

Property owners name: _Tony Woods_

Current Mailing Address: _4163 South Fm 730 Decatur TX 76243_

911 Site Address: _5980 East Hwy 380_

Contact Phone Numbers: _817-247-5823_

Driving directions to site: _East out of Deatur on 380 10 miles_
_Right on CR 4004_

Water Source? ☑ Private Well ☐ Public Water Supplied by _____

In a platted subdivision? ☑ Yes ☐ No (Lot _5_ Block _____ Subdivision _Stonewood Addt_ Phase _____ )

OR

LEGAL DESCRIPTION OF PROPERTY: Abstract: _____ Survey Name: _____
Date the land was purchased? _____ Was it purchased from family? ☐ Yes-_____ ☐ No
Seller of land? _____ Date the land was divided? _____

Is this permit for: ☐ Residential ☑ Commercial ☐ or Industrial? Lot Size? _38.25_ acres

Is the property in the city limits? ☐ Yes ☑ No Is the property in the cities ETJ? ☐ Yes ☑ No

Are there any other existing structures on the property? ☐ Yes-_____ ☑ No

Is there an existing septic system on the property? ☐ Yes ☑ No (This will be verified by our inspector)

**VIOLATION OF THIS VERIFICATION MAY RESULT IN APPLICATION BEING PROSECUTED UNDER THE TEXAS PENAL CODE §37.10 (a)(1). IT IS UNDERSTOOD THAT THIS IS NOT A PERMIT AND IT IS ONLY AN APPLICATION FOR A PERMIT ONCE THE FOLLOWING REQUIREMENTS HAVE BEEN MET. THIS APPLICATION EXPIRES AFTER 60 DAYS. I HAVE READ AND UNDERSTOOD THIS DOCUMENT AND THE APPLICATION PROCESS.**

_Tony Woods_                                    _5·8·2019_
Signature                                        Date Submitted to WCDS

*WCDS OFFICE USE ONLY:*                          *Date reviewed:* _____
*Does this property appear to need to be platted?* ☐ *Yes* ☐ *No*
*Platted Subdivisions: Does this property appear to need to be re-platted?* ☐ *Yes* ☐ *No*
*Does this property need development plans?* ☐ *Yes* ☐ *No*
*Is this property or any part of this development/subdivision in the floodplain?* ☐ *Yes* ☐ *No*
*Ready to APPLY for PERMIT for 911 Address, Driveway Permit, Floodplain Permit, or Septic System?* ☐ *YES*

## Site Evaluation Report

Date _____ 15 Apr 19 _____

Applicant:
Name _____ Ledford Services _____ Phone _____ 817-994-3958 _____
Street or P.O. Box _____ P.O. Box 155 _____
City _____ Bridgeport _____ State _Texas_ Zip _76246_

Property Location:
Lot __5R1__ Block __[xx]__ Subdivision _[xx]_
Street Address __[xx] SH 380__
Unincorporated Area ___X___ (or) City _____
Additional Information __[xx] - NOT KNOWN__

Schematic of site
(reflecting the following :)

① Compass north, adjacent streets, slope, property lines.
② Location of Site evaluation borings.
③ Location of existing or proposed water wells.
④ Location of drainageways, streams, ponds, cut/fill areas, existing & proposed buildings.
⑤ Additional pertinent information:

Proposed Commercial use.

[ SEE PLATE # 2 ]

## Site Evaluation Results

### General Site Notes:

① Total site area = _+/- 7.125_ (acres)
② Proposed depth of ossf excavation __3.0__ (feet)
③ Restrictive horizon present ? __YES__
④ Depth to restrictive horizon (If Present) __2.5__ (feet)
⑤ Presence or evidence of groundwater ? _NO_
⑥ Existing or proposed well within 100 feet of OSSF ? __NO__
    (If yes see schematic for location)
⑦ Estimated slope in OSSF area (%) __3 %__
⑧ Presence of nearby ponds, streams, drainageways ? _NO_
⑨ Significant trees/undergrowth in OSSF area ? __NO__
⑩ Is the OSSF in a FEMA designated 100 year floodway ? __NO__
⑪ Comments:

Subsoil from Backhoe Dug Test Pits.

### TP-1

| Depth (feet) | Soil Type (USDA) | Soil Class (TCEQ) | Suitable (S) Unsuitable(U) |
|---|---|---|---|
| 0.0' to 2.5' | Brown | | |
| | Silty clay | | |
| | (w/Ls frags) | I I I | S |
| 2.5' to (**) | (**) - ROCK | -- | U |

### TP-2

| Depth (feet) | Soil Type (USDA) | Soil Class (TCEQ) | Suitable (S) Unsuitable(U) |
|---|---|---|---|
| 0.0' to 2.5' | Brown | | |
| | Silty clay | | |
| | (w/Ls frags) | I I I | S |
| 2.5' to (**) | (**) - ROCK | -- | U |

### Overall Site Suitability

① Soil Criteria __U__ (S)uitable / (U)nsuitable
② Site Criteria __S__ (S)uitable / (U)nsuitable

Attested by:
Signature: _____
James M. Sims, P.E., Geotechnical Engineer
Texas Registration # 37781
6935 Craig Street, Fort Worth, Texas 76112
817-429-2346 (office) / 817-451-2019 (fax)
jimmorsims@hotmail.com (email)
Firm Registration # F-4282

Notes:
① It shall be noted that the test data and other information contained in this report does not guarantee or imply approval or performance of the proposed OSSF.
② The design, construction and installation of each OSSF is based upon specific conditions peculiar to the site in question.
③ In the event that construction activities reveal any conditions which might call the validity of this site evaluation into question, this office shall be notified so that those conditions may be evaluated as to their effect upon the conclusions represented in this site evaluation.
④ This report must be submitted to the Wise County Public Works Department, P.O. Box 899, Decatur, Texas 76234 for review and permitting.

PLATE #1

# James M. Sims, P.E.   Geotechnical

6935 CRAIG ST.
FORT WORTH, TEXAS 76112
817-429-2346

## Engineer

17 Apr 19

Link's Backhoe Service
P.O. Box 155
Bridgeport, Texas 76246

ATTN: Lonnie Vann, R.I.

Re: Proposed Low Pressure Pipe On-Site Sewage Facility (OSSF), Bus Air Manufacturing Company,
   SH 380, Wise County, Texas

Gentlemen:

This letter and attachments will serve as the design document for the installation of a Low Pressure Pipe (LPP) On-Site Sewage Facility (OSSF) at the above referenced site. Prior to system installation this report shall be submitted to the Wise County Department of Public Works for review and permitting.

Recommendations contained herein are representative of those presented in the Texas Commission on Environmental Quality (TCEQ) document *Title 30, Texas Administrative Code, Chapter 285, On-Site Sewage Facilities*, effective 29 Dec 16. A copy of *Title 30 TAC Chapter 285* is available from the TCEQ, Austin, Texas.

This design is representative of the current "State of the Art" in OSSF design. It should function within normal limits and expectations without causing significant threat or harm to existing water supply systems, the public health or the threat of pollution or nuisance conditions. *However, due to the vagaries of both nature and man, no warranty of this design performance is expressed or implied.*

A **Site Evaluation** was conducted as recommended in §285.30 (*Site Evaluation* of the aforementioned *TITLE 30 TAC CHAPTER 285*) and is included as *Plate #1*.

Approximate location of the 9,000 square foot Bus Air Company Manufacturing Facility and detached Office (currently under construction) are shown on the **System Layout** (*Plate #2*). Information provided by the owner indicates that this facility will serve approximately 30 full-time shop employees and 5 Office employees. No Floor Drains are to be conducted into the proposed OSSF and no showers or kitchens are to be constructed. A Design Effluent Inflow BOD5 of 140 ppm (maximum) is to be maintained. "Water saving devices" are to be installed in the structure yielding a Design Flow (Q) of approximately 410 gallons/day (30 full-time Shop employees @ 12 gal/person/day + 5 Office employees @ 10 gal/person/day). This value has been used for OSSF sizing.

The area proposed for OSSF construction is open. Site slope is less than 5 %. An existing water well is located greater than 150' of any OSSF component.

Based upon these data Design Specifications for the proposed OSSF follow:

1) Daily Flow: 410 gallons/day
2) Septic Tanks: 2 @ 750 gallons/each = 1,500 gallons
3) Pumping Tank: 1 @ 750 gallons
4) Effluent Loading Rate: 0.098 gallons/day/square foot
5) Total Absorption Area: = 4,200 square feet
6) Total Linear Feet of Laterals: = 840 lf
7) Lateral Diameter: 1.00 inch
8) Lateral Configuration: See *Plate #2*
9) Total Length of Supply Line: = 200 lf
10) Supply Line Diameter: 2.00 inches
11) Supply Line Placement: Side/Beneath Lateral Lines
12) Hole Size: 1/8 inch
13) Hole Spacing: See **Hole #/Hole Spacing Schedule** (*Plate #2A*)
14) Total # of Holes: See *Plate #2A*
15) Pressure Head: 1 foot
16) Flow/Hole: See *Plate #2A*
17) Total Flow: 30 gallons/minute
18) Total Head: 10 feet
19) Pump Requirements: 30 gallons/minute @ 10 feet of head
20) Storage Volume in Laterals: 34 gallons
21) Storage Volume in Supply Line: 32 gallons
22) Total Storage Volume: 66 gallons
23) Dosing Volume: 205 gallons
24) Depth of Effluent Pumped per Dose: 17 inches (@ 12 gallons/inch)
25) Check Valve Required: Yes, install a "flapper-type" check valve and an "anti-siphon" hole (cf *Plate # 3*)

## EQUIPMENT/MATERIAL SPECIFICATIONS

### Prevention of Unauthorized Access to On-Site Sewage Facilities (OSSFs) -
The methods and materials employed to prevent unauthorized access to this proposed OSSF shall comply with *TITLE 30 TAC CHAPTER 285* §285.38.

### Water Meters – In order that water use may be verified, the facility shall be equipped with a dedicated water meter. If an irrigation system is to be used it shall be supplied through with a separate meter.

### Tank Waterproofing, Risers – Tanks shall be waterproof. Risers shall be provided on the tank tops to permit access for tank pumping or pump maintenance/replacement

### Pipes and Fittings - Schedule 40 PVC pipe shall be used in the installation. A union connection shall be installed in the supply line to provide for pump maintenance/replacement. A metal globe or gate valve shall be installed in the supply line to provide for head pressure adjustment. The head pressure adjustment valve shall be housed in a protective enclosure (say a meter box) in an easily accessible location.

### Pump, Float Controls, and Alarm System - The submersible pump shall meet or (slightly) exceed the head and discharge requirements previously cited. Insofar as the pumping chamber will contain few solids, a grinder type pump is not required. Final pressure is to be adjusted by means of an in-line valve (cf Note #2 under **System Operational Check**).
Pump controls shall include an automatic, water level activated pump control switch, a high water alarm/pump activation system and a manual override switch. The alarm system shall be on a separate electrical circuit than the primary pump and shall be connected to a placarded warning device (audio and visual) located in a prominent place in the OSSF area. This alarm switch shall be set at the 2/3 capacity level in the pump tank in order to provide a small (1/3 the daily effluent flow) emergency capacity until system repair is effected.
A strong poly-vinyl rope shall be attached to the pump and secured in the riser to permit pump replacement. A typical pump tank installation is shown on *Plate #3*.

### Electrical Wiring – All wiring shall conform to *TITLE 30 TAC CHAPTER 285* (cf §285.34 (c)).

### Gravel - An energy dissipation/effluent storage medium is required surrounding the lateral line. Crushed rock (3/8 inch to 1 inch size) shall be used for this purpose (see *Plate #5*). Depth of gravel shall be 12 inches.

### Geotextile Fabric - As a further energy dissipation measure, and to prevent backfill contamination of the gravel storage medium, geotextile fabric shall cover the gravel storage medium through the full length of the lateral trenches. Geotextile fabric shall conform to *30 TAC, §285.33 (b)(1)(E)*.

**Trench Backfill** - Backfill above the gravel storage medium shall consist of TCEQ Class III material (cf *TITLE 30 TAC CHAPTER 285*, §285.91, Table VI).

**Site Drainage** – Positive Drainage away from the OSSF on all sides is necessary to insure proper OSSF function. The area shall be graded to provide drainage of any rainfall that falls on the completed field. No "low-spot" or other areas, which will accumulate runoff, shall be allowed in the area of the completed field.  Low areas that develop over the OSSF trenches shall be brought back to grade with TCEQ Class III material.

## SYSTEM INSTALLATION

1) Prior to OSSF installation, all lot corners shall be staked and the lot lines shall be located so as to insure accurate placement of the proposed OSSF. In addition, all underground utilities shall be located and staked.

2) The system shall be located approximately as shown on *Plate #2*. Slight system realignment (+/- 5 feet) is allowable to accommodate site topography.

3) A minimum trench width of 36 inches shall be observed. A lateral line trench depth of 18 inches and a supply line trench depth six inches greater than this depth shall be used. The lateral line trenches shall parallel the ground surface contour and their bottoms shall be level to assure equal distribution of the effluent throughout the system. Lateral line trenches are bedded with gravel prior to lateral line placement.

4) Lateral lines are drilled (first hole approximately 60% of the hole spacing from the supply line, last hole approximately 40% of the hole spacing from the end of the lateral line) and placed "holes down" in the excavated and bedded trenches. Holes are drilled through one side of the pipe only.

5) Lateral lines are connected to the supply manifold (see *Plate #4*).

6) Pump and controls are installed (see *Plate #3*).

7) System pressure is set (see Note #2 under System Operational Check, below).

8) Site is graded to prevent accumulation of rainfall and to control drainage across the site.

9) Site is sodded/seeded with an appropriate grass to aid in effluent transpiration and to control site erosion.

## SYSTEM OPERATIONAL CHECK

Prior to utilization, system operation shall be verified.  This may be accomplished by:

1) Fill the pumping chamber until the high level switch is activated. At this point the pump shall begin operating.

2) While the pump is operating, adjust the globe/gate valve in the supply line until the desired pressure head (Specification Note #15) is observed in the uppermost extremity of the system.  This may best be accomplished by providing a "turn-up" riser (see *Plate #4*) at the end of the uppermost lateral line. This riser may be provided with a threaded cap to allow occasional monitoring of the pressure head. As an aid to system maintenance (see Note #2, below) risers may be provided at the end of each lateral line, buried slightly beneath the groundsurface to provide for lawn maintenance.

3) Verify that the pump shuts off at the low float control level.

4) Manually operate the emergency alarm switch to verify alarm activation.

## SYSTEM MAINTENANCE:

1) Sludge accumulation in the tanks shall be monitored and pumped as required.

2) Pressure head shall be annually checked (as outlined above) and adjusted as necessary

3) Pump and control (including alarm) operation shall be checked annually.

4) Pump Maintenance shall follow manufacturer's schedules.

4

5) No vehicular traffic shall be allowed on the system.

6) No sprinkler system shall be installed in the system limits.

7) No subsurface construction shall be permitted within the system limits. Puncturing of the supply or lateral lines may possibly result.

## CHANGED CONDITIONS:

In the event that construction activities reveal any conditions which might call the validity of these recommendations into question or require a re-positioning of any significant OSSF component, this office shall be notified so that the conditions may be evaluated as to their effect upon this design. In the event that any significant changes are required, it may be necessary that further field work/engineering work be performed and an ADDENDUM to this proposal issued.

I trust that this design will meet the requirements of your site. If you have any questions, or if I may be of further service, please call.

Sincerely,

James M. Sims, P.E.

Firm Registration #
F-4282

*Distribution:*

*Link's Backhoe Service – 1 copy (emailed)*



N

SH 380

SCALE:
1" = 40'
(slope approx)

633'

STATE OF TEXAS
JAMES M. SIMS
37781
REGISTERED ENGINEER

NE Corner

Approx. ℄
Intermittent Drainage

Notes:
1) Property line dimensions are advisory only.
2) That portion of the Gravity Line that passes beneath
   the Parking Area shall be "sleeved" in a larger diameter
   SCH 40 PVC pipe for the crossing distance plus 3' side.
3) Daily Design Flow (Q) based upon:
   a) 30 Shop Employees @ 12 gal/employee/day
      5 Office Employees @ 10 gal/employee/day
      + 410 gallon/day
4) NO Floor Drains to be directed into the OSSF.
5) NO Showers or Kitchens. BOD < 300 ppm.

Line # 12

Approx. Limits
Base Material
Parking / Equipment Storage

TP-2

494'

750 Gallon
Pump Tank

4"
Gravity Line
(1% Minimum Grade)

2.0"
Supply Line

9,000 sf
Bus Air
Manufacturing Company
Facility
(Undr Constr)
(FF = +/- 818 MSL)

Office

Storage Tanks:
2 @ 750 gallons

Future
30' Road

TP-1

Vann AngLot 5R11 Bus Air bldg17 Apr 19

SYSTEM LAYOUT
PLATE #2

PLATE #2A

# HOLE #/ HOLE SPACING SCHEDULE
## BUS AIR COMPANY - SH 380

| LINE # | LENGTH (ft) | ELEV (ft) | Rnd Off (to 0.5) | Delta H (ft) | P.Head (ft) | Flow/hole (GPM) | Flow/LF 5#(GPM) | # HOLES (EA) | FLOW/LF Balanced | FLOWLINE (GPM) | SPACING (ft) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 70 | 811.50 | 811.5 | 0.0 | 1.0 | 0.18 | 0.036 | 14 | 0.036 | 2.52 | 5.00 |
| 2 | 70 | 811.32 | 811.5 | 0.0 | 1.0 | 0.18 | 0.036 | 14 | 0.036 | 2.52 | 5.00 |
| 3 | 70 | 811.14 | 811.0 | 0.5 | 1.5 | 0.22 | 0.044 | 11 | 0.035 | 2.42 | 6.36 |
| 4 | 70 | 810.96 | 811.0 | 0.5 | 1.5 | 0.22 | 0.044 | 11 | 0.035 | 2.42 | 6.36 |
| 5 | 70 | 810.78 | 811.0 | 0.5 | 1.5 | 0.22 | 0.044 | 11 | 0.035 | 2.42 | 6.36 |
| 6 | 70 | 810.60 | 810.5 | 1.0 | 2.0 | 0.26 | 0.052 | 10 | 0.035 | 2.60 | 7.00 |
| 7 | 70 | 810.42 | 810.5 | 1.0 | 2.0 | 0.26 | 0.052 | 10 | 0.037 | 2.60 | 7.00 |
| 8 | 70 | 810.24 | 810.0 | 1.5 | 2.5 | 0.29 | 0.058 | 9 | 0.037 | 2.61 | 7.78 |
| 9 | 70 | 810.06 | 810.0 | 1.5 | 2.5 | 0.29 | 0.058 | 9 | 0.037 | 2.61 | 7.78 |
| 10 | 70 | 809.88 | 810.0 | 1.5 | 2.5 | 0.29 | 0.058 | 9 | 0.037 | 2.61 | 7.78 |
| 11 | 70 | 809.70 | 809.5 | 2.0 | 3.0 | 0.32 | 0.064 | 8 | 0.037 | 2.56 | 8.75 |
| 12 | 70 | 809.52 | 809.5 | 2.0 | 3.0 | 0.32 | 0.064 | 8 | 0.037 | 2.56 | 8.75 |

TYPICAL PUMP TANK INSTALLATION

PLATE #3

SUPPLY
MANIFOLD

MANIFOLD - LATERAL
CONNECTION

TURN - UP

MANIFOLD - LATERAL
CONNECTION

DISTRIBUTION
LATERAL

HOLES DRILLED
AS SPECIFIED

DISTRIBUTION SYSTEM

ELBOW

PIPE
3" - 6"
LENGTH

Supply Line

REDUCING TEE

SIDE MANIFOLD -
LATERAL CONNECTION

CAP

PIPE

ELBOW

TURN - UP

TYPICAL CONNECTIONS

PLATE #4

Transverse
(no scale)



backfill
(as specified)

geotextile fabric
(covers gravel)

lateral
line

gravel

18"

2"

2"

3'

Notes:

① Trench surficial backfill shall consist
   of TCEQ Class III material.

② Trench c-c spacing is 6.0'

Longitudinal
(no scale)



supply line trench
backfilled with clay

supply line

gravel
(as specified)

exposed/buried-covered
turn-up

supply
line

lateral line
(hole spacing as specified)

distribution trench bottom level

70'

Typical Lateral Trench
Cross Section

PLATE #5



SYSTEM LAYOUT
PLATE #2



I HAVE DIRECTED A CAREFUL AND ACCURATE SURVEY MADE ON THE GROUND OF THE PROPERTY LOCATED ON HIGHWAY 380, WISE COUNTY TEXAS, AND BEING DESCRIBED AS LOT 5 OF STONEWOOD ADDITION, AN ADDITION IN WISE COUNTY, TEXAS AS SHOWN ON PLAT RECORDED IN PLAT CABINET E, SLIDE 78, PLAT RECORDS OF WISE COUNTY, TEXAS.

NOTES:

1. BEARING BASIS DERIVED FROM GPS OBSERVATIONS MADE ON THE GROUND. TEXAS NORTH CENTRAL NAD 83.
2. SUBJECT TO RESTRICTIVE COVENANTS RECORDED IN PLAT CABINET E, SLIDE 78, PLAT RECORDS OF WISE COUNTY, TEXAS.
3. VOL. 292 PAGE 416 DOES NOT AFFECT THE SUBJECT TRACT.
4. VOL. 328, PAGE 592 DOES NOT AFFECT THE SUBJECT TRACT.
5. VOL. 389, PAGE 73 IS A BLANKET TYPE EASEMENT AND DOES AFFECT THE SUBJECT TRACT.
6. VOL. 405, PAGE 495 IS A BLANKET TYPE EASEMENT AND DOES AFFECT THE SUBJECT TRACT.
7. VOLUME 1125, PAGE 498 DOES NOT AFFECT THE SUBJECT TRACT.
8. VOL. 1125, PAGE 504 DOES NOT AFFECT THE SUBJECT TRACT.
9. VOL. 1125, PAGE 507 DOES NOT AFFECT THE SUBJECT TRACT.
10. VOL. 1411, PAGE 763 IS A 30' WIDE PIPELINE EASEMENT WITH THE RIGHT OF INGRESS AND EGRESS AND DOES AFFECT THE SUBJECT TRACT AS SHOWN.
11. DOCUMENT NO. 2014-046019 A 2½' PIPELINE EASEMENT TO DEVON GAS SERVICES, LP., IS UNABLE TO BE LOCATED BY DESCRIPTION, AND DOES AFFECT THE SUBJECT TRACT BY RIGHTS OF INGRESS AND EGRESS.

HWY 380

N 82°55'49" E  1272.64'

16' U.E. PER PLAT
50' BL PER PLAT

LOT 1

LOT 9

N 00°03'11" E  1262.06'

APPROXIMATE LOCATION
GAS PIPELINE

LOT 5
38.25 ACRES

EXISTING PIPELINE

S 01°35'24" W  1420.37'

LOT 4

LOT 6

16' U.E. PER PLAT      50' BL PER PLAT      30' PIPELINE EASEMENT
1411/700

N 89°56'49" W  1224.72'

CR 4004

LEGEND

| | | | |
|---|---|---|---|
| ⊡ = PROPERTY CORNER | | CIRF | = CAPPED IRON ROD FOUND |
| ⊙ = BENCHMARK | | IRF | = IRON ROD FOUND |
| ⊞ = TELEPHONE/UTILITY RISER | (T-U-R) | CIRS | = CAPPED IRON ROD SET |
| ⊡ = BURIED CABLE MARKER | (BCM) | MFCP | = METAL FENCE CORNER POST |
| ⊡ = TELEPHONE MANHOLE | (T-MH) | WFCP | = METAL FENCE CORNER POST |
| ⊙ = POWER/UTILITY POLE | (PP/P) | | = PLAT/DEED CALLS |
| ⊙ = LIGHT POLE | (LP) | POB | = POINT OF BEGINNING |
| ⊙ = GUY WIRE | (GUY) | R.O.W. | = RIGHT-OF-WAY |
| ⊡ = ELECTRIC VAULT | (V) | | |
| ⊡ = ELECTRIC TRANSFORMER | (TR/N) | | = CONCRETE SURFACE |
| ⊡ = WATER METER | (WV) | | = ASPHALT SURFACE |
| M = WATER VALVE | (WV) | | = GRAVEL SURFACE |

LINETYPE LEGEND

PROPERTY LINE
EASEMENT LINES
OVERLAID LINES
ADJOINER LINES
OVERHEAD UTILITY ——— OHU ———
ASPHALT ROAD
GRAVEL ROAD
WISE FENCE LINES

STATE OF TEXAS
REGISTERED
J.E. THOMPSON
4857
PROFESSIONAL
LAND SURVEYOR

CERTIFY TO: BUILDING 380, LLC, DAVID CLABORN, GUARDIAN TITLE COMPANY, FIRST AMERICAN TITLE COMPANY

CERTIFICATION:
THIS SURVEY HAS BEEN PREPARED IN CONNECTION WITH GF #14977 AND I HEREBY CERTIFY THAT THIS SURVEY HAS BEEN PREPARED FROM AN ACCURATE ON-THE-GROUND SURVEY OF THE PREMISES DEPICTED HEREON AND DESCRIBED IN THE LEGAL DESCRIPTION. ATTACHED HERETO, CONDUCTED UNDER MY DIRECTION AND SUPERVISION ON 09/25/2019 AND THAT THE FINDINGS AND RESULTS OF SAID SURVEY ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF AND THAT THE SIZE, TYPE AND LOCATION OF VISIBLE AND APPARENT PERMANENT IMPROVEMENTS ARE AS SHOWN, AND THAT SAID SURVEY CORRECTLY SHOWS THE LOCATION OF ALL ALLEYS, STREETS, MAINTAINED RIGHTS-OF-WAY, AND EASEMENTS OF RECORD, AS SUPPLIED TO ME, OF WHICH THE UNDERSIGNED IS AWARE OR HAS BEEN ADVISED AFFECTING THE SUBJECT PREMISES ACCORDING TO THE DESCRIPTIONS OF RECORD, AND THAT EXCEPT AS SHOWN THERE ARE NO VISIBLE OR APPARENT INTRUSIONS, CONFLICTS OR PROTRUSIONS.

J.E. Thompson

J.E. THOMPSON II R.P.L.S. No 4857

ERRORS: THE CLIENT OR CLIENT'S REPRESENTATIVES WILL HAVE 45 DAYS FROM THE DATE THE SURVEY WAS ISSUED TO CHANGE ANY MISSPELLINGS OR ANY ERRORS ON THE SURVEY REPORT. AFTER THIS TIME HAS EXPIRED ALL PARTIES INVOLVED MUST ACCEPT THE SURVEY AS ISSUED.

LAND TITLE SURVEY
LOT 5
STONEWOOD ADDITION
WISE COUNTY, TEXAS

ALL AMERICAN SURVEYING

111 N DIXON
GAINESVILLE, TX 76240
PH. 940-665-9105
FAX. 940-665-9106

| DRAWN BY: | DATE: | JOB NO. | SCALE: | PAGE: |
|---|---|---|---|---|
| KLA | 10/04/2018 | 162250-2 | 1" = 200' | 1 OF 1 |

# EXHIBIT 3

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

Bus Air, LLC,                      )
                                   )
                  Plaintiff,       )
                                   )
                                   )   C.A. No. <u>2019-0532</u>
          v.                       )
                                   )
Anthony R. Woods and               )
E3 Rivers, LLC f/k/a Bus Air       )
Manufacturing, LLC,                )
                                   )
                  Defendants.      )

## <u>AFFIDAVIT OF DAVID OBERDORFF</u>

I, David Oberdorff, being duly sworn, deposes and says as follows:

     1.      I make this affidavit based upon my own personal knowledge.

     2.      I am the Vice President of Sales for Plaintiff Bus Air, LLC.

     3.      I have personal knowledge that WW Sales, Inc. operates its business on the property located at 5980 East US HWY 380, Decatur, Texas 76234 ("Premises"). I gained this knowledge through my observation of the sign depicting "WW Sales" and its location as "5980 East US HWY 380, Decatur, Texas 76234" as shown in the photograph that I took on July 11, 2019 from a public road adjacent to the Premises, which photograph is attached hereto as <u>Exhibit A</u>.

1

4.     On July 11, 2019, while located on a public road adjacent to the Premises, I took several photographs of the ongoing business operations at the Premises.

5.     I have personal knowledge, obtained from my observation of the Premises, that there were motor vehicles being serviced on the Premises.

6.     Attached hereto as <u>Exhibit B</u> is a true and accurate copy of a photograph that I took on July 11, 2019, of the Premises.

7.     Attached hereto as <u>Exhibit C</u> is a true and accurate copy of a photograph that I took on July 11, 2019, of the Premises.

8.     Attached hereto as <u>Exhibit D</u> is a true and accurate copy of a photograph that I took on July 11, 2019, of the Premises.

9.     Attached hereto as <u>Exhibit E</u> is a true and accurate copy of a photograph that I took on July 11, 2019, of the Premises.

10.    Attached hereto as <u>Exhibit F</u> is a true and accurate copy of a photograph that I took on July 11, 2019, of the Premises.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

David Oberdorff

Sworn to and subscribed before me this 17 day of July, 2019

Notary Public
Rodney Roderick II

My commission expires:
10/31/2019

4848-5458-9596.2

3

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C



# **EXHIBIT D**



# **EXHIBIT E**



# EXHIBIT F



**EFiled:  Jul 19 2019 08:18PM EDT**
**Transaction ID 63566830**
**Case No. 2019-0532-JRS**

## <u>CERTIFICATE OF SERVICE</u>

I, Sean M. Brennecke, hereby certify that on July 19, 2019, the *Affidavit of*

*Sean M. Brennecke in Further Support of Plaintiff's Verified Complaint,*

*Plaintiff's Motion to Expedite Proceedings, and Plaintiff's Motion for*

*Preliminary Injunction* was served on the parties listed below via FedEx:

E3Rivers, LLC
4163 South FM 703
Decatur, Texas 76234
Attn: Anthony R. Woods

Anthony R. Woods
c/o E3Rivers, LLC
4163 South FM 703
Decatur, Texas 76234

The Wright Firm, LLP
8150 N. Central Expressway, Suite 775
Dallas, Texas 75206
Attn: Paul F. Wright


*/s/ Sean M. Brennecke*
Sean M. Brennecke (Bar No. 4686)

**GRANTED**

EFiled:  Jul 22 2019 10:35AM EDT
Transaction ID 63567697
Case No. 2019-0532 JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| Bus Air, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 2019-0532 JRS |
| v. | ) |
| | ) |
| Anthony R. Woods, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### [PROPOSED] ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF KELLY KIRBY, ESQUIRE <u>TO REPRESENT BUS AIR, LLC</u>

The foregoing application for admission to practice in this action *pro hac vice* of Kelly Kirby, Esquire, to represent Bus Air, LLC is hereby granted.

IT IS SO ORDERED this _____day of July, 2019

_____
Vice Chancellor Joseph R. Slights

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---:|:---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 63550298 |
| **Current Date:** | Jul 22, 2019 |
| **Case Number:** | 2019-0532-JRS |
| **Case Name:** | Bus Air, LLC vs Anthony R. Woods |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

**GRANTED**

EFiled: Jul 22 2019 10:36AM EDT
Transaction ID 63567709
Case No. 2019-0532 JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| Bus Air, LLC, | ) |
|  | ) |
| Plaintiff, | ) |
|  | )   C.A. No. 2019-0532 JRS |
| v. | ) |
|  | ) |
| Anthony R. Woods, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

### [PROPOSED] ORDER GRANTING MOTION FOR ADMISSION *PRO HAC VICE* OF THOMAS T. REITH, ESQUIRE <u>TO REPRESENT BUS AIR, LLC</u>

The foregoing application for admission to practice in this action *pro hac vice* of Thomas T. Reith, Esquire, to represent Bus Air, LLC is hereby granted.

IT IS SO ORDERED this _____day of July, 2019

_____
Vice Chancellor Joseph R. Slights

PHIL1 8104544v.1

| | |
|---|---|
| **This document constitutes a ruling of the court and should be treated as such.** | |
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 63550390 |
| **Current Date:** | Jul 22, 2019 |
| **Case Number:** | 2019-0532-JRS |
| **Case Name:** | Bus Air, LLC vs Anthony R. Woods |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

EFiled:  Jul 24 2019 05:14PM EDT
Transaction ID 63624667
Case No. 2019-0532-JRS

# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

JOSEPH R. SLIGHTS III
  VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone:  (302) 739-4397
Facsimile:  (302) 739-6179

July 24, 2019

Richard M. Beck, Esquire
Sean M. Brennecke, Esquire
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE  19801

     Re:   *Bus Air, LLC v. Anthony R. Woods, et al.*
            C.A. No. 2019-0532-JRS

Dear Counsel:

This will confirm that a telephonic argument is scheduled in the above-referenced matter for August 13, 2019, at 2:00 p.m. to address Plaintiff's Motion to Expedite Proceedings.  It is requested that you initiate the conference call. In addition to the participants, please forward the dial-in information to my assistant by emailing Cheryl.Pusey@delaware.gov.  Ms. Pusey will forward the information to our court reporters.

I ask that counsel confer and agree on a schedule for response and reply with the last submission filed by August 6, 2019.  Thank you.

                       Very truly yours,

                       ***/s/ Joseph R. Slights III***

JRSIII/cap
cc:   Michael J. Farnan, Esquire
       Register in Chancery

**EFiled:  Jul 26 2019 01:48PM EDT**
**Transaction ID 63631746**
**Case No. 2019-0532-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BUS AIR, LLC,

    Plaintiff,

v.

ANTHONY R. WOODS and
E3 RIVERS, LLC F/K/A BUS AIR
MANUFACTURING, LLC

    Defendants.

C.A. No.: 2019-0532-JRS

## ENTRY OF APPEARANCE FOR DEFENDANTS ANTHONY R. WOODS AND E3 RIVERS, LLC F/K/A BUS AIR MANUFACTURING, LLC

PLEASE ENTER the appearance of Brian E. Farnan and Michael J. Farnan

of Farnan LLP as counsel for Defendants Anthony R. Woods and E3 Rivers, LLC

F/K/A Bus Air Manufacturing, LLC.

Dated: July 26, 2019

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (#4089)
Michael J. Farnan (#5165)
919 N. Market St., 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Defendants Anthony R.*
*Woods and E3 Rivers, LLC F/K/A Bus Air*
*Manufacturing, LLC*

**EFiled:  Jul 26 2019 01:48PM EDT**
**Transaction ID 63631746**
**Case No. 2019-0532-JRS**

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Farnan, hereby certify that on July 26, 2019, a copy of the

Entry of Appearance was served via LexisNexis File&Serve on the

following:

Richard M. Beck
Sean M. Brennecke
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

*Attorneys for Plaintiff Bus Air, LLC*

/s/ Michael J. Farnan
Michael J. Farnan (Bar No. 5165)

**EFiled:  Jul 26 2019 03:56PM EDT**
**Transaction ID 63631930**
**Case No. 2019-0532-JRS**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| BUS AIR, LLC, | |
| Plaintiff, | C.A. No.: 2019-0532-JRS |
| v. | |
| ANTHONY R. WOODS and E3 RIVERS, LLC F/K/A BUS AIR MANUFACTURING, LLC | |
| Defendants. | |

**MOTION FOR ADMISSION *PRO HAC VICE* OF
CASEY GRIFFITH**

I, Michael J. Farnan, a member of the Delaware Bar who maintains an office in Delaware for the practice of law, pursuant to Court of Chancery Rule 170(b) hereby move for admission *pro hac vice* for Casey Griffith of Griffith Barbee PLLC, One Arts Plaza, 1722 Routh St., Ste. 710, Dallas, Texas 75201 to represent Defendants Anthony R. Woods and E3 Rivers, LLC F/K/A Bus Air Manufacturing, LLC in this action.  I certify that I find the applicant to be a reputable and competent attorney and that I am in a position to recommend the applicant's admission *pro hac vice*. Casey Griffith is admitted, practicing, and in good standing in the State of Texas, and is admitted and in good standing but inactive in the States of Missouri and Kansas.

Dated: July 26, 2019                    Respectfully submitted,

                                        FARNAN LLP

                                        /s/ Michael J. Farnan
                                        Brian E. Farnan (Bar No. 4089)
                                        Michael J. Farnan (Bar No. 5165)
                                        919 North Market Street, 12th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 777-0300
                                        Facsimile: (302) 777-0301
                                        bfarnan@farnanlaw.com
                                        mfarnan@farnanlaw.com

                                        Words: 130

                                        *Attorney for Defendants Anthony R. Woods*
                                        *and E3 Rivers, LLC F/K/A Bus Air*
                                        *Manufacturing, LLC*

EFiled:  Jul 26 2019 03:56PM EDT
Transaction ID 63631930
Case No. 2019-0532-JRS

## <u>CASEY GRIFFITH CERTIFICATION</u>

Casey Griffith hereby certifies:

1.      I am admitted to and am a member in good standing of the Bar of the

States of **Texas, Missouri (inactive), and Kansas (inactive).**

2.      I shall be bound by the Delaware Lawyers' Rules of Professional

Conduct and have reviewed the Principles of Professionalism for Delaware

Lawyers.

3.      I and all attorneys of my firm who directly or indirectly provide

services to the party or cause at issue in the above actions shall be bound by all

Rules of this Court.

4.      I, without exception, do not maintain an office in the State of

Delaware and consent to the appointment of the Register in Chancery of New

Castle County as agent upon whom service of process may be made for all actions,

including disciplinary actions, that may arise out of the practice of law under Court

of Chancery Rule 170 and any activities related thereto.

**5.      I have appeared in ___ actions in courts of record in Delaware in**

**the preceding twelve (12) months:**

6.      Payment for the *pro hac vice* admission assessment in the amount of

$414.00 is attached to be deposited in the Delaware Supreme Court registration

fund for the purposes of the governance of the Bar of this Court and may be distributed pursuant to Supreme Court Rule 69.

7.      I have not been disbarred or suspended and am not the object of any pending disciplinary proceedings in any jurisdiction where I have been admitted generally, *pro hac vice*, or in any other way, with no exceptions.

**8.      I am admitted for the practice of law in the following states or other jurisdictions: States of Texas, Missouri (inactive), and Kansas (inactive).**

Dated: July 25, 2019

Casey Griffith
Griffith Barbee PLLC
One Arts Plaza
1722 Routh St., Ste. 710
Dallas, Texas 75201
Telephone: (214) 446-6020
casey.griffith@griffithbarbee.com

**EFiled:  Jul 26 2019 03:56PM EDT**
**Transaction ID 63631930**
**Case No. 2019-0532-JRS**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

BUS AIR, LLC,

     Plaintiff,

v.

ANTHONY R. WOODS and
E3 RIVERS, LLC F/K/A BUS AIR
MANUFACTURING, LLC

     Defendants.

C.A. No.: 2019-0532-JRS

**ORDER GRANTING MOTION FOR
ADMISSION *PRO HAC VICE* OF CASEY GRIFFITH**

It is hereby ORDERED this _____ day of _____ 2019 that the Motion for

Admission *Pro Hac Vice* of Casey Griffith is GRANTED.

_____
Vice Chancellor

EFiled: Jul 26 2019 03:56PM EDT
Transaction ID 63631930
Case No. 2019-0532-JRS

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Farnan, hereby certify that on July 26, 2019, a copy of the

Motion for Admission Pro Hac Vice of Casey Griffith was served via LexisNexis

File&Serve on the following:

Richard M. Beck
Sean M. Brennecke
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

*Attorneys for Plaintiff Bus Air, LLC*

/s/ Michael J. Farnan
Michael J. Farnan (Bar No. 5165)

EFiled: Jul 26 2019 03:57PM EDT
Transaction ID 63631960
Case No. 2019-0532-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BUS AIR, LLC, | |
| Plaintiff, | C.A. No.: 2019-0532-JRS |
| v. | |
| ANTHONY R. WOODS and E3 RIVERS, LLC F/K/A BUS AIR MANUFACTURING, LLC | |
| Defendants. | |

## MOTION FOR ADMISSION *PRO HAC VICE* OF MICHAEL BARBEE

I, Michael J. Farnan, a member of the Delaware Bar who maintains an office in Delaware for the practice of law, pursuant to Court of Chancery Rule 170(b) hereby move for admission *pro hac vice* for Michael Barbee of Griffith Barbee PLLC, One Arts Plaza, 1722 Routh St., Ste. 710, Dallas, Texas 75201 to represent Defendants Anthony R. Woods and E3 Rivers, LLC F/K/A Bus Air Manufacturing, LLC in this action. I certify that I find the applicant to be a reputable and competent attorney and that I am in a position to recommend the applicant's admission *pro hac vice*. Michael Barbee is admitted, practicing, and in good standing in the State of Texas.

Dated: July 25, 2019

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Words: 114

*Attorney for Defendants Anthony R. Woods
and E3 Rivers, LLC F/K/A Bus Air
Manufacturing, LLC*

EFiled:  Jul 26 2019 03:57PM EDT
Transaction ID 63631960
Case No. 2019-0532-JRS

## <u>MICHAEL BARBEE CERTIFICATION</u>

Michael Barbee hereby certifies:

1.      I am admitted to and am a member in good standing of the Bar of the

State of **Texas.**

2.      I shall be bound by the Delaware Lawyers' Rules of Professional

Conduct and have reviewed the Principles of Professionalism for Delaware

Lawyers.

3.      I and all attorneys of my firm who directly or indirectly provide

services to the party or cause at issue in the above actions shall be bound by all

Rules of this Court.

4.      I, without exception, do not maintain an office in the State of

Delaware and consent to the appointment of the Register in Chancery of New

Castle County as agent upon whom service of process may be made for all actions,

including disciplinary actions, that may arise out of the practice of law under Court

of Chancery Rule 170 and any activities related thereto.

**5.      I have appeared in _0_ actions in courts of record in Delaware in**

**the preceding twelve (12) months:**

6.      Payment for the *pro hac vice* admission assessment in the amount of

$414.00 is attached to be deposited in the Delaware Supreme Court registration

fund for the purposes of the governance of the Bar of this Court and may be distributed pursuant to Supreme Court Rule 69.

7.     I have not been disbarred or suspended and am not the object of any pending disciplinary proceedings in any jurisdiction where I have been admitted generally, *pro hac vice*, or in any other way, with no exceptions.

**8.     I am admitted for the practice of law in the following states or other jurisdictions: State of Texas.**

Dated: July 25, 2019

Michael Barbee
Griffith Barbee PLLC
One Arts Plaza
1722 Routh St., Ste. 710
Dallas, Texas 75201
Telephone: (214) 446-6020
michael.barbee@griffithbarbee.com

EFiled:  Jul 26 2019 03:57PM EDT
Transaction ID 63631960
Case No. 2019-0532-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

BUS AIR, LLC,

     Plaintiff,

v.

ANTHONY R. WOODS and
E3 RIVERS, LLC F/K/A BUS AIR
MANUFACTURING, LLC

     Defendants.

C.A. No.: 2019-0532-JRS

**ORDER GRANTING MOTION FOR**
**ADMISSION *PRO HAC VICE* OF MICHAEL BARBEE**

It is hereby ORDERED this _____ day of _____ 2019 that the Motion for

Admission *Pro Hac Vice* of Michael Barbee is GRANTED.

_____
Vice Chancellor

**EFiled:  Jul 26 2019 03:57PM EDT**
**Transaction ID 63631960**
**Case No. 2019-0532-JRS**

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Farnan, hereby certify that on July 26, 2019, a copy of the

Motion for Admission Pro Hac Vice of Michael Barbee was served via LexisNexis

File&Serve on the following:

Richard M. Beck
Sean M. Brennecke
Klehr Harrison Harvey Branzburg LLP
919 Market Street, Suite 1000
Wilmington, DE 19801

*Attorneys for Plaintiff Bus Air, LLC*

/s/ Michael J. Farnan
Michael J. Farnan (Bar No. 5165)

**GRANTED**

EFiled:  Jul 26 2019 04:58PM EDT
Transaction ID 63633286
Case No. 2019-0532-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BUS AIR, LLC,

      Plaintiff,

v.

ANTHONY R. WOODS and
E3 RIVERS, LLC F/K/A BUS AIR
MANUFACTURING, LLC

      Defendants.

C.A. No.: 2019-0532-JRS

## ORDER GRANTING MOTION FOR
## ADMISSION *PRO HAC VICE* OF CASEY GRIFFITH

It is hereby ORDERED this _____ day of _____ 2019 that the Motion for

Admission *Pro Hac Vice* of Casey Griffith is GRANTED.

_____
Vice Chancellor

**This document constitutes a ruling of the court and should be treated as such.**

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 63631930 |
| **Current Date:** | Jul 26, 2019 |
| **Case Number:** | 2019-0532-JRS |
| **Case Name:** | Bus Air, LLC vs Anthony R. Woods |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

**GRANTED**

EFiled: Jul 26 2019 04:59PM EDT
Transaction ID 63633288
Case No. 2019-0532-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

BUS AIR, LLC,

    Plaintiff,

v.

ANTHONY R. WOODS and
E3 RIVERS, LLC F/K/A BUS AIR
MANUFACTURING, LLC

    Defendants.

C.A. No.: 2019-0532-JRS

## ORDER GRANTING MOTION FOR
## ADMISSION *PRO HAC VICE* OF MICHAEL BARBEE

It is hereby ORDERED this _____ day of _____ 2019 that the Motion for

Admission *Pro Hac Vice* of Michael Barbee is GRANTED.

_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 63631960 |
| **Current Date:** | Jul 26, 2019 |
| **Case Number:** | 2019-0532-JRS |
| **Case Name:** | Bus Air, LLC vs Anthony R. Woods |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**