| | | |
|---|---|---|
| BUS AIR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1435-RGA-CJB |
| | ) | |
| ANTHONY R. WOODS and E3 RIVERS, | ) | |
| LLC f/k/a BUS AIR MANUFACTURING, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

This action, which was filed by Plaintiff Bus Air, LLC ("Plaintiff") against Defendants

Anthony R. Woods ("Mr. Woods") and E3 Rivers, LLC ("E3 Rivers") (collectively,

"Defendants"), relates to an Asset Purchase Agreement (the "APA") executed by Plaintiff and

Defendants in September 2017. Pursuant to that APA, Defendants conveyed to Plaintiff their

business in the field of automotive air conditioning. (D.I. 9, ex 1 at 1) In the instant action,

Plaintiff alleges that Defendants have breached certain terms of the APA, including a covenant

not to compete against Plaintiff and a covenant not to solicit certain employees or other entities

(the "noncompetition and nonsolicitation clause").

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction, (D.I. 8),

and Defendants' Motion to Dismiss, (D.I. 13) (collectively, the "Motions"). With its Motion for

a Preliminary Injunction, Plaintiff seeks to enjoin Defendants from engaging in various actions

relating to alleged violations of the APA. (D.I. 8) Defendants, via their Motion to Dismiss, seek

to dismiss the suit for lack of personal jurisdiction under Federal Rule of Civil Procedure

12(b)(2) and for failure to join indispensable parties under Federal Rules of Civil Procedure

12(b)(7) and 19. (D.I. 13) For the reasons set forth below, the Court recommends that Plaintiff's

Motion for a Preliminary Injunction be DENIED and that Defendants' Motion to Dismiss be DENIED.

## I.    BACKGROUND

### A.    The Parties

Plaintiff Bus Air, LLC is a Delaware limited liability company with its principal places of business in Rhome, Texas and Tulsa, Oklahoma. (D.I. 1, ex. A at ¶ 3)  It is a "well-established manufacturer, installer, service provider and parts provider of air conditioning systems to the motor vehicle market" that "specializes in buses, emergency vehicles and large trucks." (*Id.*) Plaintiff's parent company, Pro Air Holdings, LLC, ("Pro Air") is also a Delaware limited liability company. (*Id.*)

Defendant Mr. Woods is an individual residing in Decatur, Texas, (D.I. 1, ex. A at ¶ 4), and the former owner of Bus Air Manufacturing, LLC, (D.I. 24 at ¶ 2).  After he built the business, Mr. Woods conveyed it to Plaintiff in September 2017 via the APA. (*Id.*) (Because Bus Air Manufacturing, LLC was sold to Plaintiff through the APA, it will be referred to herein as "Old Co."). (*See* D.I. 1, ex. A at 1))

Defendant E3 Rivers is a Texas limited liability company and the successor entity to Old Co. (D.I. 24 at ¶ 2)

### B.    Factual History

#### 1.    The APA

As noted above, in September 2017, Mr. Woods and Bus Air executed the APA, by which Mr. Woods conveyed his business to Plaintiff for $18,190,000 in cash consideration. (D.I.

9, ex. 1 at ¶ 3.1)[1] After the closing, Plaintiff continued in the Business; that is, as did Old Co. before it, it serves customers in the motor vehicle air conditioning industry. (D.I. 1, ex. A at ¶ 11)

The APA included two key sections that are particularly relevant to the Motions.

The first key section is Section 7.4, which contains the noncompetition and nonsolicitation clause. Although Section 7.4 is one long paragraph in the APA, its content can be understandably broken up into three fairly distinct subparts. First is a subpart relating to "goodwill":

> <u>Noncompetition and Nonsolicitation</u>. The Company [i.e., Bus Air Manufacturing, LLC] and each Stockholder, jointly and severally, hereby acknowledge and agree that the covenants and agreements set forth in this Section 7.4 are a material inducement to Buyer [i.e., Plaintiff] to enter into this Agreement and to perform its obligations hereunder, and that Buyer would incur a significant loss of the goodwill being purchased as part of the transactions contemplated hereby if either the Company or the Stockholder [i.e., Mr. Woods] were to breach any of the provisions of this Section 7.4. . . .

(D.I. 9, ex. 1 at § 7.4 (emphasis in original); *see also id.* at 1) Second is a subpart containing the operative restrictions on competition (the "noncompetition provision") and solicitation (the "nonsolicitation provision"):

> . . . Therefore, in order to facilitate the consummation of the transactions contemplated hereby, the Company and the Stockholder, jointly and severally, agree that for the Restricted Period (as defined below), neither the Company nor the

---

[1]      In its Complaint, Plaintiff alleges that in the months prior to the closing, "Defendants told [a former employee of Old Co., Andrew Beard, who now serves as Plaintiff's Vice President of Operations] that if there were ever a breakdown in the relationship with the parties, . . . [Defendants] would reenter the industry and compete with [Plaintiff]." (D.I. 1, ex. A at ¶ 44; D.I. 27, ex. 2 at ¶ 2)  Plaintiff alleges that it did not learn of this conversation until after the closing. (D.I. 1, ex. A at ¶ 44)

> Stockholder will, in any such case or in any manner whatsoever, engage directly or indirectly (whether through Affiliates or otherwise) in all or any portion of the Business as conducted as of the Closing Date anywhere in North America; provided, however, that the passive ownership of less than 1% of the outstanding stock of any publicly-traded corporation will not be deemed, solely by reason thereof, a violation of this Section 7.4. In addition, for the applicable Restricted Period, the Company and the Stockholder, jointly and severally, agree that neither the Company nor the Stockholder will, in any such case (i) recruit, offer employment, employ, engage as a consultant, lure or entice away any Person who is or was an employee or independent contractor of the Company at any time during the twelve (12) month period preceding the date on which any of the foregoing actions would take place, (ii) solicit business from any Person (or any successor in interest to any such Person) which is or was during the twelve (12) month period preceding the Closing Date a contractor, customer, supplier or service provider with or to the Company for the purpose of securing business or contracts related to the Business, or (iii) solicit, encourage, initiate or participate in discussions or negotiations with, or provide any information to, any present or future contractor, supplier or service provider with or to the Company with respect to the termination or adverse alteration of his, her or its relationship with the Company. For purposes of this Section 7.4, "Restricted Period" means a period of five years from and after the Closing Date. . . .

(*Id.* (emphasis in original)) Third is a subpart providing that any term within the noncompetition and nonsolicitation clause, if it is found invalid or unenforceable, can be rewritten instead of wholly stricken:

> If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 7.4 is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability will have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(*Id.*)

The second key section of the APA for purposes of the Motions includes a choice-of-law provision and a forum selection clause; it reads:

> Governing Law; Venue.  The validity and construction of this Agreement shall be governed by the internal laws (and not the choice-of-law rules) of the State of Delaware.  All disputes, litigation, proceedings or other legal actions by any party to this Agreement shall be instituted exclusively in the courts of the State of Delaware or of the United States in the State of Delaware.

(*Id.* at § 10.3 (emphasis in original))

## 2.      The Employment Agreement

On the same date that they executed the APA, Mr. Woods and Plaintiff also executed an employment agreement (the "EA").  (D.I. 15, ex. A-2; *see also* D.I. 9, ex. 1 at § 4.2(e))  It provides that Mr. Woods would be President and CEO of Plaintiff and that his employment would be at-will.  (D.I. 15, ex. A-2 at 1)  It also included nonsolicitation provisions binding Mr. Woods, which are somewhat similar to the restrictions set out in the noncompetition and nonsolicitation clause of the APA.  (*Compare* D.I. 15, ex. A-2 at 2 *with* D.I. 9, ex. 1 at § 7.4)  These provisions were in effect until one year from the date of the termination of Mr. Woods's employment.  (D.I. 15, ex. A-2 at 2)

The EA was an exhibit to the APA.  (D.I. 9, ex. 1 at § 4.2(e); *see also* D.I. 15 at 16 & n.72)  And Section 10.9 of the APA provides an incorporation by reference clause whereby "[t]he Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein."  (D.I. 9, ex. 1 at § 10.9)  Thus, the terms of the EA were incorporated into the APA.

The EA contained its own choice-of-law and forum selection clause.  This provided that the EA "will be construed and enforced under the laws of the State of Texas, without regard to its conflict of law principles" and that "[i]n the event of any alleged breach of this Agreement,

you consent to the exclusive jurisdiction of the federal and state courts in the State of Texas."
(D.I. 15, ex. A-2 at 3)

### 3. Events Subsequent to the Execution of the APA and EA

Plaintiff has described several categories of Defendants' conduct that, in its view, are particularly relevant to alleged breaches of the APA. The relevant facts relating to each category of conduct will be described below.

#### a. Chad and Adam Whitton, WW Sales, LLC and Mrs. Woods's Distribution of Money to the Whittons

Chad and Adam Whitton (the "Whittons") are Mr. Woods's nephews. (D.I. 24 at ¶ 3) When Mr. Woods owned Bus Air Manufacturing, LLC, the Whittons were his employees. (*Id.* at ¶ 4; D.I. 1, ex. A at ¶ 23) Mr. Woods has stated that the Whittons held "high-level positions" at Old Co., though he has not specified what these positions were. (D.I. 24 at ¶ 35)

Upon the execution of the APA, the Whittons—like Mr. Woods—became employees of Plaintiff, via certain at-will employment agreements. (D.I. 1, ex. A at ¶ 24) Pursuant to these agreements, the Whittons too were subject to certain restrictive covenants. (D.I. 15 at 7) The Whittons' restrictive covenants were for a term of only one year (unlike the provisions of the noncompetition and nonsolicitation clause of the APA, which bind Mr. Woods for five years from the September 2017 closing date). (*Id.*; D.I. 9, ex. 1 at ¶ 7.4) The record does not indicate under what circumstances the Whittons' employment with Plaintiff terminated. But by February 2018, the Whittons' employment with Plaintiff had in fact ended; thereafter, the Whittons entered the roofing business. (D.I. 9, ex. 5 at ¶ 12; D.I. 1, ex. A at ¶ 27)

In December 2017, Mr. Woods distributed $1.465 million of the closing proceeds to the Whittons ($1 million to Chad Whitton and $465,000 to Adam Whitton). (D.I. 1, ex. A at ¶ 26; *id.*, ex. A at ex. 2) In a declaration submitted by Defendants, Mr. Woods states that: (1) there

were "no conditions on that $1.465 million payment to my nephews"; (2) he received no consideration for the payment and the payment was not a "seed investment" in the Whittons' business; and (3) the payment was simply "a monetary token of appreciation provided to my nephews—who held high-level positions in [Old. Co.] and helped me build it through hard work and dedication." (D.I. 24 at ¶¶ 34-35)

At some point, the Whittons left the roofing business and entered the automotive air conditioning business. In furtherance of this venture, on or about November 13, 2018, the Whittons formed non-party WW Sales, LLC ("WW Sales"). (D.I. 1, ex. A at ¶ 31) It is not disputed that WW Sales is in the business of automotive air conditioning and that it is in direct competition with Plaintiff. (*See* D.I. 29 ("Tr.") at 122 (Defendants' counsel describing the Whittons as a "new competitor" to Plaintiff); *see also* D.I. 23 at 3-4)

Plaintiff alleges that "the Whittons did not and do not have the financial means or expertise on their own to create and operate a new company [like WW Sales.]" (D.I. 1, ex. A at ¶ 27) Mr. Woods, for his part, states that: (1) he has no equity interest in, owns no stock in and owns no voting security in WW Sales; (2) he has "no financial interest in WW Sales['] profits or revenues[;]" (3) he has no formal or informal position with WW Sales; and (4) he neither had nor has the power to govern the company or to direct its operations. (D.I. 24 at ¶¶ 18-27)

### b.    The Premises and Mr. Woods's Role as to the Premises

Building 380, LLC ("Building 380") is a Texas limited liability company solely owned by Mr. Woods. (D.I. 1, ex. A at ex. 3; D.I. 24 at ¶ 11; *see also* D.I. 1, ex. A at ¶ 29) On November 16, 2018 (three days after the Whittons formed WW Sales), Building 380 purchased real property in Decatur, Texas, referred to herein as the "Premises." (D.I. 1, ex. A at ¶ 32; *id.* at ex. 3, ex. 5)

The Premises are now the site of the Whittons' business. (*Id.* at ¶ 33; D.I. 24 at ¶ 14) WW Sales leases the Premises from Building 380 for $10,000 per month, (D.I. 24 at ¶ 14), which Mr. Woods describes as a "fair market" rent that is fixed and does not vary depending on WW Sales' financial success, (*id.* at ¶¶ 14-15). In its Complaint, Plaintiff also alleges that "Defendants constructed a facility on the Premises specifically designed, engineered and outfitted to service buses, including the installation and maintenance of air conditioning systems, as well as final inspection and wash, all part of the services Old. Co. provided prior to the sale to [Plaintiff]." (D.I. 1, ex. A at ¶ 33)

It is not disputed that the Whittons and WW Sales have used and do currently use the Premises to promote the business of automotive air conditioning. (*Id.* at ¶ 34; Tr. at 59)[2] Plaintiff has submitted photographs of the Premises, for example, which show a facility located on the property that appears to be servicing large motor vehicles (i.e., school buses). (D.I. 9, ex. 2)

The record indicates that Mr. Woods played at least some role in readying the Premises so that it could be used thereafter by the Whittons. For example, in May 2019, Mr. Woods signed and submitted an Application for Installation of On-Site Sewage Facility regarding the Premises to the Wise County Department of Public Works in Decatur, Texas. (D.I. 27, ex. 1 at 5) In this application, Mr. Woods wrote that the Premises were to be used for a "Service Shop. 9000 sq. ft." (*Id.*) In the same month, Mr. Woods also signed and submitted an Application for Development Permits for the Premises to Wise County Development Services in Decatur. (*Id.* at 11) Certain documents that appear to have been attached to this application refer to the Premises

---

[2]     Mr. Woods states that through Building 380, he is also building recreational vehicle and boat storage facilities on the Premises in the hopes of eventually generating additional rental income from those facilities. (D.I. 24 at ¶ 16)

as the future location of "Bus Air Manufacturing Company." (*Id.* at 13 (letter from "James Sims, P.E., Geotechnical Engineer" to "Link's Backhoe Service" regarding the on-site sewage facility); *id.* at 17 (map accompanying Mr. Sims's letter listing "9000 sf Bus Air Manufacturing Company Facility (Undr Constr)" as being on the Premises); *id.* at 22 (same)) The rest of the attachments to this application detail various aspects of the proposed on-site sewage system for the Premises. (*See, e.g.*, *id.* at 13-16, 19-21) Mr. Woods was granted a license to operate such a system on the property in May 2019. (*Id.* at 9)

### c.   Mr. Woods's Meeting with Casey Cummings

Casey Cummings was "the former CEO of a leading designer, manufacturer and installer of mobile air conditioning and heating systems" in the "school and commercial bus, ambulance, emergency vehicle, van, specialty truck, sleeper cab, off-highway and small cab markets." (D.I. 9, ex. 4 at ¶ 2) In an affidavit that Mr. Cummings signed and that was submitted by Plaintiff, Mr. Cummings did not provide any further detail about the name of this company, or whether it had any prior relationship with Old Co. (*See generally* D.I. 9, ex. 4) Through his role as CEO of this company, and in light of his other prior work experience, Mr. Cummings is familiar with Plaintiff's industry. (*Id.* at ¶ 3) By October 2019, Mr. Cummings had left this company; he is currently employed by Pro Air, Plaintiff's parent company. (Tr. at 66, 91-92)

Mr. Cummings has known Mr. Woods for approximately 30 to 35 years. (D.I. 9, ex. 4 at ¶ 4) In December 2018, Mr. Cummings met Mr. Woods for lunch, whereupon Mr. Woods disclosed that he was "buying a piece of property for [the Whittons] to set up a bus installation business[.]" (*Id.* at ¶ 6) Mr. Cummings states that Mr. Woods also told him during this meeting that the Whittons "would run the business because [Mr. Woods] was barred from the bus installation business by a non-compete agreement with [Plaintiff]." (*Id.*) Mr. Woods also

inquired whether Mr. Cummings's then-current employer "had any need for bus installation work[.]" (*Id.* at ¶ 8) If so, Mr. Woods "advised [Mr. Cummings] to contact Chad and Adam [Whitton]." (*Id.*) In January 2019, based upon Mr. Woods's recommendation, Mr. Cummings contacted the Whittons and "set up and attended a meeting with [them] to discuss employing [them] to do bus installation work." (*Id.* at ¶¶ 9-10) The record does not indicate whether or not Mr. Cummings's company actually agreed to employ the Whittons' company thereafter.

### d.    Mr. Woods's Contact with Patrick Hennessy

Patrick Hennessy ("Mr. Hennessy") is the Vice President of Sales / Engineering for DCM Manufacturing, Inc. ("DCM"). (D.I. 9, ex. 5 at ¶ 2) DCM manufactures products in the automotive air conditioning and heating market, including fans and blowers. (*Id.* at ¶ 3) Mr. Hennessy has worked for DCM for 22 years, during which he has gained familiarity with the automotive air conditioning and heating systems industry. (*Id.* at ¶ 4) Mr. Hennessy has also been acquainted with Mr. Woods and the Whittons for approximately 15 years, during which he sold products to Mr. Woods and Old Co. (*Id.* at ¶¶ 5-6) Subsequent to the APA's execution, Mr. Hennessy has sold the same type of products to Plaintiff. (*Id.* at ¶ 7)

Plaintiff has provided an affidavit from Mr. Hennessy, in which Mr. Hennessy explains that at some point after the APA was executed (Mr. Hennessy does not state when) Chad Whitton contacted him via cell phone. (D.I. 9, ex. 5 at ¶ 13) During this call, Chad Whitton "requested that [Mr. Hennessy] sell him the axial fans [DCM] manufacture[s], which the Whittons wanted for use in their roofing business." (*Id.*) Mr. Hennessy notes, however, that these DCM fans are of no use in the roofing business, and that they are instead used mainly for bus, construction and other specialty vehicles. (*Id.* at ¶¶ 14-15) At this time, Mr. Hennessy: (1) believed "that the Whittons were working with Mr. Woods to re-enter the HVAC business" and

were seeking to purchase DCM's fans so they could do so; (2) had a business relationship with Plaintiff; and (3) was aware of the noncompetition and nonsolicitation provisions of the APA. (*Id.* at ¶¶ 10, 16) In light of all of this, Mr. Hennessy "told Chad Whitton that I declined to supply the Whittons with DCM products due to a conflict of interest with [Plaintiff]." (*Id.* at ¶ 16)

At some "time" "[a]fter" these conversations with Chad Whitton—again, Mr. Hennessy does not state when—"via text message, Mr. Woods asked [Mr. Hennessy] to contact [Mr. Woods]." (*Id.* at ¶ 17) Mr. Hennessy "suspected Mr. Woods was either himself or through the Whittons looking to break back into the bus HVAC business" and, "[k]nowing what [he] did about Mr. Woods's non-competition and non-solicitation restrictions, [Mr. Hennessy] did not respond to Mr. Woods's text." (*Id.* at ¶¶ 18-19)

### C.  Procedural History

Events relating to this litigation commenced on June 5, 2019, when Plaintiff sent a letter to Mr. Woods and the Whittons. (D.I. 15, ex. B-1; *see also* D.I. 1, ex. A at ¶ 51) In this letter, Plaintiff articulated its factual basis for believing that Defendants were in breach of the noncompetition and nonsolicitation clause found in Section 7.4 of the APA. (D.I. 15, ex. B-1 at 1-5) Further, Plaintiff generally demanded that Defendants cease competing with it and provide proof of such cessation. (*Id.* at 5-6) Finally, Plaintiff put Defendants on notice that if they did not comply with Plaintiff's demands, Plaintiff would institute litigation against Defendants. (*Id.* at 6-8)

In response to Plaintiff's letter, on June 11, 2019, the Whittons and WW Sales filed a petition for declaratory judgment in the 271st Judicial District in Wise County, Texas (the "Texas Court"), seeking a declaration that they have not violated Section 7.4 of the APA and that

this section is unenforceable (the "Texas Action"). (D.I. 1 at ¶ 53; *id.*, ex. A at ex. 9 at 88-92) One day later, on June 12, 2019, Defendants (and Building 380) filed a Petition in Intervention in the Texas Action, pursuant to Texas Rule of Civil Procedure 60; pursuant to this filing, Defendants sought to intervene as plaintiffs in the Texas Action. (D.I. 1, ex. A at ex. 9 at 93-98) Plaintiff thereafter filed a motion to dismiss the Texas Action. (Tr. at 101) Recently, the Texas Court has stated that Plaintiff's motion to dismiss the Texas Action will be granted. (D.I. 30 & ex. 1)

On July 10, 2019, Plaintiff filed its Complaint in the Court of Chancery of the State of Delaware ("Chancery Court"). (D.I. 1, ex. A at 1) The Complaint includes two counts: Breach of Restrictive Covenants (Count I) and Indemnification (Count II). (*Id.* at ¶¶ 61-70) In the Complaint, Plaintiff requested preliminary and permanent injunctive relief, (*id.* at 21-24), and along with the Complaint, Plaintiff filed a Motion for a Preliminary Injunction in the Chancery Court, (*id.* at ex. 9 at 120-21). Plaintiff additionally filed a Motion to Expedite Proceedings, requesting that the Chancery Court hear its motion for a preliminary injunction on an expedited basis. (*Id.* at 103-19) On July 31, 2019, Defendants removed the case from Chancery Court to this Court. (D.I. 1 at 5)

On August 21, 2019, Plaintiff filed its Motion for a Preliminary Injunction in this Court. (D.I. 8) This case was thereafter referred to the Court for all purposes through the case dispositive motion deadline. (D.I. 10) On August 26, 2019, Defendants filed their Motion to Dismiss. (D.I. 13) Briefing on the Motions was completed on September 25, 2019. (D.I. 27; D.I. 28)

On September 4, 2019, the Court held a status teleconference with the parties regarding the Motions. Prior to the teleconference, the Court had inquired, *inter alia*, whether either or

both parties wished to take additional discovery prior to a hearing on Plaintiff's Motion for a Preliminary Injunction; both sides informed the Court that they did not wish to do so. (D.I. 11; D.I. 19 at 2; *see also* Tr. at 33, 64)  After hearing argument from the parties during the teleconference as to the order in which the Court should resolve the Motions, the Court set a hearing on both Motions for October 4, 2019. (D.I. 20)  At that hearing, the Court heard oral argument on both Motions.

## II.  DISCUSSION

Below, the Court will first address Plaintiff's Motion for a Preliminary Injunction. Thereafter, it will address Defendants' Motion to Dismiss.

### A.  Motion for a Preliminary Injunction

#### 1.  Legal Standards

"Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (internal quotation marks and citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,[3] that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors:  it must demonstrate that it can win on the merits . . . and that it is more

---

[3]  "[T]he plaintiff . . . needs only to show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief.  A 'likelihood' does not mean more likely than not." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (emphasis in original).

likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (footnotes omitted). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* In assessing the four preliminary injunction factors, a court should consider that "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (internal quotation marks and citation omitted)).

The moving party "bears the burden of producing evidence sufficient to convince the court that [the preliminary injunction factors weigh in favor of granting an injunction.]" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity[.]" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

### 2.    Analysis

As will be further set out below, the Court concludes that after reviewing the record as to the first preliminary injunction factor—i.e., likelihood of success on the merits—Plaintiff has not met its burden at this time. In light of this, the Court will address that factor in great detail below, and will not substantively discuss the other three preliminary injunction factors.

#### a.    Likelihood of Success on the Merits

Plaintiff has alleged that Defendants breached various portions of the APA's noncompetition and nonsolicitation clause, arguing that its showing as to certain of these breaches demonstrates that it is likely to succeed as to Count I. The noncompetition and

nonsolicitation clause, as was noted above, first provides the noncompetition provision, which states that Mr. Woods and E3 Rivers will not, for the relevant period of time, "in any such case or in any manner whatsoever, *engage directly or indirectly* (whether through Affiliates[4] or otherwise) in all or any portion of the Business[5] as conducted as of the Closing Date anywhere in North America[.]" (D.I. 9, ex. 1 at § 7.4 (emphasis added))  The clause then goes on to provide three more specific restrictions on solicitation (i.e., the nonsolicitation provision), which state that Mr. Woods and E3 Rivers will not:

> (i)   recruit, offer employment, employ, engage as a consultant, lure or entice away any Person who is or was an employee or independent contractor of the Company [i.e., Bus Air Manufacturing, LLC] at any time during the twelve (12) month period preceding the date on which any of the foregoing actions would take place,
>
> (ii)  solicit business from any Person (or any successor in interest to any such Person) which is or was during the twelve (12) month period preceding the Closing Date a contractor, customer, supplier or service provider with or to the Company for the purpose of securing business or contracts related to the Business, or
>
> (iii) solicit, encourage, initiate or participate in discussions or negotiations with, or provide any information to, any present or future contractor, supplier or service provider with or to the Company with respect to the termination or adverse alteration of his, her or its relationship with the Company.

(*Id.*)

---

4      "Affiliate" is defined in the APA as "[a]s applied to any Person . . ., any Person controlling, controlled by or under common control with such Person." (D.I. 9, ex. 1 at § 9)

5      "Business" is defined in the APA as "the business of designing, engineering, providing, manufacturing, installing, servicing and providing parts to the motor vehicle air conditioning industry[.]" (D.I. 9, ex. 1 at 1)

In its briefing, Plaintiff listed a number of facts that it asserted were relevant to why Defendants' conduct amounts to a breach of the noncompetition and nonsolicitation clause. (*See generally* D.I. 9; D.I. 27) But it did so in a fairly unorganized manner. (*Id.*) Thus, after reading Plaintiff's briefing, it was difficult for the Court to understand: (1) What specific categories of conduct were asserted by Plaintiff to evidence breach of contract?; and (2) What particular provisions of the APA's noncompetition and nonsolicitation clause were assertedly implicated (and violated) by each such course of conduct at issue? (Tr. at 5, 32; D.I. 23 at 9 (Defendants noting that "frustratingly . . . [Plaintiff] fails to apply any of its alleged 'facts' to the [relevant provisions of Section 7.4], leaving Defendants and the Court to divine its claims")) During oral argument on the Motions, the Court asked Plaintiff's counsel to clarify Plaintiff's arguments in these regards. (Tr. at 5, 32) In response, Plaintiff's counsel asserted that the "top three" categories of conduct that demonstrates a breach are: (1) Mr. Woods's involvement with the Premises, (2) Mr. Woods's meeting with Mr. Cummings and (3) Mr. Woods's conversation with Mr. Hennessy. (Tr. at 31-33) Thus, below the Court will primarily address these three categories of purported breach in turn.[6]

---

[6]    Defendants also argued that Plaintiff was unlikely to be successful in this suit for reasons other than the lack of evidence supporting Plaintiff's claims of breach of contract. One such argument was that because Plaintiff failed to join the Whittons, WW Sales and Building 380 as parties to this suit, the suit must be dismissed. (D.I. 23 at 6-8) This argument will be addressed below (and found wanting) regarding Defendants' Motion to Dismiss. Defendants also argued no likelihood of success because Plaintiff could not show that the geographic scope of the noncompetition and nonsolicitation clause was reasonable (and thus, could not show that it was likely that the clause was enforceable). (*Id.* at 18-19); *see also O'Leary v. Telecom Res. Serv., LLC*, Civil Action No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) (explaining that under Delaware law, the reasonableness of a covenant's geographic scope is "not determined by physical distances, but by reference to the area in which a convenantee has an interest the covenants are designed to protect"). Here, the scope of the relevant covenant is "anywhere in North America[,]" (D.I. 9, ex. 1 at § 7.4), and unfortunately, the record is not particularly robust as to whether Plaintiff's business interests reach throughout North America (or failing that, whether those interests are at least national in scope). (D.I. 9 at 14 (citing to no

16

### i.    Mr. Woods's involvement with the Premises

The first major category of conduct relates Mr. Woods's involvement with the Premises. Here, Plaintiff focused on: (1) Mr. Woods's role in leasing the Premises from Building 380 to WW Sales and (2) Mr. Woods's actions in developing the Premises for use by WW Sales and the Whittons.

First, the Court addresses Mr. Woods's lease of the Premises (through Building 380) to the Whittons and WW Sales. During the hearing on the Motions, Plaintiff confirmed that it was not contending that this lease arrangement, in and of itself, constituted a breach of APA. (Tr. at 7-8 ("[Plaintiff's Counsel]: If Mr. Woods simply had a lease of a building that he owned, an existing building that he owned, and leased that to the Whittons or any other party, that alone would not amount to a breach[.]"))[7] While Plaintiff maintains that the lease is still relevant to Plaintiff's Motion because it is "part of an entire pattern commenced prior to the closing of the APA that continues to present day of conduct relating to a violation of [Section] 7.4 [of the APA,]" (*id.* at 8), in light of Plaintiff's concession, the Court cannot find that Mr. Woods's receipt of lease payments from WW Sales is evidence demonstrating Plaintiff's likelihood of

---

record evidence to support the proposition that "[Plaintiff's] Business is national"); D.I. 23 at 19; D.I. 27 at 9-10; Tr. at 42-43) Though the Court suspects that Plaintiff eventually will be able to muster evidence supporting at least a United States-based scope for the covenant at issue, (Tr. at 43-44), in light of the lack of a current record on this point, the Court will not reach this issue here. And it need not, since below it concludes that Plaintiff has not demonstrated a likelihood of success on the merits as to the substance of its breach claims.

[7]    Plaintiff is likely making this concession in light of a significant amount of legal authority indicating that, absent a contractual provision clearly to the contrary, a noncompetition covenant does not preclude a party from merely leasing property or loaning money to another engaged in a competing business. *See Goddard Sys., Inc. v. Gondal*, Civil Action No. 17-1003-CJB, 2018 WL 1566570, at *21 (D. Del. Mar. 29, 2018) (citing *Nat'l Propane Corp. v. Miller*, 18 P.3d 782, 787 (Colo. Ct. App. 2000)); (Tr. at 8 (Plaintiff's counsel acknowledging that this "appears to be the general rule across various jurisdictions")).

success on the merits as to Count I. Put differently, the Court does not see how Mr. Woods's participation in a lease agreement that is not violative of the APA in some way helps demonstrate that Plaintiff is likely to succeed in showing that a violation of the APA has occurred.

Second, the Court addresses Mr. Woods's involvement in readying the Premises for use by WW Sales. Here, there is no dispute about certain facts. For example, the record undoubtedly shows that the Premises are, in fact, being used in furtherance of "Business," as that term is defined in the APA. Indeed, Defendants do not deny that WW Sales has used and does use the Premises to, *inter alia*, install and service parts relating to the motor vehicle air conditioning industry. (D.I. 9, ex. 2; Tr. at 59) Instead, the issues here are: (1) the extent of Mr. Woods's role in getting the Premises ready to be used by WW Sales in such a competitive manner; and (2) whether such a role amounts to "engag[ing] directly or indirectly . . . in . . . the Business" pursuant to Section 7.4's meaning. (*See* D.I. 9, ex. 1 at § 7.4)

Plaintiff argues that Mr. Woods played a significant role in readying the Premises for use by WW Sales. In that regard, it alleges that Mr. Woods "constructed a facility on the Premises specifically designed, engineered, and outfitted to service buses, including the installation and maintenance of air conditioning systems, as well as the final inspection and wash, all part of the services Old Co. provided prior to the sale to [Plaintiff]." (D.I. 1, ex. A at ¶ 33; D.I. 27 at 7-8 (Plaintiff asserting that Mr. Woods "'ordered equipment' for the Whittons and outfitted the Premises for the Whittons' competition in the bus installation business" and "outfitted the Premises with bus installation equipment to be used by competitors in the Business"); Tr. at 9-10 (Plaintiff's counsel asserting that Mr. Woods "built out that building specifically for the service of aftermarket bus air conditioning")) The difficulty here for Plaintiff is that there is no evidence of record to support this bald allegation.

In an attempt to support the allegation, Plaintiff pointed to documents relating to Mr. Woods's application for certain permits for the Premises. (D.I. 27, ex. 1; *see also* Tr. at 9-15) Of record are two applications that Mr. Woods submitted to Wise County, Texas governmental officials. These are an application for permission to install an on-site sewage facility on the Premises (noting that the Premises would be used as a "Service Shop") and an application for permission to obtain a septic permit—both of which Mr. Woods signed and submitted in May 2019.[8] (D.I. 27, ex. 1 at 6-24 (applications and attached documents, including a map showing the proposed septic fields and noting that they would be near buildings referred to as "Bus Air Manufacturing Company"); *see also id.* at 4 (e-mail from the Chief Deputy Coordinator of the Wise County Department of Public works referring to this application as relating to a "septic permit"); Tr. at 11) But nothing relating to these applications suggests that Mr. Woods "constructed a facility on the Premises specifically designed, engineered, and outfitted to service buses[.]" (D.I. 1, ex. A at ¶ 33) Sewage systems are a universal need for any type of business (or residential) establishment. And if leasing the Premises to the Whittons undisputedly does not amount to a violation of the noncompetition provision of Section 7.4, then the Court is hard-pressed to see how filing paperwork to help get a septic system installed on the Premises

---

[8]     During the hearing, Plaintiff's counsel reported that although the documents at issue purport to relate to septic system permitting and installation, he understood them to be an application for a broader "building permit[]" and that this was based on his "understanding [of] the way the building permits work in Texas . . . just an understanding of mine from research[.]" (Tr. at 11) Because there is no record evidence supporting this attorney argument, however, the Court cannot credit it here. (*Id.* at 11-12 ([The Court:] So just on the face of it, it doesn't look like the [septic] permit itself has anything particularly to do with this [automotive air conditioning] industry. [Plaintiff's counsel:] Again, Your Honor, the permit is part of the narrative."); *id.* at 17 (Plaintiff's counsel appearing to acknowledge that the permit was "for the sewage for a larger building"); *id.* at 58-59 (Defendants' counsel noting that "this is just a license to construct an on-site sewer facility"))

(something one would presumably have to do if one wanted to lease the Premises for commercial use to *anyone*) amounts to such a violation. (*See* Tr. at 11-12)

As noted above, Plaintiff also submitted some pictures of what the Premises looks like (as of July 2019), which show pictures of buses parked there, apparently ready to be serviced. (D.I. 9, ex. 2 at exs. A-C) And again, it is not disputed that WW Sales uses the Premises to perform work that meets the APA's definition of "Business." (Tr. at 50, 59) Now, if there was evidence that Mr. Woods actually played a role in designing and constructing a facility to be specifically used by the Whittons to compete in "Business," that might at least provide fuel for an argument that in doing so, Mr. Woods was "engag[ing] directly or indirectly (whether through Affiliates or otherwise) . . . in . . . the Business" under the meaning of Section 7.4. (D.I. 9, ex. 1 at § 7.4; *see also* Tr. at 19-20) But there is no persuasive evidence of this in the record.[9] For all the Court knows (based on what it has, and has not, been presented with), the buildings/facilities

---

[9] Here, the Court does not consider the Plaintiff's bald statements in the Complaint that Mr. Woods "constructed a facility on the Premises" or "specifically designed, engineered, and outfitted" the Premises to be persuasive evidence of these facts. (D.I. 1, ex. A at ¶ 33) Although these allegations read as if they are meant to assert statements of fact, they are really more akin to legal conclusions, because they provide no indication of what is the actual factual support that undergirds them. *Cf. Johnson v. City of Union City*, Civil Action No. 12-1042 SRC, 2012 WL 6021808, at *1 (D.N.J. Nov. 20, 2012) (denying a preliminary injunction when plaintiff "relied on bald legal conclusions" instead of "providing proof"). There is no indication from the verified Complaint, for example, of whether Plaintiff is coming to these conclusions because it has reviewed documents showing that Mr. Woods took these actions, or because witnesses have told Plaintiff that Mr. Woods did so, or (instead) because Plaintiff simply speculates or guesses that this must have been the way that the Premises were constructed. Indeed, when the Court asked Plaintiff's counsel during the hearing to state what *was* the underlying evidence that Plaintiff had to support these statements, Plaintiff's counsel acknowledged that it had no such evidence, other than the fact that Mr. Woods had "not denied it." (Tr. at 12-13) But Mr. Woods had not *admitted* these facts either. And it is Plaintiff's burden to come forward with something more than mere guesswork in order to establish key components of its likelihood of success on the merits.

on the Premises were designed and constructed by third party construction firms, or the

Whittons, or someone else, without any input from Mr. Woods. (*See* Tr. at 13)[10]

For all of these reasons, Mr. Woods's involvement with the Premises does not add up to a

likely breach of the APA.

### ii. Mr. Woods's conversation with Mr. Cummings

Next, Plaintiff argues that Mr. Woods's conversation with Mr. Cummings—wherein Mr.

Woods suggested that Mr. Cummings have his current employer contact the Whittons for any

bus installation work it might need, (D.I. 9, ex. 4 at ¶¶ 8-10)—amounts to a likely breach of the

APA. The Court disagrees.

As an initial matter, Plaintiff never clearly articulated in its briefing what portions of the

noncompetition and nonsolicitation clause it believed Mr. Woods violated due to his

conversation with Mr. Cummings. (*See generally* D.I. 9; D.I. 27) During the hearing, for the

first time, Plaintiff's counsel explicitly articulated the view that this conduct *both*: (1) breached

---

[10] At times, Plaintiff appears to rely on circumstantial evidence that Mr. Woods (who had decades of experience in the Business) was most likely the person who made design- and construction-related choices regarding construction of competing facilities on the Premises. Plaintiff argues that this must be so, because the Whittons did not and could not have had the wherewithal to make these choices themselves. (Tr. at 16 ("[Plaintiff's Counsel]: [T]he brains behind the Old Co., and the party who had . . . the wherewithal to know how to set up this business is the sophisticated party that is Mr. Woods."); *see also id.* at 13-14 ("[Plaintiff's Counsel]: Mr. Woods[,] who is in the business for 30 years, bought the property. He applied for a permit. He set up the building specifically.")) But as even Plaintiff acknowledges, at the time of WW Sales' conception, the "Whittons, in fact, ha[d] been involved in the [B]usiness for some time[.]" (*Id.* at 16; *see also id.* at 52 (Defendants' counsel arguing that the Whittons are "not some . . . 20-year-olds that don't know what they're doing" and that they have "been in this business for 20 years")) And according to Mr. Woods's declaration, the Whittons "held high-level positions in [Old Co.] and helped [him] build [Old Co.] through hard work and dedication." (D.I. 24 at ¶ 35) So the record does not support the assertion that the Whittons were so devoid of knowledge about the Business that they could not have overseen the construction of facilities on the Premises (and that Mr. Woods must have played this role instead). And with no evidence of record regarding how such facilities ultimately *actually were designed or constructed*, Plaintiff's circumstantial argument regarding Mr. Woods's role is exceedingly weak at this stage.

the noncompetition provision (i.e., that Mr. Woods will not "in any manner whatsoever, engage directly or indirectly . . . in all or any portion of the Business[,]" (D.I. 9, ex. 1 at § 7.4)); *and* (2) breached two subsections of nonsolicitation provision, which provide that Mr. Woods will not "solicit business from any Person . . . which is or was during the twelve (12) month period preceding the Closing Date a contractor, customer, supplier or service provider with or to [Old Co.], for the purpose of securing business or contracts related to the Business" or not "solicit, encourage, initiate or participate in discussions or negotiations with, or provide any information to, any present or future contractor, supplier or service provider with or to [Old Co.] with respect to the termination or adverse alteration of his, her or its relationship with the [Old Co.,]" (*id.*). (Tr. at 26-31 (Plaintiff's counsel asserting that Mr. Woods's conduct as to Mr. Cummings amounted to breach of subsections (ii) and (iii) of the nonsolicitation provision); *id.* at 93-95 (Plaintiff's counsel also asserting that this conduct amounted to breach of the noncompetition provision))[11]

Taking up the latter argument first, in order for Mr. Woods's conversation with him to amount to a breach of either of the two subsections of the nonsolicitation provision, Mr. Cummings would have then needed to be, *inter alia*, employed by a "contractor, customer, supplier or service provider" with Old Co. in the 12 months preceding the closing date, or a "present or future contractor, supplier or service provider with or to" Old Co. (D.I. 9, ex. 1 at § 7.4)[12] That, in turn, begs a few questions: (1) Who was Mr. Cummings working for during the

---

[11]     In Plaintiff's briefing, it appeared that Plaintiff was *only* arguing that the conversation with Mr. Cummings amounted to a breach of subsections (ii) and (iii) of the nonsolicitation provision. (*See* D.I. 27 at 9 (Plaintiff suggesting that, with regard to the conversation with Mr. Cummings, this amounted to a violation of these two subsections of the nonsolicitation provision))

[12]     If there had been sufficient record evidence that Mr. Cummings's company qualified as one such entity, the Court would agree that the record would then show that Mr.

December 2018 lunch meeting with Mr. Woods?; and (2) Does that company fall within one of the categories above?

The answers, on this record are: We just do not know. In his affidavit, Mr. Cummings does not identify the company who employed him at this time. Instead, he states only that the company was, *inter alia*, a "leading designer, manufacturer and installer of mobile air conditioning and heating systems[.]" (*Id.*, ex. 4 at ¶ 2) Tellingly, Mr. Cummings does not state that this company was a contractor, customer, supplier or service provider to Old Co. in the 12 months prior to the closing date (or ever). And Mr. Cummings provides no further details about the company that might lead one to believe that, even if it had never worked with Old Co., it might at the relevant time have been considered a "future contractor, supplier or service provider" to Old Co.[13]

This is all true despite the fact that at the time he submitted the affidavit, Mr. Cummings actually worked for Pro Air, the parent company of Plaintiff. (Tr. at 65-68, 92) If Plaintiff could obtain information from anyone indicating that Mr. Woods breached one of these two nonsolicitation provisions, it would seem to be logistically easiest to get such information from a person who is actually now working for Plaintiff's parent company. When asked about this

---

Woods's conversation with Mr. Cummings likely violated Section 7.4. Defendants argue to the contrary that this conversation merely amounts to Mr. Woods "exercis[ing] his right to tell the consuming public who they should use for their bus installation needs." (D.I. 23 at 18) But Defendants could not be saved by relying on that type of word salad. The record is that in this conversation, Mr. Woods "advised" Mr. Cummings to contact the Whittons if Mr. Cummings's employer "had any need for bus installation work[.]" (D.I. 9, ex. 4 at ¶ 8) That is, *inter alia*, "solicit[ing] business . . . for the purpose of securing business or contracts related to the Business" under any reasonable understanding of the term. (*Id.*, ex. 1 at § 7.4)

[13]     The Court is not actually sure how, as of December 2018, Mr. Cummings's company could have been a "present or future" contractor, supplier or service provider of Old. Co., since Old Co. apparently ceased to exist as an operating entity after the 2017 closing. (Tr. at 68-69)

during the hearing, Plaintiff's counsel indicated that Mr. Cummings's affidavit read as it did

because counsel does not "push affiants to say more than they're comfortable doing." (Tr. at 92;

*see also id.* at 27-28 (Plaintiff's counsel stating, when asked by the Court what company Mr.

Cummings worked for, that he did not recall, and that Mr. Cummings "requested that [the

company's name] not be included in [his] affidavit")) But if so, then this only further

demonstrates that no showing of a likely breach has been made. That is, if Mr. Cummings was

not "comfortable" stating facts that would show a violation of one of these nonsolicitation

provisions, then at this stage, the Court must infer that there *were* no such facts that could be

stated.[14]

As to the asserted breach of the broader noncompetition provision, the Court also cannot

now find a likely breach. Here, Plaintiff argues that if Mr. Woods's conversation with Mr.

Cummings is not covered by Section 7.4's nonsolicitation provision, it is nevertheless subsumed

within the noncompetition provision's "engage directly or indirectly . . . in . . . the Business"

---

[14]     At oral argument, Plaintiff's counsel attempted to address this issue further by
pointing to Mr. Beard's affidavit, which states that "Mr. Woods's separate efforts to contact and
steer former Old Co. / present Bus Air suppliers, vendors, customers and relationship partners—
such as affiants [David Manning's], [Mr.] Hennessey's and [Mr.] Cummings's companies to Bus
Air's competitors" were wrongful. (D.I. 27, ex. 2 at ¶ 9; Tr. at 28-31) This statement is just too
vague and non-specific to amount to good evidence that Mr. Cummings's former company met
the requirements of either of the two subsections of the nonsolicitation provision at issue. It does
not, for example, state whether Mr. Cummings's former company had a relationship with Old
Co. during the 12-month period prior to the closing. And it is unclear whether Mr. Beard is
saying that Mr. Cummings's company (as compared to Mr. Manning's or Mr. Hennessey's
companies) was a "former" Old Co. supplier/vendor/customer/partner or a "present" Bus Air
supplier/vendor/customer/partner.

Mr. Beard works for Plaintiff. (D.I. 27, ex. 2 at ¶ 1) If Mr. Beard's testimony is to be
used to establish that Mr. Cummings's company qualifies as one of the entities relevant to the
nonsolicitation provision, the Court would expect that his affidavit would set this out clearly and
explicitly. It did not do so, and thus it is not persuasive evidence of breach here.

language.[15] Yet as was noted above, the noncompetition provision is followed immediately in Section 7.4 by the nonsolicitation provision, and the sentence including the nonsolicitation provision begins with the words "In addition . . ." (D.I. 9, ex. 1 at § 7.4) This suggests that the nonsolicitation provision is "addition[al]" to—and thus covers new and distinct subject matter from—the noncompetition provision.[16] Moreover, if the drafters of the APA went to the trouble to carve out certain types of solicitation that are prohibited (i.e., were Mr. Woods to solicit a company that was a customer of Old Co. during the 12-month period preceding the closing) and certain types that were not (i.e., were Mr. Woods to solicit a company that was a customer of Old Co. 13 months prior to the closing), then it seems strange that the intent/effect of the noncompetition provision would be to render the nonsolicitation provision redundant or unnecessary (i.e., by nevertheless prohibiting any of the forms of solicitation that are explicitly permitted by the nonsolicitation provision). Such a result would seem to give no effect to the actual wording of the nonsolicitation provision—an outcome disfavored under Delaware law. *See GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)

---

[15]     Pursuant to the APA's choice-of-law and forum selection clause, Delaware law would apply to any contract interpretation issues relating to Plaintiff's claim of breach of the APA. (D.I. 9, ex. 1 at § 10.3; Tr. at 39) Nowhere in its briefing did Plaintiff address the construction of "engage" under Delaware law, nor provide any argument as to why Delaware state caselaw would support the application of the noncompetition provision to Mr. Cummings's conversation with Mr. Woods. (*See* D.I. 9; D.I. 37)

[16]     *Cf. Cordance Corp. v. Amazon.com, Inc.*, 727 F. Supp. 2d 310, 325 (D. Del. 2010) (in reading a supporting affidavit containing two clauses, this Court understood the use of the word "[a]dditionally" after a first sentence to mean that the first sentence and a subsequent, second sentence provided "two separate pieces of support[,]" because, "[o]therwise, one would not need the word 'additionally'").

("When interpreting a contract . . . a court must construe the agreement as a whole, giving effect to all provisions therein.") (internal quotation marks and citations omitted).

For all of the above reasons, Plaintiff has not shown that Mr. Cummings's conversation with Mr. Woods likely constitutes a breach of the APA.

### iii. Mr. Woods's contact with Mr. Hennessy

Lastly, Plaintiff argues that Mr. Woods likely breached Section 7.4 due to his contact with Mr. Hennessy. By way of recap, sometime after Old Co.'s sale to Plaintiff in September 2017 (it is not clear when), Chad Whitton contacted Mr. Hennessy, requesting that Mr. Hennessy sell him axial fans manufactured by Mr. Hennessy's company, DCM. (D.I. 9, ex. 5 at ¶ 13) Mr. Hennessy (who suspected that the Whittons were working with Mr. Woods to re-enter the automotive HVAC business, and that these fans were meant to be used for that purpose) told Chad Whitton that DCM would not sell him the axial fans. (*Id.* at ¶ 16) Mr. Hennessy reports that "[a]fter this time" (he does not say how long after), Mr. Woods contacted Mr. Hennessy by text message and "asked [Mr. Hennessy] to contact him[.]" (*Id.* at ¶ 17) Mr. Hennessy (knowing that Mr. Woods was barred from soliciting certain of Plaintiff's clients by the APA) "did not respond to Mr. Woods's text." (*Id.* at ¶ 19)

As an initial matter, there is no dispute that Mr. Hennessy's company (DCM) was one of Plaintiff's vendors, and that prior to that it had been a longtime vendor to Old. Co. (*Id.* at ¶¶ 6-7) Thus, there is no dispute that Mr. Hennessy and his company were (at the time of the text

message) a "supplier or service provider" that Mr. Woods could not "solicit business" from. (*See* D.I. 9, ex. 1 at § 7.4)

Yet here again, with so little evidence of record about the nature of Mr. Woods's contact with Mr. Cummings, the Court cannot determine that it was likely violative of Section 7.4. The Court so concludes for a few reasons.

For one thing, other than Mr. Hennessy's affidavit, which states that Mr. Woods's text asked Mr. Hennessy to "contact him[,]" there is no record of any substantive communication between the two men. And so we do not have any direct evidence (i.e., via text message or otherwise) as to *why* Mr. Woods was communicating with Mr. Hennessy.[17]

Moreover, the Court has no other information about the temporal proximity between Mr. Woods's text and Mr. Hennessy's prior communication with Chad Whitton (wherein Mr. Hennessy declined to sell Mr. Whitton the axial fans). In other words, if 10 minutes after Mr. Hennessy finished speaking with Chad Whitton, Mr. Woods texted Mr. Hennessy asking to talk, the inference Plaintiff wishes the Court to draw here (of an attempt at wrongful solicitation)

---

[17] During the hearing, Plaintiff's counsel suggested that despite this, the Court can infer that Mr. Woods's motive had to have been related to improper solicitation because "Mr. Woods had really no other reason to be contacting Patrick Hennessy [except] in connection with what the Whittons did or did not do." (Tr. at 24-25) In other words, Plaintiff was suggesting that Mr. Woods could *only* have been contacting Mr. Hennessy in an attempt to solicit business from him, in light of the one-track (i.e., solely Business-related) nature of the two men's relationship in the past. But the Court cannot make such an inference based on attorney argument; it would need to do so based on facts of record. And while Mr. Hennessy's affidavit notes that he was "acquainted with" Mr. Woods . . . for approximately 15 years" through Mr. Hennessy's "work in the bus HVAC industry, and through other business dealings," that is all Mr. Hennessy says on the subject of his relationship with Mr. Woods. (D.I. 9, ex. 5 at ¶¶ 5-6) And for his part, in his declaration, Mr. Woods states that he "did not direct [his] nephews to purchase fans for uses in buses or roofing." (D.I. 24 at ¶ 29) From this thin record, the Court cannot conclude it is likely that the subject matter of a text message (one containing no information about its purpose) relates to wrongful solicitation.

would be much stronger. But we have no such evidence. Mr. Hennessy's affidavit simply states that the text message came sometime "[a]fter" his communication with Chad Whitton. Whether that was a day, a week, a month or a year "after[,]" Mr. Hennessy does not say. (Tr. at 24 (Plaintiff's counsel noting that Mr. Hennessy's "best recollection was that [the text] was after the conversation that he had with the Whittons" but that Mr. Hennessy had no more specific memory of when the text came))

Lastly (and perhaps most significantly), the Court is not convinced that, as a legal matter, Mr. Woods could be found to have "solicit[ed] business" from Mr. Hennessy under the meaning of Section 7.4 based on a conversation that never happened. If Mr. Woods never actually got the chance to communicate anything to Mr. Hennessy—other than that Mr. Hennessy should "contact" him—and Mr. Woods never actually spoke substantively to Mr. Hennessy, how could Mr. Woods be said to have "solicit[ed]" Mr. Hennessy's business?

For all of the above reasons, Plaintiff has not shown that Mr. Woods's contact with Mr. Hennessy likely constitutes a breach of the APA.

### iv.    Conclusion

The Court finds that—based only on the state of the record before it today—Mr. Woods's involvement with the Premises, Mr. Woods's conversation with Mr. Cummings, and Mr. Woods's contact with Mr. Hennessy do not likely constitute breaches of Section 7.4 of the APA.[18] As a result, Plaintiff has not carried its burden to demonstrate a likelihood of success on the merits.

---

[18]    The Court pauses here to make note of one other type of conduct that, during the hearing, was at times suggested by Plaintiff to be relevant to a showing of breach. As was noted above, Mr. Woods gave $1.465 million from the proceeds of the APA to the Whittons, purportedly as a gift, or "reward[,]" for their work with Old. Co. (D.I. 24 at ¶ 35) After Plaintiff referenced this payment in its opening brief, Defendants explained in their answering brief why the payment did not amount to a breach of Section 7.4. (D.I. 23 at 16-17) Yet Plaintiff did not

The Court certainly understands why Plaintiff has pursued this action. After paying a substantial amount of money to Mr. Woods, it has seen Mr. Woods lease property to his family members, and has seen those family members use that property to start a business that competes with Plaintiff's business. Moreover, Plaintiff has some evidence that Mr. Woods is at least promoting the Whittons' business to those in the industry. And Mr. Woods may well be doing more than this.

This is all very suspicious. Something about this does not smell right to Plaintiff. The Court understands this.

---

make reference to this issue in its reply brief. (*See* Tr. at 37-38) This would typically be construed as Plaintiff having abandoned this argument. *Cf. Blakeman v. Freedom Rides, Inc.*, Civil Action No. 12-416-LPS-CJB, 2013 WL 3503165, at *13 (D. Del. July 10, 2013) (citing cases). During the hearing, the Court asked Plaintiff's counsel about this issue, noting that it appeared that Plaintiff was not now "suggesting that [this] payment . . . was related to a breach." (Tr. at 16) In response, Plaintiff's counsel gave conflicting answers—at first stating that Plaintiff was *not* arguing that the payment amounts to a breach, and later saying that it *was* making that argument. (*Compare* Tr. at 16-17 (Plaintiff's counsel confirming, in response to the Court's question, that this payment does not amount to "the breach itself" and instead that Plaintiff makes reference to it in its briefing only because it is "part of the narrative") *with id.* at 36-38 (Plaintiff's counsel now asserting that the payment does amount to a violation of Section 7.4))

If the issue has not been abandoned by Plaintiff for purposes of this motion, the Court finds that there is insufficient evidence of breach as to the payment. Even assuming that the Whittons' subsequent use of that money to fund the start-up of WW Sales *could* amount to a breach of Section 7.4, there is insufficient evidence of record that the Whittons *actually used* the monies for this purpose. That is, there is no direct evidence of record as to what the Whittons did with the money. (Tr. at 38) Nor is there much in the way of circumstantial evidence to indicate that the money was used to support the launch of WW Sales. Indeed, in his declaration, Mr. Woods says that: (1) the money was not used as a "seed investment" in WW Sales; and (2) there were no preconditions on the payment. (D.I. 24 at ¶¶ 33-34) Moreover, there is not temporal proximity between the time when the money was received by the Whittons (in late 2017) to when WW Sales launched (in June 2019). (Tr. at 53) And Plaintiff put forward no other circumstantial evidence suggesting a link (e.g., as to the state of the Whittons' finances, or their inability to fund WW Sales other than by resort to use of this money). In the end, this would be too thin a reed on which to find a likelihood of success on the merits as to Count I.

But in order to obtain the "extraordinary" remedy of injunctive relief—i.e., before a case has even gotten started in earnest, to be able to force Plaintiff's adversaries to stop doing what they believe they have a legal entitlement to do—Plaintiff has to come forward with more than just suspicions. It has to have sufficient evidence that Defendants have likely violated at least one provision of the APA. And Plaintiff has not produced such evidence here. Eventually, via discovery, Plaintiff may be able to show that where there was some smoke, there also was fire. But that is just not where we are.

### b.     The Remaining Preliminary Injunction Factors

In light of the fact that Plaintiff has not made a sufficient showing as to the likelihood of success on the merits, it cannot demonstrate an entitlement to a preliminary injunction. *Reilly*, 858 F.3d at 179. In light of this, the Court declines to address the three remaining preliminary injunction factors and recommends that Plaintiff's Motion for a Preliminary Injunction be denied.

### B.     Motion to Dismiss

With their Motion to Dismiss, Defendants argue that:  (1) the case must be dismissed pursuant to Rule 12(b)(2), in that the only basis for personal jurisdiction as to Defendants (the forum selection clause in the APA) is rendered a nullity due to a purportedly conflicting clause in the EA; and (2) the case must be dismissed pursuant to Rule 12(b)(7) and Rule 19 because Plaintiff failed to join purportedly necessary and indispensable parties (the Whittons, WW Sales and Building 380).  The Court will address those arguments in turn.

### 1.     Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

### a.     Legal Standards

Rule 12(b)(2) requires the Court to dismiss any case in which it lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). As an initial matter, if a jurisdictional defense is raised by way of a Rule 12(b)(2) motion, then the plaintiff bears the burden of showing the basis for jurisdiction. *Eastman Chem. Co. v. AlphaPet Inc.*, Civil Action No. 09-971-LPS-CJB, 2011 WL 6004079, at *3 (D. Del. Nov. 4, 2011); *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008). To satisfy its burden at this stage of the litigation, where the district court has not held an evidentiary hearing, the plaintiff must only establish a *prima facie* case of personal jurisdiction. *Metcalfe v. Renaissance Marine Inc.*, 566 F.3d 324, 330 (3d Cir. 2009); *Power Integrations, Inc.*, 547 F. Supp. 2d at 369.

"To establish personal jurisdiction, the plaintiff [typically] must adduce facts sufficient to satisfy two requirements — one statutory and one constitutional." *Eastman Chem. Co.*, 2011 WL 6004079, at *3. First, the Court must consider whether the defendant's actions fall within the scope of Delaware's long-arm statute, Del. Code tit. 10, § 3104(c). *Id.*; *Power Integrations, Inc.*, 547 F. Supp. 2d at 369. Second, the Court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *Eastman Chem. Co.*, 2011 WL 6004079, at *3 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *Power Integrations, Inc.*, 547 F. Supp. 2d at 369-70.

However, the personal jurisdiction requirement is a waivable right. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985); *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982). For example, contractual partners are free to voluntarily consent to personal jurisdiction in a chosen forum through agreement to the inclusion of a forum selection clause in their contract; where such forum selection provisions are freely negotiated and otherwise not unreasonable or unjust, their enforcement does not offend due process. *Burger*

*King Corp.*, 471 U.S. at 472 n.14; *Ins. Corp. of Ir., Ltd.*, 456 U.S. at 703-04; *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9-12 (1972). "When a party is bound by a forum selection clause, the party is deemed to have expressly consented to personal jurisdiction." *Eastman Chem. Co.*, 2011 WL 6004079, at *4; *see also Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008); *Res. Ventures, Inc v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999). Thus, once a valid forum selection is in effect, "a minimum contacts analysis under the Delaware long-arm statute and Due Process Clause of the U.S. Constitution is not required." *Eastman Chem. Co.*, 2011 WL 6004079, at *4 (internal quotation marks, brackets and citation omitted); *see also Solae, LLC*, 557 F. Supp. 2d at 456; *Res. Ventures, Inc.*, 42 F. Supp. 2d at 431-32.

### b.      Analysis

In explaining why there is personal jurisdiction over Defendants in this case, Plaintiff relies exclusively on the APA's forum selection clause. Again, that clause states that "[a]ll disputes, litigation, proceedings or other legal actions by any party to this Agreement shall be instituted exclusively in the courts of the State of Delaware or of the United States in the State of Delaware." (D.I. 9, ex. 1 at § 10.3) But in pushing back on Plaintiff's position, Defendants make the following multi-step argument: (1) the APA was contemporaneously executed along with the EA, and the APA explicitly incorporates the EA by reference; (2) the EA too has a forum selection clause, which designates "the federal and state courts in the State of Texas" as the forums in which breach of the EA can be litigated, (*see* D.I. 15, ex. A at ex. 2 at 3); and (3) these "conflicting forum selection clauses [in the APA and EA, which are to be read together as one entire agreement, create] a latent ambiguity in the [integrated APA/EA] contract when read

32

as a whole[,]" and this renders the APA's Delaware forum selection clause unenforceable. (D.I. 15 at 1-2, 15)

The parties both point to *Duff v. Innovative Discovery LLC*, C.A. No. 7599-VCP, 2012 WL 6096586 (Del. Ch. Dec. 7, 2012), as the closest on-point authority. (Tr. at 105, 110)[19] In *Duff*, the plaintiffs, who were former members of the defendant limited liability company (or "LLC"), filed various claims against the defendant, including claims for breach of a licensing agreement ("License Agreement") and breach of certain redemption agreements ("Redemption Agreements"). *Id.* at *1-2. As is the case here, the two sets of agreements were interrelated, in that the License Agreement was incorporated into the Redemption Agreements by reference. *Id.* at *12 & n.71. And like here, both agreements contained differing forum selection clauses. The Redemption Agreements contained a forum selection clause stating that the parties "hereby consent to the jurisdiction of the courts of the State of Delaware" regarding any suit arising out of or relating to the transactions contemplated thereby, while the License Agreement contained a forum selection clause stating that the "sole jurisdiction and venue for actions relating to the subject matter hereof" was the state and federal courts of California. *Id.* at *2-3, *12.

---

[19]     According to the law of the Third Circuit, in a diversity case like this one, where there is a dispute over a forum selection clause that turns on an issue of contract interpretation, a court should look to state contract law (as opposed to federal law) to resolve the dispute (except in situations not applicable here, such as where uniquely federal interests are at stake, or where Congress has delegated power to the federal courts to develop substantive law on a particular subject). *See In re McGraw-Hill Global Educ. Holdings, LLC*, 909 F.3d. 48, 58 (3d Cir. 2018); *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 182-83 (3d Cir. 2017). The parties here agree that, in light of this authority, state contract law applies to this dispute. (D.I. 15 at 15; D.I. 22 at 16) And they further agree that Delaware's choice-of-law rules (which govern which state's substantive law applies to this contract dispute, *see Collins*, 874 F.3d at 183), would in turn mandate that Delaware substantive law should be utilized here. (D.I. 15 at 15; D.I. 22 at 16) In light of this, the Court will apply Delaware state contract law to this dispute.

After the plaintiffs filed suit against the defendant in the Delaware Court of Chancery, the defendant argued, *inter alia*, that the court was not the proper venue for one of the counts in the plaintiff's complaint (Count IV).[20] *Id.* at *11-12. The defendant pointed to the forum selection clause in the License Agreement, and argued that since Count IV related to the subject matter of that agreement, it should be litigated in the California courts. *Id.* at *11. The plaintiff, however, cited to Delaware law indicating that if the relevant contractual language is not "crystalline" then a court "will not interpret a forum selection clause to indicate the parties intended to make jurisdiction exclusive." *Troy Corp. v. Schoon*, No. C.A. 1959-VCL, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007) (*cited in Duff*, 2012 WL 6096586, at *11) (internal quotation marks and citation omitted). It argued that because the subject matter of Count IV at least partly related to defendant's obligations under the Redemption Agreements, and because (per the Redemption Agreements' forum selection clause) Delaware was an agreed-upon venue for such claims, it was not "crystalline" that this claim should be brought only in California's courts. *Duff*, 2012 WL 6096586, at *12.

In resolving the dispute, the *Duff* Court first noted that under Delaware law, where a contract explicitly incorporates another contract by reference, "the two contracts will be read together as a single contract." *Id.* at *12 (citations omitted).[21] Since the License Agreement was incorporated into the Redemption Agreements, the *Duff* Court observed that "arguably the forum selection clause in the Redemption Agreements [i.e., favoring Delaware courts] could be applied to the attached License Agreement." *Id.* Proceeding under the assumption that the two contracts

---

[20]     Personal jurisdiction as to the defendant does not appear to have been at issue in *Duff* because the defendant was a Delaware LLC. *Duff*, 2012 WL 6096586, at *1.

[21]     *See also Askari v. Pharm. Corp. of Am.*, Civil Action No. 16-1123-RGA, 2018 WL 3768988, at *3 (D. Del. Aug. 8, 2018) (citing *Duff*, 2012 WL 6096586, at *12).

should be read together as one, the Court of Chancery then noted that since Count IV "at least arguably arises out of" the defendant's obligations under the Redemption Agreements, then it was reasonable to read the Redemption Agreements' forum selection clause to mean that the defendant had "consented to jurisdiction in this Delaware court and waived any objection it might have to venue here." *Id.* From there, the *Duff* Court noted that "this Court has held that where a contract contains two conflicting provisions, the document is rendered ambiguous" and that "Delaware courts only will declare a forum selection clause 'strictly binding' when the parties use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action." *Id.* (certain internal quotation marks and citations omitted). The *Duff* Court then applied these two legal propositions to the facts of the case, concluding that: (1) "to the extent the forum selection provisions in the Redemption Agreements and the License Agreement conflict, they make the parties' intent as to a contractual choice of forum here far from 'crystalline'"; and (2) because the defendant "has not met the 'crystalline' standard, it has not shown that California is the 'exclusive' forum for a claim such as Count IV." *Id.* Therefore, the *Duff* Court denied the defendant's motion to dismiss Count IV for improper venue. *Id.*

In the Court's view, the reasoning and the outcome in *Duff* supports Plaintiff's position (that the language of the APA's forum selection clause allows for personal jurisdiction over Defendants here). Indeed, Defendants draw the wrong lesson from *Duff*'s holding. If *Duff* offers a rule of construction, it is that in situations like this one (where two agreements with conflicting forum selection clauses are to be read together[22] and where the language of those respective

---

[22]     There can be little doubt that under Delaware law, the APA and EA would need to be read together, as the APA's language is explicit in incorporating the EA as an "integral part" of "this Agreement[.]" (D.I. 9, ex. 1 at § 10.9); *see also Askari*, 2018 WL 3768988, at *3.

clauses render it "ambiguous" as to whether the parties agreed that certain claims should be exclusively pursued in one state's courts), the effect of this ambiguity is not—as Defendants suggest—to render the forum selection clauses "unenforceable" or "null[.]" (D.I. 15 at 15; D.I. 28 at 9) Instead, the *Duff* Court suggested that since it was not "crystalline" that the parties had agreed to only *one* venue as being appropriate for Count IV, the result was that *either* venue (i.e., California courts or Delaware courts) was an appropriate venue for the claim. (*See* D.I. 22 at 18 (Plaintiff citing *Duff* for the proposition that "at most [it] establishes that the Delaware Courts' jurisdiction is not exclusive — not that [this] Court is stripped of its bargained-for jurisdiction over Defendants")); *see also Duff*, 2012 WL 6096586, at *12 (noting that a reasonable interpretation of the integrated agreements was that the defendant had "consented to jurisdiction in this Delaware Court and *waived any objection it might have to venue here*") (emphasis added). And since the plaintiff in *Duff* chose to file suit in Delaware state court (one such agreed-upon venue), then case as to Count IV could proceed forward there.[23]

Applying *Duff* to the facts here, even if the presence of the two forum selection clauses "rendered [the combined document] ambiguous[,]" *Duff*, 2012 WL 6096586, at *12, the right outcome would *not* be to strike the portion of the APA's forum selection clause that allows for

---

[23]    In other words, in *Duff*, even though the forum selection clause in the License Agreement stated that the "sole jurisdiction and venue" for relevant claims was the courts of California, because the Delaware forum selection clause from the Redemption Agreements had to be read as part of the same contract, the result was that (as to the integrated agreement), the parties had not used "express language clearly indicating that the forum selection clause excludes all [] courts" other than California courts. *Duff*, 2012 WL 6096586, at *12 (internal quotation marks and citations omitted). Instead, the combined effect of reading both forum selection clauses as part of the same agreement was that the parties had used language indicating that the courts of *either* state would be appropriate for the resolution of Count IV.

the instant claims to be brought in Delaware courts. The right outcome would be that, at a minimum, the claims could be brought in Delaware *or* Texas.[24]

Such an outcome would also seem to respect the principle of Delaware law that a court should "give effect to the terms of private agreements to resolve disputes in a designated judicial forum[.]" *Duff*, 2012 WL 6096586, at *11 (citing *Troy Corp.*, 2007 WL 949441, at *2); *see also Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010). After all, it cannot be doubted that all parties here at one point agreed that Delaware courts were a "designated judicial forum" where claims arising out of the APA must be pursued. And the breaches complained of in Count I of the Complaint are alleged breaches of the APA. (D.I. 1, ex. A at ¶¶ 61-66) Any outcome here mandating that such claims *could not* be brought in the Delaware courts would not "give effect" to the terms of the APA's forum selection clause; instead, it would do violence to those terms.

---

[24]      Plaintiff argues that even if the APA and EA are read together, there would be no ambiguity and the only possible conclusion is that the instant claims could *only* be brought in Delaware courts. Plaintiff suggests this is so in part because "conduct complained of [in the Complaint] 'took place after the expiration of' the [EA,]" (D.I. 22 at 16 (quoting D.I. 15 at 7)), such that the EA's forum selection clause is "rende[red] moot for determining the scope of the case and controversy in this action[,]" (*id.* at 18). The Court is not sure that is correct, however. The EA's nonsolicitation provisions did not expire until June 2019 (according to Plaintiff), (*id.* at 17; D.I. 1, ex. A at ¶ 27), and at least certain of the conduct complained of here (e.g., Mr. Woods's conversation with Mr. Cummings in December 2018) occurred while the EA's provisions were in effect.

Plaintiff also argues that there is no ambiguity because its Complaint only facially brings claims under the APA (not the EA), and that in that circumstance, only the APA's forum selection clause would be relevant. (D.I. 22 at 17-18; Tr. at 115) The Court is not certain that this is correct, either. If at least some of the conduct complained of *could have* been claimed as a violation of the EA, then the fact that Plaintiff only *actually* pursued claims here relating to the APA would not be dispositive as to whether the EA's forum selection clause would be relevant. *See Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1252 (Del. Ch. 2010). In any event, the Court need not resolve this question, as all it need decide here is that the effect of the integrated agreement is to allow for personal jurisdiction in Delaware. And it does.

For the above reasons, the Court concludes that the APA's forum selection clause establishes this Court's personal jurisdiction over Defendants. It thus recommends that Defendants' Rule 12(b)(2) motion be denied.

### 2. Rule 12(b)(7) and Rule 19 Motion to Dismiss for Failure to Join Necessary and Indispensable Parties

#### a. Legal Standards

Pursuant to Federal Rule of Civil Procedure 12(b)(7), a party may seek dismissal for failure to join an absent party under Rule 19. In deciding whether to grant such a dismissal, the Court must first determine whether the absent party is a necessary party under Rule 19(a)(1). *See Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 312 (3d Cir. 2007). A person is a necessary party according to Rule 19(a)(1) if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). If the absent party is necessary under Rule 19(a)(1), it must be joined, so long as joinder is feasible. *Gen. Refractories Co.*, 500 F.3d at 312. If joinder is necessary, but infeasible, the Court must then determine whether the absent party is "indispensable" under Rule 19(b). *Id.* This "indispensable" inquiry requires a balancing of the interests of the plaintiff, the defendant, the absent party, the courts, and the public. *See Feriozzi Co. v. Ashworks, Inc.*, 130 F. App'x 535, 538-39 (3d Cir. 2005) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*,

390 U.S. 102, 109-11 (1968)); *see also* Fed. R. Civ. P. 19(b). If an absent party is indispensable, the Court must dismiss the action pursuant to Rule 12(b)(7). *See Gen. Refractories Co.*, 500 F.3d at 312.

The movant "bears the burden of showing why an absent party should be joined under Rule 19." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 97 (3d Cir. 2011); *see also Cephalon, Inc. v. Watson Pharms., Inc.*, 629 F. Supp. 2d 338, 346 (D. Del. 2009). "When making a Rule 19 determination, the Court may consider evidence outside the pleadings." *Jurimex Kommerz Transit G.m.b.H. v. Case Corp.*, 201 F.R.D. 337, 340 (D. Del. 2001); *see also Arçelik A.Ş. v. E.I. du Pont De Nemours & Co.*, Civil Action No. 15-961-LPS, 2018 WL 1401327, at *3 (D. Del. Mar. 20, 2018).

### b. Analysis

Defendants urge that dismissal under Rules 12(b)(7) and 19 is appropriate because, as an initial matter, the absent parties—the Whittons, WW Sales, and Building 380 (collectively, the "Texas Parties")—are necessary to the suit. In support of this assertion, Defendants raise three arguments. First, they claim that because Plaintiff's proposed injunctive relief implicates the Texas Parties' business, the Court cannot afford "complete relief" without them. (D.I. 15 at 10-11; *see also* Fed. R. Civ. P. 19(a)(1)(A)). Second, Defendants argue that any impact that this case has on the Texas Parties' business interests implicates the Texas Parties' legal "interest" within the meaning of Rule 19(a)(1)(B)(i). (D.I. 15 at 11-12) Third, Defendants argue that a judgment in this case could subject them to "inconsistent obligations" within the meaning of Rule 19(a)(1)(B)(ii). (D.I. 15 at 12-13); *see also* Fed. R. Civ. P. 19(a)(1)(B)(ii). The Court will address these arguments in turn.

### i. In the Texas Parties' absence, may the Court accord complete relief among existing parties?

Defendants first argue that because Plaintiff's proposed injunctive relief, (D.I. 8), is really designed to stop the Texas Parties from engaging in their business, the Court cannot afford relief to Plaintiff by enjoining only Defendants. (D.I. 15 at 10-11; D.I. 28 at 1-2) In this regard, Defendants note that if the Court granted Plaintiff's proposed injunctive relief in full, this would enjoin Defendants from taking action that would impact the Texas Parties, such as by requiring Defendants to: (1) stop engaging, directly or indirectly (including by or through the Texas Parties) in the Business or stop soliciting customers (including by or through the Texas Parties) in any manner relating to the Business; (2) immediately terminate all agreements they have with the Texas Parties relating to the Business; (3) immediately stop using the Premises for anything relating to the Business; and (4) provide a written accounting to Plaintiff relating to the Texas Parties. (D.I. 15 at 10)[25] Defendants argue that if "the Court grants the injunctive relief sought by [Plaintiff] limited to Woods and E3Rivers only, such relief would ring 'hollow' because the Court does not have personal jurisdiction to enforce the injunction against the [Texas Parties]." (D.I. 15 at 11) For various reasons, the Court disagrees.

For one thing, a significant amount of the requested injunctive relief asks the Court to order that Defendants "terminate all agreements" with the certain of the Texas Parties, or stop "taking payment of rent" for use of the Premises from certain of the Texas Parties or stop "implement[ing] any contract" concerning the Business with certain of the Texas Parties. (D.I. 8 at ¶¶ 3(a), (d), & (f)) So far as the Court is aware, all of this targeted conduct relates to the fact

---

[25]     Plaintiff set out its proposed injunctive relief in its Complaint, (D.I. 1, ex. A at 21-22), but with its Motion for a Preliminary Injunction, it has provided a more targeted and specific request for such relief, (D.I. 8). The Court will focus on the latter proposal here, as it reflects the actual relief that Plaintiff is currently asking the Court to impose. (Tr. at 122, 135)

that Mr. Woods's company leases the Premises to the Whittons/WW Sales so that WW Sales can use the Premises for its business. (*See* Tr. at 147) However, for the reasons expressed above with regard to the decision on the Motion for a Preliminary Injunction, the lease itself could not amount to a violation of the APA's noncompetition and nonsolicitation clause. And it is undisputed that the Whittons are permitted to engage in the Business (so long as Defendants are not involved in that Business by way of a violation of the APA). (Tr. at 145 ("The Court: [The Whittons] can compete freely? [Plaintiff's Counsel]: Yes. They can compete as long as it doesn't involve Mr. Woods and E3 [Rivers].")) So as it relates to this leasing conduct (standing alone), the Court sees no possibility that these proposals will ever be adopted.

With regard to the other proposed forms of relief at issue, (D.I. 8 at ¶¶ 2, 3(b), 3(c), 3(e) & 3(h)), Plaintiff asks the Court to enjoin *only Defendants* from doing or not doing certain things. (*See* D.I. 22 at 6) Much of this sought-after relief simply asks the Court to enforce the terms of the APA's noncompetition and nonsolicitation clause; that clause, *inter alia*, precludes *Defendants* from violating the clause either directly or indirectly. And the Court surely has the power to enjoin *Defendants* from taking such actions. If it did so, that order would not ring "hollow" in light of the Court's lack of jurisdiction over the Whittons or WW Sales. It would instead serve to stop Mr. Woods from engaging in such conduct (to the extent it was violative of the APA), such that the conduct would not occur in the future. The Whittons and WW Sales would still be free to run their business.

In their reply brief and at oral argument, Defendants relied on *Village of Hotvela Traditional Elders v. Indian Health Servs.*, 1 F. Supp. 2d 1022 (D. Ariz. 1997), *aff'd*, 141 F.3d 1182 (9th Cir. 1998) in support of the proposition that an injunction must reach the "true parties sought to be restrained." (D.I. 28 at 2; *see also* Tr. at 146-47; D.I. 28 at 3 (focusing on the "true

*conduct* sought to be restrained") (emphasis added)) In that case, the plaintiffs—a group of Hopi elders—sought to enjoin the construction of a sewage treatment project; the project was proceeding under written agreements between several federal agencies and the Hopi tribe. *Hotvela*, 1 F. Supp. 2d at 1024-25. Under the doctrine of tribal sovereign immunity, the Hopi tribe could not be joined as a party to the suit. *Id.* at 1027. The issues for the *Hotvela* Court, then, were whether the Hopi tribe was a "necessary" party and an "indispensable" party under Rules 19(a) and (b), respectively. The district court found that the Hopi tribe was a necessary party for several reasons, including because the Court could not afford complete relief in its absence. *Id.* at 1026. This was because even if the Court enjoined the parties to the suit from proceeding with the construction project, the non-party tribe could continue building the project, albeit with other funds. *Id.*

*Hotvela* is not helpful to Defendants here as to the Rule 19(a)(1)(A) "complete relief" issue. Here, unlike in that case, the Defendants targeted by the injunctive relief request are signatories to the contract at issue (the APA) and are being sued in the instant matter; thus, they may be properly subject to an injunction if they violate the APA's terms. Thus, an injunction against Defendants could provide "complete relief" to Plaintiff.

For these reasons, Defendants have not shown that Rule 19(a)(1)(A) is satisfied.

ii. **Would disposing of this action in the absence of the Texas Parties "impair or impede" the Texas Parties' ability to protect an "interest" relating to the subject of this action?**

Next, Defendants argue that an injunction could "impair or impede" the Texas Parties' interests (pursuant to Rule 19(a)(1)(B)(i)). (D.I. 15 at 11-12; D.I. 28 at 3-6; Tr. at 130-31) Defendants raise three points in support of this claim, none of which the Court finds persuasive.

42

Defendants' first argument relates to the fact that Plaintiff requests, as part of its injunctive relief, that the Court cancel contracts between Defendants and certain of the Texas Parties—particularly, "their lease agreement." (D.I. 28 at 5; *see also* D.I. 8 at ¶¶ 3(a), 3(d)-(f)) But as the Court has stated above, it currently sees no reasonable chance that injunctive relief in this action (if ever granted) would end the lease agreement with certain of the Texas Parties. Moreover, in cases involving breach of contract claims (as here), courts typically do not consider non-signatories to the contract to be necessary parties under Rule 19, even if injunctive relief against a signatory defendant could have some downstream impact on the absent party. *See OneCommand, Inc. v. Beroth*, No. 1:12-cv-471, 2012 WL 3755614, at *2 (S.D. Ohio Aug. 29, 2012) (concluding that the defendant's new employer was not a necessary party pursuant to Rule 19(a)(1)(B)(i), where the defendant's former employer sued plaintiff for a violation of a nonsolicitation and nondisclosure agreement, with the Court noting that "[e]mployers routinely sue former employees over non-competition violations without adding the competitor employers as defendants") (citing cases); *McDonald's Corp. v. E. Liberty Station Assocs.*, Civil Action No. 14–313, 2014 WL 6982473, at *3 (W.D. Pa. Dec. 10, 2014) (finding that a nonparty franchisee did not possess an "interest" within the meaning of Rule 19(a)(1)(B)(i) merely because the lawsuit between the franchisor/lessee and property owner would "likely impact" him); *cf. Ravago Ams., LLC v. Ward*, Case No 18cv2924, 2019 WL 524266, at *3 (N.D. Ohio Feb. 11, 2019) (rejecting defendant's argument that his new employer was an indispensable party under Rule 19(b), as to a lawsuit brought by defendant's former employer for breach of contract involving a restrictive covenant).[26]

---

[26]    In their reply brief, Defendants state that "[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or contract, all parties who may be affected by the determination of the action are indispensable." For that

Defendants' second argument is that the relief Plaintiff truly seeks is to "shut down" the Whittons' business. (D.I. 15 at 12) Again, though, the Court does not see how this is so. With the Whittons/WW Sales' ability to lease the Premises not in jeopardy, and with any injunctive relief sought only sought against Defendants, the Whittons' business does not seem to be at risk. The Court also notes that Defendants' position is that they have no interaction with or role in the work of WW Sales. (D.I. 24 at ¶¶ 18-27; Tr. at 124) If that is so, the Court does not see how any injunctive relief ordered in this case could likely harm (let alone "shut down") the Whittons' business efforts. (*See* D.I. 22 at 9)

Defendants' third argument is that even if Defendants are found liable here, "this suit could still result in findings of wrongful conduct by the [Texas Parties] that would be unfavorable precedent for them in the Texas action and any future litigation regarding their business." (D.I. 15 at 12) Yet Defendants cite to no legal authority for the proposition that if discovery in this action brings to light some "wrongful conduct" engaged in by the Texas Parties, that means the Texas Parties have an "interest" in this litigation for purposes of Rule 19(a)(1)(B)(i). *Cf. Gen. Refractories Co.*, 500 F.3d at 317 (rejecting the proposition that where a piece of litigation may result in a "persuasive precedent" against an absent party, the disposition of the action in that party's absence would impair or impede that party's ability to protect its "interest" within the meaning of Rule 19(a)(1)(B)(i)) (internal quotation marks and citation omitted).

For these reasons, Defendants have not shown that Rule 19(a)(1)(B)(i) is satisfied.

---

proposition, Defendants cite *Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 540 (10th Cir. 1987) (*cited in* D.I 28 at 5 & n.23). *Jicarilla* involved an absent party (the Apache Tribe) who was a signatory to a contract involving oil and gas leases, and in the litigation, the viability of those very leases was at issue. *Id.* So the case is not comparable to the facts here.

### iii. Will the Texas Parties' absence subject them to a "substantial risk" of "inconsistent obligations"?

Lastly, Defendants argue that in the absence of the Texas Parties, an injunction by this Court would subject them to a risk of "inconsistent obligations" under the meaning of Rule 19(a)(1)(B)(ii). In this regard, they argue that if the Court imposed an injunction requiring Defendants to stop permitting the Whittons or WW Sales from leasing the Premises, or required Defendants to terminate their lease agreement with the Whittons/WW Sales, this could "force [Mr.] Woods to expose himself to claims by the Whittons and WW Sales for terminating their access to the property or terminating any contracts between them." (D.I. 15 at 13)

Yet as noted above, there is (at least as of now) no real prospect that this litigation will result in the alteration of the lease agreement at issue. Moreover, the fact that a party may be subjected to obligations in an instant matter, and may (as a result) face an obligation in a future matter to a third party, does not mean the party is subject to "multiple, or . . . inconsistent obligations" under the meaning of Rule 19(a)(1)(B)(ii). *Arçelik A.Ş.*, 2018 WL 1401327, at *4 ("[T]he possibility that [defendant] may be subjected to multiple obligations in a potential litigation later between the foreign subsidiaries of DuPont and the [absent] parties is not enough to trigger Rule 19."); *cf. Gen. Refractories Co.*, 500 F.3d at 319 ("[A]n outcome adverse to [the defendant] in [the plaintiff's] present action against it does not have any legal effect on whatever right of contribution or indemnification [the defendant] may have against [other parties].") (certain alterations in original).

For these reasons, Defendants have not shown that Rule 19(a)(1)(B)(ii) is satisfied.

### iv. Conclusion

Because Defendants have not shown that the Texas Parties are necessary parties, they cannot demonstrate that those absent parties must be joined pursuant to Rule 19. Thus, the Court

need not proceed further with its Rule 19 analysis, and it recommends that Defendants' Rule 12(b)(7) motion be denied.

## III. CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for a Preliminary Injunction be DENIED and that Defendants' Motion to Dismiss be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: November 26, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE