**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BUS AIR, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1435-RGA-CJB |
| | ) | |
| ANTHONY R. WOODS and | ) | |
| E3 RIVERS, LLC F/K/A BUS AIR | ) | |
| MANUFACTURING, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM ORDER</u>

Presently pending in this breach of contract dispute are Plaintiff Bus Air, LLC's ("Bus Air" or "Plaintiff") "Motion to Compel Arbitration of Defendants' Counterclaims as They Relate to Earnout and to Stay Litigation Pending Arbitration" (the "Motion to Compel"), (D.I. 86), and Defendants Anthony R. Woods ("Woods") and E3 Rivers, LLC f/k/a Bus Air Manufacturing, LLC's ("E3 Rivers" and collectively with Woods, "Defendants") "Motion to Strike Plaintiff's Evidence Submitted in Support of its Motion to Compel Arbitration and Stay Litigation" (the "Motion to Strike," and together with the Motion to Compel, the "Motions"), (D.I. 102). For the reasons set forth below, the Court orders that the Motion to Strike be DENIED and that the Motion to Compel be DENIED.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff Bus Air is a Delaware limited liability company that manufactures, installs and services motor vehicle air conditioning systems. (D.I. 1, ex. A at ¶ 3) Defendant Woods resides in Texas and is the "principal owner and controlling person" of Defendant E3 Rivers. (*Id*. at ¶ 4)

E3 Rivers is a Texas limited liability company, which was formerly known as Bus Air Manufacturing, LLC.  (*Id.* at ¶ 6)

Plaintiff purchased Defendants' bus-related air conditioning installation and service business pursuant to an Asset Purchase Agreement, or "APA."  (*Id.* at ¶¶ 1, 9; *id.*, ex. 1 (hereinafter, "APA") at 1)  The APA was executed on September 25, 2017; it was signed for Plaintiff by Plaintiff's Vice President James Peden, and it was signed by Woods on behalf of E3 Rivers and himself.  (APA at 1, 32-33)

        **2.**     **The APA**

The APA defines the following as parties to the transaction:  Plaintiff is the "Buyer[,]" E3 Rivers (formerly Bus Air Manufacturing, LLC) is the "Company[,]" and Woods is the "Stockholder."  (*Id.* at 1)  E3 Rivers/ Bus Air Manufacturing, LLC is also referred to as the "<u>SELLER</u>" on the signature page of the APA.  (*Id*. at 33 (emphasis in original))

The APA provides, *inter alia*, the terms for the purchase of the "Acquired Assets[,]" which are listed therein.  (*Id.* at § 1.1)  It notes that at the closing, Plaintiff would "acquire the Acquired Assets for an aggregate purchase price of up to $20,190,000" (the "Purchase Price"). (*Id.* at § 3.1)  The APA provided for a first payment equal to $18,190,000 of the Purchase Price to be paid at closing, with up to an additional $2,000,000 (the "Earnout Amount") that could be paid in the future.  (*Id.*)  Section 3.1 of the APA explained how the Earnout Amount was to be calculated:

> 3.1 . . . The Earnout shall be calculated pursuant to the following formula, which formula is based on EBITDA of $3,540,000, as calculated in the RSM Quality of Earnings Report dated May 11, 2017 (the "<u>RSM Report</u>"):  5.7 x the difference between (a) Seller's EBITDA with respect to the trailing twelve (12) months ending December 31, 2018 calculated on the same basis as the RSM Report (the "Earnout Date") with a cap on EBITDA of $3,540,000 and ([]b) $3,189,000 (the amount determined pursuant

2

> to such formula, the "Earnout Amount"); *provided*, that for
> purposes of clarity, in the event that (a) is less than (b) there shall
> be no payment and in no event shall Buyer be obligated to pay
> Seller more than the Maximum Earnout Payment.  Any Earnout
> Amount to be made by Buyer to Seller hereby shall be paid to
> Seller within 10 Business Days after the Earnout Payment is finally
> determined by Buyer based on its audited financial statements.

(*Id.* (emphasis in original))[1]  Section 3.1 also explains how "disagreement[s]" between the Buyer

and Seller (hereinafter, the "parties") about the Earnout Amount should be handled:

> Any disagreement between Buyer and Seller with respect to the
> calculation of the Earnout Amount shall be resolved by the
> Independent Accounting Firm ["IAF"] in the same manner and
> pursuant to the same procedures as are set forth in Section 3.2(e)
> for resolutions of disputes regarding Final Closing Amounts.

(*Id.*)  Section 3.2(e) relates to Plaintiff's provision, within 90 days of closing, of certain

calculations (calculations that include "Target Net Working Capital" and "Closing Net Working

Capital") that are designated as the "Final Closing Amounts"; these calculations could also have

an impact on the Purchase Price.  (*Id.* at §§ 3.2(d) & (e) (emphasis omitted))  In relevant part,

Section 3.2(e) reads:

> If the Company disputes any aspect of Buyer's Proposed
> Calculations, then the Company shall have the right, at the
> Company's expense, to review the Final Net Working Capital.
> The Company shall complete its review within fifteen (15) days
> after the date the Company disputes Buyer's Proposed
> Calculations.  If the Company, after such review, still disagrees
> with Buyer's Proposed Calculations, and Buyer does not accept the
> Company's proposed alternative calculations[,] . . . the Company
> and Buyer shall work together in good faith to attempt to resolve
> their differences concerning the Final Net Working Capital and if
> the Company and Buyer are unable to resolve such differences
> within fifteen (15) days after delivery of the Company's Proposed
> Calculations to Buyer, then the Company and Buyer shall direct an
> independent regional accounting firm to be mutually agreed upon

---

[1]     Although not defined in any of the pleadings, the Court understands "EBITDA"
to stand for earnings before interest, taxes, depreciation and amortization.

by both parties (the "<u>Independent Accounting Firm</u>") to resolve the remaining disputed items (the "<u>Remaining Disputed Items</u>") within fifteen (15) days after the date of Buyer's rejection of the Company's Proposed Calculations by conducting its own review of the Final Net Working Capital and thereafter selecting either the Company's Proposed Calculations of the Remaining Disputed Items or Buyer's Proposed Calculations of the Remaining Disputed Items or an amount in between the two.  Each of the Company and Buyer agrees that it shall be bound by the Independent Accounting Firm's determination of the Remaining Disputed Items.

(*Id.* at § 3.2(e) (emphasis in original))

### 3.    The Earnout Amount Calculation Dispute

The instant Motion to Compel relates to a dispute about calculation of the Earnout Amount.  On April 30, 2019, Janice Hodson, the Chief Financial Officer for KODA Enterprises Group ("KODA"), a company that provides management services to Plaintiff, sent Plaintiff's Earnout Amount calculation to Defendants' accountant, Corey Strange.  (D.I. 87, ex. 1 (hereinafter the "First Hodson Aff.") at ¶¶ 1, 7-8)  Ms. Hodson's calculation indicated that Plaintiff's EBIDTA for 2018 was less than $3,189,000; thus, Plaintiff asserted that, pursuant to Section 3.1 of the APA, "no Earnout Amount was due because Bus Air's EBITDA fell far short of the requisite amount required to trigger payment."  (First Hodson Aff. at ¶¶ 5, 8; *see also id.*, ex. A at Bus-Air_0000933)

In response, on May 2, 2019, Mr. Strange asked Ms. Hodson via e-mail if she could provide Plaintiff's "12.31.18 financial statement" so that Defendants could "see where the numbers are coming from[.]"  (*Id.*, ex. B at 2)  Ms. Hodson replied by sending Mr. Strange "information [] extracted from the consolidated financial statements" that purportedly supported her calculations.  (*Id.*, ex. B at 1)  On May 9, 2019, a representative from Plaintiff's accountant, RSM US LLP, e-mailed Woods and Mr. Strange and stated that his company had reviewed the financial data provided by Ms. Hodson and had "confirm[ed] that the 2018 balances agree[d] to

[their] audit of Bus Air, LLC." (*Id.*, ex. C at 1)  On June 4, 2019, Mr. Strange requested via e-mail that KODA provide a number of additional financial documents relating to the Earnout Amount calculation.  (*Id.*, ex. D at Bus-Air_0000963)  The next day, Mr. Peden responded on behalf of Plaintiff to say that because Plaintiff believed that it had "complied fully with the APA in accounting for the Earnout Payment[,]" Plaintiff would "not supply any other information." (*Id.*, ex. D at Bus-Air_0000962)

###    B.    Procedural History

On July 10, 2019, Plaintiff filed this action in the Court of Chancery of the State of Delaware.  (D.I. 1, ex. A at 1)  The original Complaint, in which Plaintiff alleged that Defendants violated non-solicitation and non-competition provisions in the APA, contained two counts:  Count I for Breach of Restrictive Covenants and Count II for Indemnification.  (*Id.* at ¶¶ 61-70)  On July 31, 2019, Defendants removed the case to this Court.  (D.I. 1)  On August 21, 2019, Plaintiff filed a motion seeking a preliminary injunction (the "motion for preliminary injunction").  (D.I. 8)  The next day, the case was referred to the Court by United States District Judge Richard G. Andrews for all purposes through the case dispositive motion deadline.  (D.I. 10)  And on August 26, 2019, Defendants filed a motion to dismiss the Complaint (the "motion to dismiss").  (D.I. 13)

The Court later held oral argument on both the motion for preliminary injunction and the motion to dismiss, (D.I. 29); on November 26, 2019, the Court recommended that Plaintiff's motion for preliminary injunction be denied and that Defendants' motion to dismiss be denied, (D.I. 31).  The District Court later adopted this recommendation.  (D.I. 36)

Next, on January 20, 2020, Defendants filed their Answer and Counterclaim with regard to the original Complaint.  (D.I. 42)  Defendants' Counterclaim (the "January 2020

5

Counterclaim") included four counts, three of which related to the parties' dispute about the Earnout Amount. (*Id*., Counterclaim at ¶¶ 42, 46, 56) Plaintiff filed an Answer and Defenses to Plaintiff's Counterclaim on February 26, 2020; that document contained no assertion that the Earnout Amount dispute should be required to go to arbitration. (D.I. 54)

On April 2, 2020, Plaintiff filed a motion for leave to file an Amended Complaint (the "Motion to Amend"). (D.I. 70) The proposed Amended Complaint contained four new counts (Count I for Declaratory Judgment, Count II for Promissory Estoppel, Count III for Breach of the APA and Count IV for Declaratory Judgment) along with the two counts that were in the original Complaint (now labeled as Count V and Count VI). (*Id.*; *see also* D.I. 70-1 at ¶¶ 90-124) Count IV was related to the Earnout Amount dispute, and it sought a declaratory judgment "that the Defendants must resolve purported disagreements concerning the Earnout Amount with the Independent Accounting Firm [that would] terminate the controversy." (D.I. 70-1 at ¶¶ 107-14) On April, 8, 2020, the Court granted-in-part and denied-in-part the Motion to Amend; in doing so, the Court permitted Plaintiff to add only one of the new counts, Count III, finding that the other new counts were identical in substance to Plaintiff's affirmative defenses to certain of Defendants' counterclaims, and were thus redundant. (D.I. 72) Thereafter, on April 15, 2020, Plaintiff filed the operative Amended Complaint, which now contains three counts: Count I for Breach of the APA, Count II for Breach of Restrictive Covenants and Count III for Indemnification. (D.I. 77 at ¶¶ 89-102)

Next, on April 29, 2020, Defendants filed their Answer and Counterclaim with regard to the Amended Complaint. (D.I. 78) The Counterclaim contains four counts: Count I for Breach of the APA, Count II for Breach of the Implied Covenant of Good Faith and Fair Dealing, Count III for Declaratory Judgment and Count IV for Indemnification. (D.I. 78, Counterclaim at ¶¶ 40-

64)  As with Defendants' original Counterclaim, three of the counts (Counts I-III) reference the dispute regarding the Earnout Amount calculation.  (*See, e.g.*, *id.* at ¶¶ 42, 46, 51, 56, 60)  In those counts, Defendants dispute that no Earnout Amount was due to them and assert that Plaintiff's actions relating to the Earnout Amount constitute a breach of the APA or the implied covenant of good faith and fair dealing, for various reasons.  (*See id.* at ¶¶ 10, 12-14, 42)

On May 13, 2020, Plaintiff filed an Answer and Defenses to Defendants' Counterclaim. (D.I. 82)  Therein, it included as an affirmative defense that "Defendants' counterclaims are barred, in whole or part, because this Court does not have subject matter jurisdiction over them to the extent that they relate to the Earnout Amount, which the parties to the APA agreed would be heard and resolved exclusively by an Independent Accounting Firm."  (*Id.* at 9)

On July 10, 2020, Plaintiff filed the instant Motion to Compel, in which it asks the Court to:  (1) compel to arbitration Defendants' Counterclaims I-III, to the extent those counts relate to the dispute over the Earnout Amount; and (2) stay the remainder of this case pending arbitration. (D.I. 86)  Briefing on the Motion to Compel was completed on August 20, 2020.  (D.I. 98)

Finally, on September 1, 2020, Defendants filed the instant Motion to Strike.  (D.I. 102; D.I. 103 at 1)  Briefing on the Motion to Strike was completed on September 21, 2020.  (D.I. 107)

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), which governs the issues here, was enacted by Congress in 1925 to quell historical judicial hostility toward the enforcement of arbitration agreements.  *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12 (2001); *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177-78 (3d Cir. 2010).  The United States Court of Appeals for the Third Circuit has "repeatedly recognized that the [FAA] establishes a 'strong

federal policy in favor of the resolution of disputes through arbitration.'"  *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 200 (3d Cir. 2010) (quoting *Puleo*, 605 F.3d at 178).

Pursuant to Section 3 of the FAA, a court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]"  9 U.S.C. § 3.  Section 3, thus "requires the court, on application of one of the parties [to the litigation], to stay the action if it involves an issue referable to arbitration under an agreement in writing."  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009) (internal quotation marks, citation and footnote omitted); *see also Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he statute clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded.").

However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted).  Therefore, a party may not be compelled under the FAA to submit to arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so."  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original).  Thus, in deciding whether to compel arbitration under the FAA, a court first considers (1) whether there is a valid arbitration agreement between the parties, and if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.  *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014); *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 137 (3d Cir. 1998).

With respect to the first inquiry (or "step one"), courts apply "ordinary state-law principles that govern the formation of contracts." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (internal quotation marks and citations omitted); *see also Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 500 (D. Del. 2010). In examining this question, if the affirmative defense of arbitrability is apparent on the face of the complaint (or documents relied upon therein), a court utilizes "a motion to dismiss standard without the inherent delay of discovery[.]" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773-74 (3d Cir. 2013) (internal quotation marks and citation omitted). If, however, the complaint does not establish on its face an agreement to arbitrate, or if the party opposing the motion to compel arbitration thereafter comes forward with "reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement" in question, then a court utilizes a summary judgment standard to resolve the issue. *Id.* at 774 (internal quotation marks and citation omitted).[2] In utilizing the summary judgment standard, a court assesses whether there is a genuine issue of material fact as to whether the parties entered into such an arbitration agreement, and, in doing so, gives the opposing party the benefit of all reasonable doubts and inferences that may arise. *Id.* at 772; *see also Vilches v. Travelers Cos.*, 413 F. App'x 487, 490-91 (3d Cir. 2011).

If a complaint does not itself establish an agreement to arbitrate, or if the non-movant has come forward with reliable evidence that calls into question whether it intended to be bound by an arbitration agreement, then the "non-movant must be given the opportunity to conduct limited

---

[2] The use of a summary judgment standard in such scenarios is appropriate because an order compelling arbitration in this context is "in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Century Indem. Co.*, 584 F.3d at 528 (internal quotation marks and citation omitted).

discovery on the narrow issue concerning the validity of the arbitration agreement[.]" *Guidotti*, 716 F.3d at 774 (internal quotation marks and citations omitted). If limited discovery is provided, the court may thereafter entertain a renewed motion to compel arbitration, judging the motion under the applicable summary judgment standard. *Id.* at 776. If a genuine issue of material fact does then exist as to whether there was an agreement to arbitrate, this precludes the grant of a motion seeking to compel arbitration. *Id.*; *Century Indem. Co.*, 584 F.3d at 528. A trial is then required to determine whether an arbitration agreement exists. *Guidotti*, 716 F.3d at 776; *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518 (3d Cir. 2007); *see also* 9 U.S.C. § 4. On the other hand, if at this stage a determination as to whether an agreement to arbitrate was formed will not turn on disputed issues of fact (and instead only "involves contract construction" issues), the Court simply then makes a legal determination, using the aforementioned state law principles. *Century Indem. Co.*, 584 F.3d at 528-30.

With regard to the step two question—i.e., whether the dispute between the parties falls within the scope of the valid arbitration agreement—the court utilizes federal law. *Id.* at 524. Pursuant to the FAA and federal policy, there is a presumption in favor of arbitration "[i]n determining whether the particular dispute falls within a valid arbitration agreement's scope[.]" *Id.*; *see also Cohen*, 750 F. Supp. 2d at 501. Thus, an "'order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT & T Techs., Inc.*, 475 U.S. at 650).[3]

---

[3]     As noted above, Defendants filed a Motion to Strike, and in doing so, they seek to strike five documents or document sets (the "five documents") that Plaintiff submitted along with its Motion to Compel. (D.I. 102; D.I. 103) Defendants' argument is that the Court should be assessing the Motion to Compel under a Rule 12(b)(6) standard, and that therefore, the Court

## III.    DISCUSSION

In responding to the Motion to Compel, Defendants raise three issues regarding the

question of arbitration.  First, Defendants assert that Plaintiff has waived its right to compel

---

should not take into account these extra-pleading documents.  (D.I. 102 at 1)  For the following
reasons, the Court DENIES the Motion to Strike.

When it comes to the step one question of whether the parties reached an agreement to
arbitrate, the parties' arguments in their Motion to Compel briefing essentially relate to legal
disputes—i.e., disputes that focus on the APA itself, not extrinsic evidence.  (D.I. 87; D.I. 93;
D.I. 98)  For example, Plaintiff has asserted that the "only thing that this Court needs to decide"
the Motion to Compel "is the [APA.]"  (D.I. 106 at 1)  And otherwise, with regard to this step
one issue, Plaintiff cited to only one of the five documents at issue in the Argument section of its
briefing on the Motion to Compel.  (D.I. 98 at 9)  (That citation was not helpful or persuasive,
and it had no impact on the Court's ultimate decision.).  As for Defendants, they do not rely on
extrinsic evidence at all as to the step one issue, and they do not seek to take any further
discovery.  (D.I. 107 at 2)  In light of this, the Court will proceed as follows with regard to the
step one issue:  (1) it will take into account the five documents; (2) in doing so, it concludes the
documents are not particularly useful in resolving the dispute; (3) it will therefore only cite the
documents in this Memorandum Order in the Background section above (mainly for context); (4)
it will render its decision on the step one issue using a summary judgment standard, noting that
the decision there will turn (in light of the parties' arguments) on a contract law-focused analysis
of the APA's wording; and (5) it can render that decision now (without needing to allow for
further discovery) because neither party is seeking any further discovery, nor are they suggesting
that it would make any difference to the outcome.

As is noted below, the parties also address the separate issue of whether Plaintiff waived
its right to move to compel arbitration.  And in support of its argument there, Plaintiff also relies
on one of the five documents at issue:  the "Reith Affidavit" (or "Reith Aff.").  (D.I. 98 at 3-8)
Yet although Defendants suggest that the Court should resolve this waiver issue by using a Rule
12(b)(6) standard (i.e., without allowing for consideration of documents extrinsic to Defendants'
Counterclaim), the Court does not see how that makes any sense.  After all, Defendants did not
even raise the defense until the filing of their answering brief regarding the Motion to Compel.
(D.I. 93 at 6-12); *see Maher v. Northland Grp., Inc.*, Civ. No. 17-2957 (KM) (JBC), 2019 WL
3245083, at *3 & n.2 (D.N.J. July 19, 2019); *Dr.'s Assocs., Inc. v. Distajo*, 944 F. Supp. 1010,
1014 (D. Conn. 1996).  The Reith Affidavit, referenced in Plaintiff's reply brief, lists some facts
that go to the issue of waiver (though, again, the document was not really crucial to the Court's
resolution of the issue).  In any event, the Court will consider that document as part of its review
of the waiver issue, and will resolve the issue using a summary judgment standard.  *Maher*, 2019
WL 3245083, at *3 & n.2.  Again there, the key disputes are legal in nature and do not turn on
contested issues of fact.  *See Dr.'s Assocs., Inc.*, 944 F. Supp. at 1014.

11

arbitration.  (D.I. 93 at 6-12)  Second, Defendants argue that the APA does not constitute a valid agreement to arbitrate between the parties.  (*Id.* at 12-18)  Third, Defendants assert that even if there is a valid arbitration agreement here, the parties' disputes relating to the Earnout Amount do not fall within the scope of any such agreement.  (*Id*. at 18-20)  The Court will address each issue in turn.

### A.    Waiver

Defendants first argue that Plaintiff waived its right to any arbitration, regardless of the import or scope of the APA's provisions, in light of Plaintiff's conduct in this litigation and its purported delay in seeking arbitration.  The issue of waiver is presumptively one that the Court, not an arbitrator, must decide.  *See Ehleiter v. Grapetree Shores, Inc*., 482 F.3d 207, 217-21 (3d Cir. 2007); *Maher v. Northland Grp., Inc*., Civ. No. 2957 (KM) (JBC), 2019 WL 3245083, at *3 (D.N.J. July 19, 2019).

Consistent with the strong preference for arbitration in federal courts, the idea that a litigant has waived his right to arbitration is "'not to be lightly inferred[]'"; waiver "'will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery.'"  *In re Pharmacy Ben. Managers Antitrust Litig*., 700 F.3d 109, 117 (3d Cir. 2012) (quoting *Nino*, 609 F.3d at 208) (certain internal quotation marks omitted).  A court may, however, refuse to enforce an arbitration agreement where a "'party has acted inconsistently with the right to arbitrate, and [a court] will not hesitate to hold that the right to arbitrate has been waived where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration.'"  *Id.* (quoting *Nino*, 609 F.3d at 208).  "'[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct[,]'" *id.* (quoting *Zimmer v. CooperNeff Advisors, Inc*., 523 F.3d

224, 231 (3d Cir. 2008)),[4] and in *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912 (3d Cir. 1992), the Third Circuit identified six factors that can help guide the prejudice inquiry:

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

*In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 117 (citations omitted). These "*Hoxworth* factors" are generally indicative of whether a party opposing arbitration would suffer prejudice attributable to the other party's delay in seeking arbitration, but the factors are non-exclusive, and not all of the factors need to be present to justify a finding of waiver. *Id.* at 117-18. Rather, the waiver determination must be based on the circumstances and context of the particular case. *Id.* at 118. The party opposing arbitration (here, Defendants) bears the burden of demonstrating sufficient prejudice. *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (3d Cir. 2011); *Dastra v. Kyriba Corp.*, CIVIL ACTION NO. 2:19-cv-04940-KSM, 2020 WL 4584001, at *1 (E.D. Pa. Aug. 10, 2020).

The parties address each *Hoxworth* factor in their briefing, and the Court will do so as well below.

With regard to the first *Hoxworth* factor— the "timeliness or lack thereof of the motion to arbitrate"—Plaintiff filed the Motion to Compel in July 2020, nearly six months after Defendants

---

[4]    The "concept of prejudice includes not only substantive prejudice to the legal position of the party claiming waiver, but also extends to prejudice resulting from the unnecessary delay and expense incurred by the [non-movant] as a result of the [movant's] belated invocation of [its] right to arbitrate." *Nino*, 609 F.3d at 209 (internal quotation marks and citation omitted).

filed their January 2020 Counterclaim (in which Defendants first raised the dispute over the Earnout Amount). (D.I. 93 at 2, 8) At any point during that six-month period, Plaintiff could have filed a motion to compel arbitration (and by doing so, it could have begun the legal process necessary in order to stay the case and require Defendants to arbitrate). Yet Plaintiff did not do so. And in the six-month interval, the docket indicates that parties engaged in a fair amount of discovery-related work. (*See also* D.I. 93 at 2; *see also infra* at 18) While the Third Circuit and district courts in the Circuit do not appear to consider delays of only a few months to aid the case for a finding of waiver, six-month delays (or the like) have been found to support such a finding. *See, e.g.*, *Am. Neighborhood Mortg. Acceptance Co. LLC v. Lund*, 1:19-36666 (NLH)(JS), 2020 WL 3604231, at *7 (D.N.J. July 2, 2020) (finding a five-month delay to support a determination of waiver); *PDC Machs. Inc. v. Nel Hydrogen A/S*, CIVIL ACTION No. 17-5399, 2018 WL 4006378, at *8 (E.D. Pa. Aug. 22, 2018) (same, as to a seven-month delay); *see also In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 118 (summarizing Third Circuit caselaw in this area, and noting that cases in which the Third Circuit had not found waiver involved delays of up to two months, while cases where waiver was found involved delays of 10 months or longer). This factor favors a finding of waiver.[5]

---

[5] Plaintiff correctly notes in response that, prior to the filing of its Motion to Compel, it had at least informed Defendants that it believed that the IAF, not a court, should resolve the parties' Earnout Amount dispute. For example, Plaintiff had made such assertions in its proposed Amended Complaint filed in April 2020, and in the Nineteenth Defense in its May 2020 Answer and Defenses to Defendants' Counterclaim. (D.I. 70 at ¶¶ 107-14; D.I. 82 at 9) So in that sense, at some point during the nearly six-month period at issue, at least part of Plaintiff's current position (i.e, that the IAF should resolve the dispute) would not have been a surprise to Defendants. However, what would have been a surprise to Defendants (until the Motion to Compel's filing) was Plaintiff's position that Sections 3.1 and 3.2(e) of the APA required *arbitration* of that dispute and that the instant case *should be stayed pursuant to the FAA*. Indeed, in its reply brief, Plaintiff acknowledges that its "analysis" as to whether this case should proceed to arbitration "changed" only after Judge Andrews issued his May 29, 2020 opinion in *Sapp v. Indus. Action Servs., LLC*, Civil Action No. 19-912-RGA, 2020 WL 2813176 (D. Del.

With regard to the second *Hoxworth* factor—the "extent to which the party seeking arbitration has contested the merits of the opposing party's claims"—the factor "can be styled as asking whether arbitration is a second bite at the apple for the proponent of it." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Jordan*, No. 17-cv-49 (RGA), No. 17-cv-199 (RGA), 2017 WL 1536396, at *6 (D. Del. Apr. 27, 2017). "Framed in terms of prejudice to the party resisting arbitration [here, Defendants], as that is the focus of the waiver analysis, the question becomes whether that party resisting arbitration has had its legal position placed in jeopardy twice: once in litigation and again in arbitration." *Id.* Here, Plaintiff did act for a time as if it felt that the Court (not an arbitrator) had jurisdiction over the Earnout Amount dispute. But this case never got close to a stage where Defendants had "*their legal position* [] considered by" this Court. *Merrill Lynch*, 2017 WL 1536396, at *6 (emphasis in original); *cf. Purshe Kaplan Sterling Invs., Inc. v. Neff*, No. 5:20-cv-00878, 2020 WL 5406040, at *5 (E.D. Pa. Sep. 9, 2020).[6] And this certainly is not a case where Plaintiff advocated for arbitration only after getting some indication from the Court that its position on the Earnout Amount issue was unlikely to prevail. For these reasons, this factor disfavors a finding of waiver.

The third *Hoxworth* factor is "whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings." So far as the Court can tell, up until the July 10, 2020 filing of the Motion to Compel, Plaintiff never

---

May 29, 2020). (D.I. 98 at 4 n.6) Up until that point, Defendants would have understandably thought that Plaintiff believed that this case would proceed forward, and that an "arbitration" (or a stay in favor thereof) was not in the picture. Defendants thus would have understandably continued to pursue and respond to discovery-related matters in the interval.

[6]    The merits of the Earnout Amount dispute were not at issue in the parties' prior (resource-intensive) litigation regarding the motion for preliminary injunction and the motion to dismiss.

told Defendants that:  (1) the FAA applies to the Earnout Amount dispute; (2) the matter should be submitted to arbitration; or (3) the instant case should be stayed pursuant to the FAA.  (D.I. 93 at 9; D.I. 98 at 5-6)  While Plaintiff did assert in early 2020 that the Earnout Amount dispute should be resolved by the IAF, (Reith Aff. at ¶¶ 4-5), conveying that position is different from filing the Motion to Compel.  *Cf. Howard v. LVNV Funding, LLC*, Case No. 3:19-cv-93, 2020 WL 7130562, at *10 (W.D. Pa. Dec. 4, 2020) (noting that the movant's inclusion of "boilerplate language about arbitration" as an affirmative defense in its answer was not sufficient to inform certain plaintiffs of its intent to pursue arbitration, as the reference "[did] not affirmatively state that there is an arbitration agreement, let alone that there was an arbitration agreement applicable to th[ose plaintiffs]").  It would not have tipped Defendants off to the prospect that they might soon be required to postpone discovery and litigation in this Court.  *See Gray Holdco*, 654 F.3d at 457 (noting that "notice of arbitration could change a party's approach to discovery as well as its litigation strategy").  Thus, factor three redounds in favor of a finding of waiver.

With regard to the fourth *Hoxworth* factor—"the extent to which a party seeking arbitration engaged in non-merits motion practice"—since the filing of Defendants' January 2020 Counterclaim, the parties have really only submitted one disputed "motion" to the Court. This was Plaintiff's Motion to Amend, filed on April 2, 2020.  (D.I. 70)[7]  So the amount of non-merits motion practice in this roughly six-month period was very small.  And the time and effort

---

[7]    The Court did hold a hearing on January 22, 2020, two days after the filing of the January 2020 Counterclaim, to address disputes about the entry of a proposed Scheduling Order. (*See* D.I. 40)  But the parties had already filed the paperwork as to those disputes prior to the filing of the January 2020 Counterclaim.  (D.I. 38; D.I. 39)  So the Court does not consider that "motion" in this calculus.  Additionally, Plaintiff filed one (non-contested) motion for admission *pro hac vice* in the relevant time period, (D.I. 83), but that motion does not move the needle as to this factor, *see In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 119.

expended on the Motion to Amend could not have significantly prejudiced Defendants. This factor weighs against a finding of waiver.[8]

With regard to the fifth *Hoxworth* factor—"the party's acquiescence to the court's pretrial orders"—there were a number of instances between the filing of the January 2020 Counterclaim and the filing of the Motion to Compel where Plaintiff, in some way, "assent[ed] to [the Court's] orders" and thus "acted inconsistently with an intent to arbitrate." *Gray Holdco*, 654 F.3d at 460. Plaintiff attended a Case Management Conference that resulted in the entry of a Scheduling Order, (D.I. 40; D.I. 44), it responded to an order requiring participation in a teleconference with a Magistrate Judge regarding alternative dispute resolution, (D.I. 45; D.I. 48), it sought and obtained from the Court stipulations to amend the Scheduling Order, (D.I. 57; D.I. 58), it sought an order to permit it to amend its Complaint, (D.I. 59; D.I. 70; D.I. 72), and it sought and obtained entry of a Protective Order, (D.I. 80; D.I. 81). None of these sought-after orders were monumental in terms of their impact on the case's disposition. But their number indicates a degree of acquiescence to this Court's (not an arbitrator's) jurisdiction over the Earnout Amount dispute. And so this factor should weigh at least slightly in favor of a finding of waiver. *In re Pharmacy Ben. Managers Antitrust Litig.*, 700 F.3d at 119-20 (concluding that the factor weighed only "somewhat in favor" of waiver, where prior to the movant's invocation of arbitration, the district court had entered orders setting hearings on a motion to dismiss and for

---

[8]    At one point in their answering brief, Defendants seem to suggest that some of the effort expended on Plaintiff's motion for preliminary injunction or Defendants' motion to dismiss should count against Plaintiff in the assessment of the *Hoxworth* factors, even though Defendants' January 2020 Counterclaim had not been filed at that time. This is because, according to Defendants, Plaintiff "should have known [even then, that the Counterclaim] was coming[.]" (D.I. 93 at 12) The Court has no record to support that statement and will not consider it here.

reconsideration of that motion, where the movant participated in those hearings, and where the district court had also entered orders setting dates for the pre-trial conference and instructed the parties to submit a discovery plan and a proposed case management order).

With regard to the sixth *Hoxworth* factor—"the extent to which the parties have engaged in discovery"—this factor can demonstrate prejudice to the non-moving party in two ways: (1) by allowing the moving party access to tools it would not necessarily have available in arbitration; and (2) by requiring the non-movant to spend significant time, money and effort that it otherwise might not have spent. *See Merrill Lynch*, 2017 WL 1536396, at *6-7 (citing cases). Here, the parties surely engaged in some significant discovery efforts during the roughly six-month period at issue. That is: (1) they served initial disclosures, amended initial disclosures and default discovery disclosures, (D.I. 49-50; D.I. 52-53; D.I. 55; D.I. 60; D.I. 63; D.I. 93 at 10); (2) Defendants served 115 document requests in four sets, propounded interrogatories, served two subpoenas and produced documents, (D.I. 51; D.I. 56; D.I. 61-62; D.I. 68; D.I. 84; D.I. 93 at 11); (3) Plaintiff served 112 document requests in two sets, propounded interrogatories, served 25 subpoenas for depositions and documents, and produced over 5,000 pages of documents, (D.I. 64; D.I. 66; D.I. 71; D.I. 74; D.I. 76; D.I. 85; D.I. 93 at 11); and (4) they conferred on discovery-related disputes, (D.I. 93 at 11). That said, the parties have not taken any depositions. And little discovery has occurred on the Earnout Amount dispute that would be the subject of any arbitration (in part because the parties and third parties who were the subject of those discovery requests lodged objections to producing such discovery). (D.I. 98 at 7; Reith Aff. at ¶¶ 6-7)

In assessing this sixth factor, the Court can surely understand how the above-referenced discovery required Defendants to expend time, money and effort.[9]  And had Defendants been aware that they were facing a motion to compel arbitration as of January 2020, they might have taken a different tack (such as by deciding to postpone some or all of the discovery until a decision on the Motion to Compel).  That said, Defendants' position here is weaker than it might otherwise be, because in their answering brief, they never really say:  (1) what they would have done differently had the Motion to Compel been filed in January 2020; or (2) exactly how they were prejudiced by having to engage in this discovery in the interval.  Those issues seem especially relevant, in light of the fact that nearly all of the discovery at issue appears to have related to non-Earnout-Amount-dispute portions of this case, which would eventually have to be litigated in this Court.  Taking all of this into account, the Court concludes that this factor weighs slightly in favor of waiver.  *Cf. Nepomuceno v. Midland Credit Mgmt., Inc.*, Civil Action No. 14-05719-SDW-SCM, 2017 WL 2267261, at *6 (D.N.J. May 24, 2017) ("The parties have participated in significant discovery activity throughout the course of this case.  The parties submitted interrogatories and responses to one another, produced documents, and participated in a deposition.  The parties also made several submissions to this Court regarding discovery disputes. . . .  Therefore, this factor also weighs in favor of waiver."); *Hendricks v. Feldman Law Firm LLP*, Civil Action No. 14-826-RGA, 2015 WL 5671741, at *5 (D. Del. Sep. 25, 2015) ("The sixth factor does not favor waiver because, although the parties have engaged in some discovery since [the Court] denied the [] motion for preliminary injunction, the discovery has

---

[9]        In contrast, the Court cannot see (and Defendants do not argue) how the discovery at issue permitted Plaintiff to have access to tools it would not otherwise have had in an arbitration.  (D.I. 98 at 8)  Thus, it will not further address that consideration here.

been limited and conducted in the context of consolidated cases to determine arbitration issues rather than the merits of the parties' dispute.").

In sum, the waiver factors present a close call. Two squarely favor Plaintiff's position, two squarely favor Defendants' position, and two only slightly favor Defendants' position. On the one hand, Plaintiff surely could have filed its Motion to Compel earlier. By failing to do so, and by engaging in litigation in the meantime, it might well have lulled Defendants into thinking that this case was not potentially arbitrable for some number of months. But on the other hand, the length of Plaintiff's delay was not staggering. Few Court-related events occurred in the interval. And while Plaintiff's actions might have caused Defendants some prejudice, Defendants could have done a stronger job of explaining exactly what that prejudice looks like. In the end, the Court is guided by the Third Circuit's instruction that "waiver is not to be lightly inferred." *Nino*, 609 F.3d at 214 (internal quotation marks and citation omitted). In light of that, and because it was Defendants' burden to make out a clear case of waiver (which they have failed to do), the Court concludes that Plaintiff did not waive its right to arbitration.

### B.    Is There a Valid Agreement to Arbitrate?

Next, the Court turns to the parties' dispute about whether the APA amounts to a valid arbitration agreement. As was noted earlier, in resolving this step one dispute, the Court must apply "ordinary state-law principles that govern the formation of contracts[,]" so long as those principles "govern contracts generally[.]" *Century Indem. Co.*, 584 F.3d at 524 (internal quotation marks and citation omitted). Here, there is no dispute that Delaware contract law applies. (D.I. 87 at 8; APA at ¶ 10.3)

Delaware law states that it will "not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate." *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d

20

393, 396 (Del. 2010); *see also DMS Props.-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 391 (Del. 2000) ("A party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement."); *Medicis Pharm. Corp. v. Anacor Pharms., Inc.*, C.A. No. 8095-VCP, 2013 WL 4509652, at *3 & n.15 (Del. Ch. Aug. 12, 2013). A court "must review a contract for ambiguity through the lens of what a reasonable person in the position of the parties would have thought the contract meant." *Kuhn Const., Inc.*, 990 A.2d at 396 (internal quotation marks and citation omitted). "Ambiguity exists when the provisions in controversy are reasonably or fairly susceptible to different interpretations." *Id*. (internal quotation marks and citation omitted).[10]

Plaintiff's position is that "the final and binding procedure set forth in Section 3.2(e) of the APA[,]" read along with Section 3.1, "constitutes a valid agreement to 'arbitrate' under the FAA." (D.I. 87 at 7)  Defendants disagree, for four different reasons.  (D.I. 93 at 12-18)  Below, the Court need only address one of those reasons in order to conclude that there is not a valid arbitration agreement between the parties.

In the Court's view, the winning argument for Defendants here is that Section 3.1 and Section 3.2(e) ("the IAF provisions") call for "an expert determination, not arbitration."  (D.I. 93 at 16-18 (emphasis omitted))  In its decision in *Sapp v. Industrial Action Servs., LLC*, Civil Action No. 19-912-RGA, 2020 WL 1450563 (D. Del. Mar. 25, 2020), *overruled by* 2020 WL 2813176 (D. Del. May 29, 2020), the Court set out the Delaware state law regarding this issue. *See Sapp*, 2020 WL 1450563, at *3-5.  In short, Delaware contract law recognizes a distinction

---

[10]    So far as the Court is aware, the record does not indicate which party drafted the APA.  And the APA itself states that it "shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted."  (APA at ¶ 10.9)  So the Court will not consider this factor in assessing the step one issue.  *See Kuhn Const., Inc.*, 990 A.2d at 397.

between an arbitration and an expert determination; it explains that an expert determination is "not an arbitration unless the parties specifically designate that expert as an arbitrator for that purpose, thereby invoking the body of law governing arbitrators." *Id.* at *3 (quoting *Penton Bus. Media Holdings, LLC v. Informa PLC*, C.A. No. 2017-0847-JTL, 2018 WL 3343495, at *8-10 (Del. Ch. July 9, 2018)). In the Court's decision in *Sapp*, and in Judge Andrews' later ruling that sustained objections to that decision, the Court and Judge Andrews addressed various factors that, pursuant to Delaware law, can be useful in assessing whether contracting parties have designated an accounting firm either to serve as an arbitrator or to simply make an expert determination. Those factors are particularly helpful in a case like this, where the APA neither specifically refers to the IAF as an "arbitrator," nor states that the IAF is an "expert, not arbitrator." *Id.* at *4.

In assessing this issue, certain factors support Plaintiff's position—i.e., that the parties intended that the IAF's role would be that of an arbitrator.

For example, as was noted above, the APA does not contain language stating that the IAF is to act as an "expert not arbitrator." Delaware case law has explained that for years, the Committee on International Commercial Disputes of the New York City Bar Association has recommended that if parties wished to make clear that they are invoking the work of an expert (not an arbitrator), then they should use "expert not arbitrator" language. *Penton*, 2018 WL 3343495, at *13; *see also Sapp*, 2020 WL 2813176, at *3. The parties obviously did not do that here.

Additionally, the APA states that "[e]ach of the [E3 Rivers] and [Plaintiff] agrees that it shall be bound by the [IAF]'s determination[.]"  (APA at ¶ 3.2(e))[11]  Delaware courts have referred to contractual language stating that an accounting firm's determination is "final and binding on all parties" as "arbitration-style language[.]"  *Penton*, 2018 WL 3343495, at *11 (internal quotation marks omitted); *see also Sapp*, 2020 WL 2813176, at *3; *but cf. Kuhn Const., Inc.*, 990 A.2d at 394-95, 397 (overturning the Court of Chancery's grant of a motion to compel arbitration, even where the referee at issue was permitted to make "final and binding" decisions on certain matters, in light of other evidence suggesting that an arbitration agreement had not been reached).

On the other hand, there are a number of factors relating to the IAF provisions that suggest that the IAF's role is that of an expert, not an arbitrator.

For example, the parties easily could have, but did not, use the word "arbitration," "arbitrate" or "arbitral" in the APA.  *See Agiliance, Inc. v. Resolver SOAR, LLC*, Civil Action No. 2018-0389-TMR, 2019 WL 343668, at *3 (Del. Ch. Jan. 25, 2019) (concluding that parties to an agreement intended to arbitrate certain disputes, where in a key paragraph of the agreement they "used the word 'arbitration' twice, 'arbitrate' once, and 'arbitral' once"); *see also Kuhn Const., Inc.*, 990 A.2d at 397 ("The referee clause does not contain the word 'arbitrate,'" and

---

[11]    Defendants argue that this "shall be bound" language should be disregarded because it appears in Section 3.2(e), not Section 3.1 (which specifically addresses the Earnout Amount).  (D.I. 93 at 16-17)  Section 3.1 states that disagreements regarding the calculation of the Earnout Amount "shall be resolved by the [IAF] in the same manner and pursuant to the same procedures as are set forth in Section 3.2(e)[.]"  (APA at ¶ 3.1)  Is the "shall be bound" requirement part of the "manner" in which the IAF is to proceed per Section 3.2(e), or is it one of the "procedures" the IAF is supposed to use pursuant to that Section?  Like a lot of the content of the IAF provisions, the answer to that question is murky.  For purposes of this Memorandum Order, the Court will assume *arguendo* that the parties agreed to be bound to the IAF's decision regarding an Earnout Amount dispute.

defendant's "failure to include the express term (having struck the arbitration clause common in the industry), coupled with other ambiguities, could lead [plaintiff] reasonably to conclude that [defendant] had elected to forego arbitration of claims").  Nor, for example, did they invoke the applicability of the rules of the American Arbitration Association.  *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79-80 (Del. 2006).  If the parties meant to clearly and unambiguously manifest their intent to arbitrate certain disputes, why did they not use the one word (or a version thereof) that would surely signal that intent?

Additionally, in the IAF provisions, the APA limits the scope of the IAF's authority to resolve disputes.  Delaware law indicates that the "type and scope of authority" granted to a decision maker can be an important clue as to whether the parties agreed to arbitration.  *Penton*, 2018 WL 3343495, at *15.  If the "authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation[,]" this suggests an "expert determination" is at play.  *Id.*; *see also Ray Beyond Corp. v. Trimaran Fund Mgmt.*, C.A. No. 2018-0497-KSJM, 2019 WL 366614, at *6 (Del. Ch. Jan. 29, 2019).  But if the grant of authority to the decision maker is "analogous to the powers of a judge in a judicial proceeding" such that the parties "expect the arbitrator to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief[,]" that suggests a "grant of authority to an arbitrator[.]"  *Penton*, 2018 WL 3343495, at *15; *see also Ray Beyond Corp.*, 2019 WL 366614, at *6.  Here, the authority granted to the IAF (i.e., resolving disputes relating to the "calculation of the Earnout Amount" and as to the calculation of "Final Closing Amounts") is of a fairly cabined scope, and relates to particular factual disputes that are within the special expertise of the decision maker.  *See Ray Beyond Corp.*, 2019 WL 366614, at *8 (concluding that arbitration provisions "typically broadly

24

encompass the entire legal and factual dispute between the parties" and that where an agreement invoked an accountant's role in "limited instances . . . within an accountant's field of expertise[,]" that suggests that the contract called for an expert determination); *see also Kuhn Const., Inc.*, 990 A.2d at 397 (noting that because the contract provided a role for the Delaware courts to resolve certain disputes, this indicated that the referee referenced therein did not have the authority to address all contractual disputes, and this in turn supported plaintiff's view that the referee was not an arbitrator); *Stone v. Nationstar Mortg. LLC*, C.A. No. 2019-0878-KSJM, 2020 WL 4037337, at *8 (Del. Ch. July 6, 2020) (concluding that contractual provisions were not arbitration provisions, where they did not "broadly encompass all legal disputes, or speak to issues typically resolved by legal professionals").

Moreover, so far as the Court can tell, the APA does not include any reference to procedural rules that the IAF must utilize. The lack of reference to such rules, which are "typically" included in arbitration agreements, suggests that the agreement was simply allowing for an expert determination. *Ray Beyond Corp.*, 2019 WL 366614, at *7; *see also Stone*, 2020 WL 4037337, at *8 (concluding that contractual provisions were not arbitration provisions where "they do not include procedural rules mimicking the judicial process").[12]

_____

[12] Another factor that can be helpful to an "arbitration vs. expert determination" decision is how long the accounting firm is given to conduct its review of the issues at play. The more temporally limited the firm's role is, the more likely the parties did not agree to an arbitration. *See Ray Beyond*, 2019 WL 366614, at *8 ("The parties' inclusion of a tight 20-day deadline [for resolution of disputes by the accountant] reinforces the conclusion that the parties did not intend to vest the [accountant] with authority over wide-ranging matters."). Here, Section 3.2(e) states that if the parties are unable to resolve their differences about the matter in dispute within a certain time frame, then they "shall direct an [IAF] to be mutually agreed upon by both parties . . . to resolve the remaining disputed items . . . *within fifteen (15) days* after the date of Buyer's rejection of the Company's Proposed Calculations by conducting its own review of the Final Net Working Capital and thereafter selecting [an amount the IAF determines is correct]." (APA at § 3.2(e) (emphasis added)) Defendants reasonably argue that this "15-day" provision could be read in two ways: either that it requires the parties to *direct* the IAF to

25

In the end, it is decidedly ambiguous as to whether the parties agreed to arbitration or an expert determination of the Earnout Amount dispute.  If anything, the above-referenced factors make a stronger case for the latter, not the former.  That is, the language in the IAF provisions seem to suggest a narrow, specialized role for the IAF—i.e., one akin to expert, whose role is to resolve disputes in a discrete subject matter area.  But at a minimum, this is surely a situation where the contract "unclearly or ambiguously reflects the intention to arbitrate."  *Kuhn Const., Inc.*, 990 A.2d at 396.  As such, the Court concludes that, pursuant to Delaware contract law, the parties did not sufficiently demonstrate that they entered into an arbitration agreement.  Therefore, it will deny the Motion to Compel.

###    C.    Does the Parties' Disagreement Fall Within the Scope of the IAF Provisions?

Lastly, the parties disagreed over whether, to the extent they did enter into a valid arbitration agreement, the merits-based disputes in question fell within the scope of that agreement.  *Flintkote*, 769 F.3d at 220.  Above, the Court has concluded that the parties did not clearly agree to arbitration of Earnout Amount disputes.  Thus, it need not address this last disputed issue at this time.

## IV.    CONCLUSION

---

resolve the remaining disputed items within 15 days after the date in question (i.e., to submit the dispute to the IAF in that time period), or that it requires the IAF to have *actually resolved* those disputes within 15 days after the date in question.  (D.I. 93 at 15-16)  From a statement in its opening brief, it appears that Plaintiff believes that the latter interpretation is correct.  (D.I. 87 at 10)

Again, the APA is just not a model of clarity here.  In the Court's view, Section 3.2(e) is ambiguous as to the meaning of this 15-day deadline.  Because this language is not all that clear, the Court does not think it should have a great impact in the "arbitration vs. expert determination" calculus.

For the reasons set out above, the Court DENIES Defendants' Motion to Strike and DENIES Plaintiff's Motion to Compel.[13]

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **February 2, 2021** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: January 28, 2021

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[13] Defendants' request for oral argument on the Motion to Strike, (D.I. 108), is DENIED.